T.C. Memo. 2001-64


UNITED STATES TAX COURT


EPIC ASSOCIATES 84-III, WILLIAM C. GRIFFITH, JR., AND
DOTTIE M. GRIFFITH, TAX MATTERS PARTNERS, Petitioners
v. COMMISSIONER OF INTERNAL REVENUE, Respondent

EPIC ASSOCIATES 83-XII, WILLIAM C. GRIFFITH, JR., AND
DOTTIE M. GRIFFITH, TAX MATTERS PARTNERS, Petitioners
v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 3877-92, 3963-92.    Filed March 19, 2001.


William C. Griffith, Jr., pro se.

Carolyn Lee Harber, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, Judge:  Respondent issued notices of final
partnership administrative adjustment (notices of FPAA)
in which respondent determined the following adjustments

with respect to the partnership items reported by Epic

Associates 83-XII (referred to herein as EA 83-XII):

|  | 1983 | 1984 | 1985 |
|---|---|---|---|
| Disallow interest and point amortization deductions | $483,029 | $556,564 | $576,848 |
| Disallow depreciation deductions | 173,119 | 173,119 | 173,119 |
| Disallow claimed net investment loss | (341,010) | -0- | -0- |
| Disallow qualified investment income | -0- | 303,571 | 330,529 |
| Disallow qualified investment expenses | -0- | 908,960 | 909,831 |
| Disallow excess expenses from net lease property | 10,859 | -0- | -0- |
| Disallow investment interest income | 66,366 | -0- | -0- |
| Disallow net investment income | 29,306 | -0- | -0- |
| Disallow investment income | -0- | 90 | 1,262 |

Respondent issued notices of FPAA in which respondent

determined the following adjustments with respect to the

partnership items reported by Epic Associates 84-III

(referred to herein as EA 84-III):

|  | 1983 | 1984 | 1985 |
|---|---|---|---|
| Disallow interest and point amortization deductions | $121,535 | $536,280 | $559,662 |
| Disallow depreciation deductions | 56,910 | 170,742 | 170,742 |
| Disallow deductions in excess of income | -0- | -0- | 44,219 |
| Disallow claimed net investment loss | (141,142) | -0- | -0- |
| Disallow qualified investment income | -0- | 217,619 | 229,131 |
| Disallow qualified investment expenses | -0- | 872,376 | 997,436 |
| Disallow net investment income | 6,097 | -0- | -0- |
| Disallow investment income | -0- | -0- | 494 |

Among the adjustments summarized above, respondent disallowed all of the interest and depreciation claimed as deductions by each partnership. The principal issues in these cases are whether certain nonrecourse promissory notes issued by each partnership to purchase real estate constitute bona fide indebtedness and whether the activity of each partnership is an "activity not engaged in for profit", as that phrase is defined by section 183(c). Unless stated otherwise, all section references in this opinion are to the Internal Revenue Code as in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. EA 83-XII and EA 84-III are limited partnerships. At the time the instant petitions were filed on their behalf, each partnership was doing business in the State of Virginia, and the tax matters partners of each partnership, William C. Griffith, Jr., and Dottie M. Griffith, resided in Atlanta, Georgia. Both limited partnerships reported

income and expenses on a calendar year basis and used the accrual method of accounting.

EA 83-XII

EA 83-XII was formed on December 3, 1982, pursuant to the Uniform Limited Partnership Act of the Commonwealth of Virginia for a 10-year term ending on December 3, 1992. The Amended and Restated Certificate and Agreement of Limited Partnership dated June 1, 1983 (referred to herein as the 83 partnership agreement) describes the business of EA 83-XII in the following terms:

Business of the Partnership

The business of the Partnership shall be to acquire, directly or indirectly, and finance, fee interests in certain improved residential real properties and to operate, manage, lease or otherwise deal with such properties with the objective of distributing income generated thereby among the Partners as provided for herein; and to hold such properties for invest-ment with the objective of capital appreciation therein and to engage in and perform all acts and activities required in connection with or incident to the foregoing.

The partnership's sole general partner was Equity Programs Investment Corp. (EPIC), a corporation that was originally incorporated in Virginia in 1974 and was reincorporated in Maryland in 1983. EPIC's business involved the purchase, lease, and sale of residential

houses and condominiums. We discuss EPIC at greater length below.

The 83 partnership agreement provides that EPIC's "interest shall be deemed to be a one-percent (1%) share in the Partnership's capital contributions for which it shall contribute" $10,580.81. In addition, the 83 partnership agreement authorizes two classes of limited partnership interests: 1 class A unit and 25 class B units. The class A unit was sold to four investors for an aggregate sum of $90,000. The purchasers of the class A unit made cash payments totaling $50,000 and executed recourse promissory notes totaling $40,000 that were payable to the partnership on July 1, 1983. These investors were admitted to the partnership on April 16, 1983.

EA 83-XII also sold 25 class B units of limited partnership interest for $38,300 per unit or a total of $957,500. Approximately $3,300 of the amount paid for each class B unit was paid in cash and the balance of $35,000 was paid in the form of a recourse promissory note payable to EX 83-XII in 14 quarterly installments of $2,500 each with the last payment due on April 1, 1987.

Before selling the class B units in EA 83-XII, EPIC circulated a confidential private placement offering memorandum dated June 1, 1983 (referred to herein as the

83 offering memorandum).  The 83 offering memorandum states
that persons who purchased class B units would be admitted
to EA 83-XII as limited partners commencing September 1,
1983.

The 83 offering memorandum states that the limited
partners' contributions would be used primarily to fund
operating deficits of the partnership.  The 83 offering
memorandum includes the following summary of EA 83-XII's
anticipated sources and uses of the proceeds of the
offering:

| Sources | Amount | Percent |
|---|---|---|
| Proceeds from sale of class A unit | $90,000 | 1.66 |
| Proceeds from sale of class B units | 957,500 | 17.68 |
| Capital contribution of general partner | 10,581 | 0.19 |
| First mortgage loans | 3,706,150 | 68.38 |
| Builder rebate [referred to herein as rental deficit contribution] | 655,319 | 12.09 |
| | 5,419,550 | 100.00 |

| Uses | | |
|---|---|---|
| Purchase price of homes | [1]3,901,550 | 71.98 |
| Sales commissions to broker/dealers [8% of the price paid for each unit] | 83,800 | 1.55 |
| Escrows and prepaid insurance | 20,370 | 0.38 |
| First mortgage loan origination fees | 148,246 | 2.73 |
| Organization fee to general partner [4% of the price paid for each unit] | 41,900 | 0.77 |
| Estimated cash-flow deficits through April 15, 1983 | 58,350 | 1.08 |
| Available for cash-flow deficits | 1,165,334 | 21.51 |
| | 5,419,550 | 100.00 |

Note:  Footnotes omitted.

[1]This amount is $255 more than the actual purchase price, $3,901,295.

As set forth above, it was anticipated that $58,350 of the
proceeds of the offering would be offset by cash-flow

deficits through April 15, 1983, and $1,165,334 of the offering proceeds would be available for cash-flow deficits after that date.  The projected annual income and operating costs of EA 83-XII as set forth in the 83 offering memorandum show an annual operating deficit of $345,344 calculated as follows:

| Projected Annual Income | Amount | Percentage of Total Income |
|---|---|---|
| Builder lease | $65,784 | 20.30 |
| Rental income (less 20% vacancy & expense factor) | 258,240 | 79.70 |
| Total projected income | 324,024 | 100.00 |

| Annual Operating Expenditures | | |
|---|---|---|
| Aggregate first mortgage principal & interest | $546,102 | 168.54 |
| Real estate taxes | 49,213 | 15.19 |
| Insurance & homeowner's dues | 21,500 | 6.64 |
| Audit expenses | 4,877 | 1.51 |
| Property administration fee | 30,600 | 9.44 |
| Allowance for maintenance & repairs | 17,076 | 5.27 |
| Total projected cash expenditures | 669,368 | 206.59 |
| Projected operating deficit | 345,344 | 106.59 |

The 83 offering memorandum also includes a cash-flow analysis for EA 83-XII from inception to June 30, 1987, as set forth in appendix A to this opinion.

In the 83 offering memorandum, it was contemplated that EPIC would finance the partnership's operating deficits by advancing funds to the partnership.  The 83 partnership agreement provides that EA 83-XII would pay interest on all

unsecured advances of funds by the general partner at the rate of 15 percent per annum. The 83 partnership agreement also permits the partnership to advance to the general partner any funds that were not distributed to the limited partners, and the agreement provides that the general partner would pay interest to EA 83-XII on such advances at the rate of 12 percent per annum.

The 83 partnership agreement provides that cash from operations is to be distributed in the following order of priority: (i) To EPIC to repay any unsecured advances made by EPIC to the partnership together with interest; (ii) to the partners in the ratio that the cumulative cash capital contributions of each partner bear to the cumulative cash capital contributions of the partners until such amounts equal the partners' cumulative cash capital contributions; (iii) 25 percent to EPIC and 75 percent to the limited partners holding the class A and class B units.

The 83 partnership agreement further provides that cash from sales and from financings is to be distributed in the following order of priority: (i) To repay partnership debt secured by the property sold or refinanced and to pay the expenses of selling each property; (ii) to repay any unsecured advances made by EPIC to the partnership together with interest; (iii) to pay EPIC a disposition

fee equal to 2.5 percent of the price for which any partnership properties are sold; (iv) to the partners in the ratio that each partner's total cash capital contributions bear to the cumulative cash capital contributions of all partners until such amounts equal the partners' cumulative cash capital contributions; and (v) 25 percent of any remaining amount to EPIC and 75 percent to the limited partners holding class A and class B units.

The partnership agreement specifies that EA 83-XII shall pay the following compensation to EPIC:

Compensations of the General Partner

\*    \*    \*    \*    \*    \*    \*

(a)  At the time of subscription, a Partnership Organization Fee, as detailed in the Confidential Private Offering Memorandum for the Partnership, being 4% of Limited Partners capital contribution upon admission to the Partnership or a maximum total payment of $41,900 for non-recurring services which may be incurred before or after formation of the Partnership, to include furnishing legal, financial, accounting and operational assistance review of rental schedules and expense forecasts and other services which do not give rise to the acquisition of specific properties or the obtaining of financing therefor;

(b)  During each full or partial month of the Partnership, the General Partner shall be paid an administration fee equal to Fifty and 00/100 ($50.00) for each Partnership property;

(c)  Such loan origination fees or service fees at commercially prevailing market rates that may derive from originating or servicing of any security interests, including mortgages and deeds of trust, placed upon Partnership property;

(d)  Reimbursement of all carrying costs of the Partnership properties including, but not by way of limitation, interest on mortgage indebtedness encumbering the properties, incurred prior to the admission of the Limited Partners to the Partnership;

(e)  Two-and-one-half percent (2 1/2%) disposition fee on all resale of Partnership properties except in connection with an exchange with a builder for like kind property;

(f)  For all unsecured advances of funds to the Partnership, the General Partner shall be entitled to interest on all such funds advanced at the rate of 15% per annum; and

(g)  Any difference between costs incurred by the General Partner on pooled insurance policies for all partnerships sponsored by the General Partner and premiums charged to the Partnership for all risk insurance coverage (including fire and hazard) for each Partnership property plus the premium attributable to decreasing the deductible amount to $100 shall be the property of the General Partner.

## Purchase of Model Houses in Carrollton, Texas, From Raldon Corp.

EPIC executed a contract entitled Epic Model Home Purchase and Leaseback Agreement (purchase and leaseback agreement), dated December 9, 1982, under which it agreed to purchase five houses located in Carrollton, Texas, from Raldon Corp. (Raldon) for $485,995 and to lease the houses

back to Raldon for use as model houses for an initial term of 18 months. For each of the five houses, there is a schedule attached to the agreement that lists the address; the base price; the "optional extras" included with the house, such as carpeting, wallpaper, and mirrored walls; the "marketing extras", such as drapes, sprinkler systems, built-ins, and landscaping; the price for each of the extras; and the "purchase price" of the house. The purchase price for each of the five houses was $8,000 to $10,000 more than the base price because of the "extras".

As one of the conditions of closing under the purchase and leaseback agreement, Raldon agreed to pay EPIC 6 percent of the purchase price of the properties. The agreement provides as follows:

> On the Closing Date, Seller [Raldon] shall pay to Equity Programs Investment Corporation a sum equal to six percent (6%) of the Purchase Price of the Properties, and the execution of this Agreement by Seller shall constitute an irrevocable assignment to Equity Programs Investment Corporation from the sale proceeds of a sum sufficient to make the payment due under this Subparagraph 5.7.

We refer to the amount payable under the above provision as the builder fee.

Another condition under the purchase and leaseback agreement required Raldon to pay at closing the first full month's rent for each of the properties plus the pro rata portion of the monthly rent for the month of closing. The agreement provides as follows:

> Seller, as tenant, shall have * * * (ii) paid to Purchaser, as Landlord, the first full month's Adjusted Monthly Rental for each of the Properties plus the pro rata portion of the Adjusted Monthly Rental for the month during which the Closing Date occurs.

We refer to this amount as the rent advance.

Finally, as a condition to closing, the purchase and leaseback agreement required Raldon to supply to the purchaser an appraisal that showed the value of the property and improvements equal to or greater than the purchase price. The agreement provides as follows:

> An appraisal of the Properties and improvements prepared by a FNMA/FHLMC qualified appraiser acceptable to Purchaser on a standard FNMA/FHLMC form which shall reflect a value of the Property and improvements equal to or greater than the Purchase Price.

EPIC made the following internal cash-flow analysis of the transaction with Raldon:

| Raldon Corp. | Year 1 | Year 2 | Year 3 | Year 4 | Total |
|---|---|---|---|---|---|
| Builder lease payments | $61,819 | $30,909 | -0- | -0- | $92,728 |
| Tax, ins., HOA reimburse | 4,476 | 2,238 | -0- | -0- | 6,714 |
| Tenant rental | -0- | 17,489 | $37,776 | $40,798 | 96,063 |
| Rental deficit contribution | -0- | -0- | -0- | -0- | -0- |
| Interest income | -0- | -0- | -0- | -0- | -0- |
| Total revenue | 66,295 | 50,636 | 37,776 | 40,798 | 195,505 |
| First trust interest | -68,031 | -68,031 | -68,031 | -68,031 | -272,124 |
| Tax, ins., HOA expense | -4,476 | -4,476 | -4,476 | -4,476 | -17,904 |
| Repairs & maintenance | -0- | -1,215 | -2,430 | -2,430 | -6,075 |
| Property management fee | -2,100 | -2,100 | -2,100 | -2,100 | -8,400 |
| Audit fee | -607 | -607 | -607 | -607 | -2,428 |
| Interest on EPIC advances | -6,288 | -6,288 | -6,288 | -6,288 | -25,152 |
| Total expenses | -81,502 | -82,717 | -83,932 | -83,932 | -332,083 |
| Anticipated cash deficit | -15,207 | -32,081 | -46,156 | -43,134 | -136,578 |
| As a percent of purchase price | -3.13% | -6.60% | -9.50% | -8.88% | -28.10% |

According to the above analysis, EPIC projected a cash

deficit from the transaction at the end of the fourth year

of $136,578 or 28.10 percent of the original purchase

price (viz $485,995).  EPIC further projected that the

following appreciation rates would be required to recoup

the investment in the properties after sales expenses of

7 percent and a disposition fee of 2.5 percent to be

paid to EPIC:

| | Investment | Appreciation Rate |
|---|---|---|
| End of 2d year | [1]$615,744 | 12.56 |
| End of 3d year | [1]678,408 | [1]11.76 |
| End of 4th year | [1]723,785 | [1]10.47 |

[1] EPIC's projection, as contained in the record is difficult to read and this amount may differ from the projection.

By instrument dated December 22, 1982, EPIC assigned

to EA 83-XII EPIC's "right, title and interest" in the

purchase and leaseback agreement with Raldon.  On

December 27, 1982, EA 83-XII closed the purchase of each of the five model houses from Raldon.

To finance its purchase of the subject houses, EA 83-XII borrowed approximately 95 percent of the purchase price of each of the properties from EPIC Mortgage, Inc. (EMI), a corporation affiliated with EPIC. EMI's business was to originate mortgages for EPIC partnerships. At closing, EA 83-XII executed five nonrecourse promissory notes, in the aggregate principal amount of $461,675, payable to EMI in monthly installments of interest only on the unpaid principal balance for 5 years at the rate of 14.375 percent. The entire indebtedness under each note was due 5 years after the date of the first payment of interest required under the note.

Each nonrecourse promissory note was secured by a deed of trust bearing the date of closing and recorded on January 3, 1983, in the land records of Denton County, Texas. A mortgage insurance company, Ticor Mortgage Insurance (TMI), issued a commitment and certificate of insurance dated December 28, 1982, providing mortgage insurance for 25 percent of the first loss amount with respect to the mortgage on each of the five properties.

Set out below is a list of each of the properties that EX 83-XII purchased from Raldon, the purchase price

of each property, the builder fee, the rent advance, and the amount borrowed with respect to each property:

| Raldon Corp. | Purchase Price | Builder Fee | Rent Advance | Loan |
|---|---|---|---|---|
| 2109 Avignon Dr. | $88,995 | $5,339.70 | $1,004 | $84,525 |
| 2111 Avignon Dr. | 89,500 | 5,370.00 | 1,009 | 85,025 |
| 2113 Avignon Dr. | 100,500 | 6,030.00 | 1,134 | 95,475 |
| 2115 Avignon Dr. | 100,500 | 6,030.00 | 1,134 | 95,475 |
| 2117 Avignon Dr. | 106,500 | 6,390.00 | 1,201 | 101,175 |
| | 485,995 | 29,159.70 | 5,482 | 461,675 |

A settlement statement was prepared for the sale of each house.  Each statement shows the above purchase price as the contract sales price of the house and shows the builder fee and rent advance for each house as charges to the seller, Raldon, and, thus, as reductions of the amount due to Raldon.  Each statement also shows the total of the "amounts paid by/for" EA 83-XII, as consisting principally of the loan proceeds and the sum of the builder fees and rent advances.  The total of these amounts exceeded the amount due from EA 83-XII.  Set out below is a summary of the settlement statements showing that a total of $8,801.60 was due to the buyer, EA 83-XII, at closing:

| Raldon Corp. | Buyer | Seller |
|---|---|---|
| Contract sales price | $485,995.00 | $485,995.00 |
| Settlement charges to buyer | 2,132.60 | -0- |
| Price adjustment | 12.50 | 12.50 |
| Gross amount due | 488,140.10 | 486,007.50 |
| Principal amount of loans | 461,675.00 | -0- |
| Builder fee | 29,159.70 | 29,159.70 |
| Rent advance | 5,482.00 | 5,482.00 |
| Rental deficit contribution | -0- | -0- |
| Other credits | 625.00 | 625.00 |
| Settlement charges to seller | -0- | 5,835.04 |
| Total credits | 496,941.70 | 41,101.74 |
| Amount due buyer | 8,801.60 | -0- |
| Amount due seller | -0- | 444,905.76 |

According to the settlement sheets, the aggregate principal amount of the loans, $461,675, was credited as follows:

| | Buyer | Seller | Others | Total |
|---|---|---|---|---|
| Settlement charges to buyer | -0- | -0- | $2,132.60 | $2,132.60 |
| Amount due less loan | $-26,465.10 | -0- | -0- | -26,465.10 |
| Builder fee | 29,159.70 | -0- | -0- | 29,159.70 |
| Rent advance | 5,482.00 | -0- | -0- | 5,482.00 |
| Other credit | 625.00 | -0- | -0- | 625.00 |
| Settlement charges to seller | -0- | -0- | 5,835.04 | 5,835.04 |
| Amount due seller | | $444,905.76 | -0- | 444,905.76 |
| | 8,801.60 | 444,905.76 | 7,967.64 | 461,675.00 |

EMI assigned to Community Savings & Loan, Inc. (CSL), a savings and loan association affiliated with EPIC, its interest in each of the promissory notes and related deeds of trust that had been issued by EA 83-XII in connection with its purchase of the five properties from Raldon. EMI made the assignment in an Assignment of Deed of Trust dated March 30, 1983. In the same instrument, CSL further assigned its interest as holder of each promissory note under the related deed of trust to the North Jersey Savings

& Loan Association.  Thus, shortly after EA 83-XII purchased the subject properties from Raldon, North Jersey Savings & Loan Association purchased the promissory notes that EA 83-XII had issued to EMI.

Purchase of Production Houses in Odessa, Texas

EPIC executed a Residential Rental Purchase Agreement (rental purchase agreement) dated December 18, 1982, under which it agreed to purchase seven houses located in the Hollywood View subdivision in Odessa, Texas, from Fox and Jacobs, Inc. (Fox & Jacobs), for $394,600.  The rental purchase agreement had originally called for the purchase of eight properties for a total of $449,500 but was amended by deleting one house sometime before closing.

The rental purchase agreement includes an exhibit B for each of the seven properties that sets forth the base price of the property and the appliances and interior decorations included in the purchase price.  This exhibit also lists an "estimated rental amount" for the property. Exhibit C to the rental purchase agreement gives EPIC the right to rent each of the properties and states that, for each property not leased as of the closing date, Fox & Jacobs agrees to pay to the purchaser on the closing date an amount equal to three times the monthly rent for that

property as set forth on exhibit B.  We refer to this amount as the rent advance.

Under the rental purchase agreement, Fox & Jacobs agreed to pay to EPIC 6.8 percent of the purchase price of the properties.  The rental purchase agreement provides for this payment as a condition to "the obligation of the Purchaser to purchase each of the Properties" in the following terms:

> On the Closing Date, Seller shall pay to Equity Programs Investment Corporation a sum equal to six and eight-tenths percent (6.8%) of the Purchase Price of the Properties, and the execution of this Agreement by Seller shall constitute an irrevocable assignment to Equity Programs Investment Corporation from the sale proceeds of a sum sufficient to make the payment due under Subparagraph 4.6.

We refer to this sum as the builder fee.

As a further condition to the purchaser's obligation under the rental purchase agreement, Fox & Jacobs agreed to pay to "the Purchaser a sum equal to the percentage as set forth on Exhibit 'A' hereof of the purchase price of each Property as a contribution towards rental deficits" (referred to herein as the rental deficit contribution). The percentages set forth on exhibit A attached to the rental purchase agreement range from 16.38 to 17.90

percent.  We refer to this payment as the rental deficit contribution.

The rental purchase agreement also provided, as a condition to the purchaser's obligation to purchase the properties, that the "purchaser shall have obtained an appraisal of each of the Properties by a FNMA/FHLMC qualified appraiser * * * which shall reflect the value of each Property equal to or greater than the purchase price applicable to that Property".

EPIC made the following internal cash-flow analysis of the transaction with Fox & Jacobs:

| Fox & Jacobs, Inc. | Year 1 | Year 2 | Year 3 | Year 4 | Total |
|---|---|---|---|---|---|
| Builder lease payments | -0- | -0- | -0- | -0- | -0- |
| Tax, ins., HOA reimburse | -0- | -0- | -0- | -0- | -0- |
| Tenant rental | $48,740 | $49,659 | $53,632 | $57,922 | $209,953 |
| Rental deficit contribution | 69,190 | -0- | -0- | -0- | 69,190 |
| Interest income | 6,556 | 3,935 | 1,312 | -0- | 11,803 |
| Total revenue | 124,486 | 53,594 | 54,944 | 57,922 | 290,946 |
| First trust interest | -62,922 | -62,922 | -62,922 | -62,922 | -251,688 |
| Tax, ins., HOA expense | -7,920 | -7,920 | -7,920 | -7,920 | -31,680 |
| Repairs & maintenance | -2,247 | -2,247 | -2,247 | -2,247 | -8,988 |
| Property management fee | -562 | -562 | -562 | -562 | -2,248 |
| Audit fee | -3,360 | -3,360 | -3,360 | -3,360 | -13,440 |
| Interest on EPIC advances | -5,815 | -5,815 | -5,815 | -5,815 | -23,260 |
| Total expenses | -82,826 | -82,826 | -82,826 | -82,826 | -331,304 |
| Anticipated cash deficit | 41,660 | -29,232 | -27,882 | -24,904 | -40,358 |
| As a percent of purchase price--check Nos. | 9.27 | -6.5 | -6.2 | -5.54 | -8.98 |

The above analysis is based upon the original plan to purchase eight houses for $449,500.  As shown above, EPIC projected a cash deficit from that transaction at the end of the fourth year of $40,358 or 8.98 percent of the

purchase price.  EPIC further projected that the following
appreciation rates would be required to recoup the invest-
ment in the properties after sales expenses of 7 percent
and the disposition fee of 2.5 percent to be paid to EPIC:

|  | Investment | Appreciation Rates |
|---|---|---|
| End of 2d year | $507,668 | 6.27 |
| End of 3d year | 541,663 | 6.41 |
| End of 4th year | 572,185 | 6.22 |

EPIC's analysis of the transaction included a
computation of the rental deficit contribution.  First,
EPIC personnel estimated that the project would generate a
monthly deficit of $2,101, taking into account estimated
monthly operating expenses of $7,961, tenant rentals of
$4,600 (with a vacancy rate of 11.7 percent), and monthly
contributions of investor capital of $1,798.  According to
the analysis, the present value of the monthly deficit
over 36 months discounted at 13 percent is $62,364.  The
analysis, which is reproduced below, designates this amount
as the rental deficit contribution:

| | | | | |
|---|---|---|---|---|
| Operating expenses per month | | | | $7,961 |
| Tenant rental revenue | | | | -4,600 |
| Rent-up factor | | | | 0.883 |
| Net tenant rental | | | | -4,062 |
| | | | | |
| Operating deficit | | | | 3,899 |
| | | | | |
| Investor contribution | | | | |
| purchase price | $449,500 | x | 0.004 | -1,798 |
| Net monthly deficit | | | | 2,101 |
| Present value of deficit | | | | |
| over 36 mos. at 13% | | | | |
| monthly deficit of | 2,101 | x | 29.68 | 62,364 [sic] |
| Rental deficit contribution | | | | 62,364 |
| As a percent of purchase price | | | | 0.1387408 |

The rental deficit contribution shown above was calculated using a net borrowing cost, exclusive of servicing and private mortgage insurance of 16.75 percent.

The rental deficit contribution computed in the above analysis, $62,364, differs from the amount used in EPIC's cash-flow analysis for the project, $69,190, and differs from the rental deficit contribution finally negotiated with Fox & Jacobs, $67,643.

By instrument dated December 21, 1982, EPIC assigned to EA 83-XII "its entire right, title and interest, as purchaser and landlord" in the rental purchase agreement dated December 18, 1982, with Fox & Jacobs. On December 30, 1982, EA 83-XII closed the purchase of each of the properties.

To finance its purchase of the subject properties, EA 83-XII borrowed approximately 95 percent of the purchase price of each of the properties from EMI. On the closing date, EA 83-XII executed seven nonrecourse promissory

notes, in the aggregate principal amount of $374,850,

payable to EMI with monthly installments of interest only

on the unpaid principal balance for 5 years at the rate of

14.375 percent.  Thereafter, the notes required EA 83-XII

to pay monthly installments of principal and interest for

5 years.  The principal amount of each note was due at the

end of 10 years, or January 1, 1993.  On March 1, 1983, the

parties executed an Allonge to Note for each of the seven

notes.  The Allonge to Note states as follows:

> The Note shall bear interest at the rate
> computed as follows:  (a) the rate of interest
> for the first sixty (60) full calendar months
> of the loan term shall be Fourteen and 375/1000
> (14.375%) per annum; (b) thereafter, the rate of
> interest shall be adjusted annually, commencing
> with the sixty-first (61st) full calendar month
> of the loan term, to a rate per annum equal to
> the sum of the FNMA auction price in effect on
> the first day of the calendar month immediately
> preceding the month of such adjustment plus 237.5
> basis points, payable as follows:

> Interest only on the unpaid principal
> balance, computed as set forth in (a) above,
> shall be payable on the first day of each month
> commencing April 1, 1983 and on the first day
> of each succeeding month through and including
> March 1, 1988.  Thereafter, payments of monthly
> installments of principal and interest at the
> rate per annum as set forth in (b) above, shall
> be fully amortized over the remaining sixty (60)
> months of the loan term, except that any remain-
> ing indebtedness, if not sooner paid, shall be
> due and payable in full on March 1, 1993.

Each nonrecourse promissory note was secured by a deed of trust bearing the closing date. The deeds of trust were recorded in the land records of Ector County, Texas, on January 14, 1983. Each deed of trust was amended on March 1, 1983, to reflect the changes made by the Allonge to Note. A mortgage insurance company, TMI, issued a Commitment and Certificate of Insurance dated January 7, 1983, providing mortgage insurance for 25 percent of the first loss amount with respect to the mortgage on each of the properties.

Set out below is a list of the seven houses that EA-XII purchased from Fox & Jacobs, Inc., together with the purchase price, the builder fee, the rental deficit contribution, the rent advance, and the amount borrowed with respect to each property:

| Fox & Jacobs, Inc. | Purchase Price | Builder Fee | Rental Deficit Contribution | Rent Advance | Loan |
|---|---|---|---|---|---|
| 1612 Hemphill Ave. | $57,400 | $3,903.20 | $10,039 | $1,725 | $54,525 |
| 1921 W. 17th St. | 54,000 | 3,672.00 | 8,847 | 1,725 | 51,300 |
| 1716 Coronado Ave. | 56,900 | 3,869.20 | 9,864 | 1,725 | 54,050 |
| 1720 Coronado Ave. | 59,400 | 4,039.20 | 10,635 | 1,725 | 56,425 |
| 1728 Coronado Ave. | 54,000 | 3,672.00 | 8,847 | 1,725 | 51,300 |
| 1700 Linda Ave. | 56,900 | 3,869.20 | 9,864 | 1,725 | 54,050 |
| 1916 Hollywood Dr. | 56,000 | 3,808.00 | 9,547 | 1,725 | 53,200 |
| Subtotal | 394,600 | 26,832.80 | 67,643 | 12,075 | 374,850 |

A settlement statement was prepared for the sale of each property. In each case, the statement shows the above purchase price as the "contract sales price" of the

property.  Each statement also shows the builder fee, the rent advance, and the rental deficit contribution as charges to the seller, Fox & Jacobs, and, thus, as reductions of the amount due to Fox & Jacobs.  Each statement also shows the total of the "amounts paid by/for" EA 83-XII, as consisting principally of the loan proceeds and the sum of the builder fees, rent advances, and rental deficit contributions.   The total of these amounts exceeded the amount due from  EA 83-XII.  Set out below is a summary of the settlement statements showing that a total of $92,331.55 had been overpaid by or on behalf of the buyer, EA 83-XII:

| Fox & Jacobs, Inc. | Buyer | Seller |
|---|---|---|
| Contract sales price | $394,600.00 | $394,600.00 |
| Settlement charges to buyer | 1,794.25 | |
| Gross amount due | 396,394.25 | 394,600.00 |
| Principal amount of loans | 374,850.00 | |
| Builder fee | 26,832.80 | 26,832.80 |
| Rent advance | 12,075.00 | 12,075.00 |
| Rental deficit contribution | 67,643.00 | 67,643.00 |
| Other credits | 7,325.00 | 7,325.00 |
| Settlement charges to seller | | 6,026.94 |
| Total credits | 488,725.80 | 119,902.74 |
| Amount due buyer | 92,331.55 | |
| Amount due seller | | 274,697.26 |

According to the settlement statements, the aggregate principal amount of the loans, $374,850, was credited as follows:

|  | Buyer | Seller | Others | Total |
|---|---|---|---|---|
| Settlement charges to buyer | -0- | -0- | $1,794.25 | $1,794.25 |
| Amount due less loans | $-21,544.25 | -0- | -0- | -21,544.25 |
| Builder fee | 26,832.80 | -0- | -0- | 26,832.80 |
| Rent advance | 12,075 | -0- | -0- | 12,075.00 |
| Rental deficit contribution | 67,643.00 | -0- | -0- | 67,643.00 |
| Other credits | 7,325.00 | -0- | -0- | 7,325.00 |
| Settlement charges to seller | -0- | -0- | 6,026.94 | 6,026.94 |
| Amount due seller | _____ | $274,697.26 | _____ | 274,697.26 |
|  | 92,331.55 | 274,697.26 | 7,821.19 | 374,850.00 |

EMI assigned to CSL its interest in each of the promissory notes and related deeds of trust that had been issued by EA 83-XII in connection with its purchase of the seven houses from Fox & Jacobs, Inc. EMI made the assignment in an Assignment of Deed of Trust dated March 31, 1983. In the same instrument, CSL further assigned its interest as holder of each promissory note under the related deed of trust to National Bank of Washington. Thus, shortly after EA 83-XII purchased the subject properties from Fox & Jacobs, National Bank of Washington purchased the promissory notes that EA 83-XII had issued to EMI. Ultimately, Westinghouse Credit Corp. acquired the deeds of trust related to the seven houses.

## Purchase of 39 Condominium Units in Paseos Castellanos

EPIC executed a Residential Rental Purchase Agreement (rental purchase agreement) dated December 22, 1982, under which it agreed to purchase 39 condominium units located in the Paseos Castellanos condominium complex in Miami,

Florida, from Babcock Co. (Babcock), a subsidiary of Weyerhaeuser, for $3,020,700. For each condominium unit covered by the rental purchase agreement, there is attached to the agreement an exhibit B which identifies the unit, its purchase price, and the monthly rent, and lists the appliances and interior decorations that are included in the purchase.

Paseos Castellanos was constructed in 1982. It consists of eight two-story buildings, with 8 units in each building for a total of 64 units. There is a garage for each unit. In each building, there are two one-story units on the second floor, over the garages; four two-story units in the center of the building; and two one-story units on the ground floor at the rear of the building.

The 39 units purchased by EA 83-XII are scattered among seven of the buildings. Seven are one-story units on the second floor, each with two bedrooms, 2-1/2 bathrooms, and 968 square feet of living space; 13 are two-story units in the center of the building, each with two bedrooms, 2-1/2 bathrooms, and 1,240 square feet; 12 are two-story units in the center of the building, each with three bedrooms, 1-1/2 bathrooms, and 1,240 square feet; and the remaining 7 are one-story units on the ground level, each with three bedrooms, two bathrooms, and 1,090 square feet.

The purchaser's obligation under the rental purchase agreement to purchase the subject properties was subject to the following condition:

> Rental of the Properties to individual tenants shall have been arranged, or shall be arranged, upon execution by Purchaser of this Agreement in accordance with the procedures set forth in Exhibit "C," attached hereto and by this reference made a part hereof.

According to exhibit C, in the event that EPIC had not leased all of the properties as of the closing date, then Babcock agreed to pay to the purchaser an amount equal to three times the monthly fair market rent of each property not leased as of the closing date as a nonrefundable contribution toward the expense of listing, showing, and leasing such property after the closing date.  We refer to this amount as the rent advance.

Under the rental purchase agreement, Babcock agreed to pay to EPIC 6.8 percent of the purchase price of each property on the closing date.  We refer to this amount as the builder fee.  The agreement further requires as a condition to the purchaser's obligation under the agreement that Babcock pay to the purchaser 19.455 percent of the purchase price of each property "as a contribution towards rental deficits (referred to as the Rental Deficit

Contribution)."  In this opinion, we refer to this payment as the rental deficit contribution.  Finally, the rental purchase agreement provides, as a condition to the purchaser's obligation to purchase the properties, that the "purchaser shall have obtained an appraisal of each of the Properties by a FNMA/FHLMC qualified appraiser * * * which shall reflect the value of each Property equal to or greater than the purchase price applicable to that property".

EPIC made the following internal cash-flow analysis of the transaction with Babcock:

| Paseos Castellanos | Year 1 | Year 2 | Year 3 | Year 4 | Total |
|---|---|---|---|---|---|
| Builder lease payments | -0- | -0- | -0- | -0- | -0- |
| Tax, ins., HOA reimburse | -0- | -0- | -0- | -0- | -0- |
| Tenant rental | $243,873 | $246,792 | $266,536 | $287,858 | $1,045,059 |
| Rental deficit contribution | 659,929 | -0- | -0- | -0- | 659,929 |
| Interest income | 62,531 | 37,533 | 12,514 | -0- | 112,578 |
| Total revenue | 966,333 | 284,325 | 279,050 | 287,858 | 1,817,566 |
| First trust interest | -424,784 | -424,784 | -424,784 | -424,784 | -1,699,136 |
| Tax, ins., HOA expense | -71,196 | -71,196 | -71,196 | -71,196 | -284,784 |
| Repairs & maintenance | -15,173 | -15,173 | -15,173 | -15,173 | -60,692 |
| Property management fee | -16,380 | -16,380 | -16,380 | -16,380 | -65,520 |
| Audit fee | -3,793 | -3,793 | -3,793 | -3,793 | -15,172 |
| Interest on EPIC advances | -39,259 | -39,259 | -39,259 | -39,259 | -157,036 |
| Total expenses | -570,585 | -570,585 | -570,585 | -570,585 | -2,282,340 |
| Anticipated cash deficit | 395,748 | -286,260 | -291,535 | -282,727 | -464,774 |
| As a percent of purchase price | 13.04 | -9.43 | -9.61 | -9.32 | -15.32 |

As shown above, EPIC projected a cash deficit from the transaction at the end of the fourth year of $464,774, or 15.32 percent of the purchase price (viz $3,034,550). EPIC further projected that the following appreciation

rates would be required to recoup the investment in the properties after sales expenses of 7 percent and a disposition fee of 2.5 percent to be paid to EPIC:

|  | Investment | Appreciation Rate |
|---|---|---|
| End of 2d year | 3405798 | 5.94 |
| End of 3d year | 3755078 | 7.36 |
| End of 4th year | 4094090 | 7.77 |

EPIC's analysis of the transaction included a computation of the rental deficit contribution.  First, EPIC personnel estimated the monthly deficit from the project, $22,235, taking into account estimated monthly operating expenses of $54,696, tenant rentals of $22,860 (with a vacancy rate of 11.1 percent), and a monthly contribution of investor capital of $12,138.  According to the analysis, the present value of the monthly deficit, $22,235, discounted over 36 months at 13 percent, is $659,929.  The analysis, which is reproduced below, designates this amount as the rental deficit contribution:

| | | | | |
|---|---|---|---|---|
| Operating expenses per month | | | | $54,696 |
| | | | | |
| Tenant rental revenue | | | | -22,860 |
| Rent-up factor | | | | 0.889 |
| Net tenant rental | | | | -20,323 |
| | | | | |
| Operating deficit | | | | 34,373 |
| Investor contribution | | | | |
| purchase price | $3,034,550 | x | 0.004 | -12,138 |
| Net monthly deficit | | | | 22,235 |
| Present value of deficit | | | | |
| over 36 mos. at 13% | | | | |
| monthly deficit of | 22,235 | x | 29.68 | 659,929 [sic] |
| Rental deficit contribution | | | | 659,929 |
| As a percent of purchase price | | | | 0.2174716 |

The rental deficit contribution shown above was calculated using a net borrowing cost, exclusive of servicing and private mortgage insurance of 16.75.

The rental deficit contribution computed in the above analysis differs from the amount finally negotiated with Babcock, $587,676.

By instrument dated December 29, 1982, EPIC assigned to EA 83-XII "all its right, title and interest" in the rental purchase agreement dated December 22, 1982, with Babcock.  Thereafter, EA 83-XII closed the sale of each of the 39 condominium units as of December 30, 1982.

To finance its purchase of the condominium units in the Paseos Castellanos complex, EA 83-XII borrowed from EMI approximately 95 percent of the purchase price of each unit.  On or about the closing date, EA 83-XII executed 39 nonrecourse promissory notes in the aggregate principal amount of $2,869,625 payable to EMI in monthly installments of interest only for 5 years at the rate of 14.375 percent.

Thereafter, the notes required EA 83-XII to pay monthly installments of interest and principal for 5 years. The notes required payment in full on January 1, 1993.

EA 83-XII executed an Allonge to Note dated March 1, 1983, for each of the 39 notes providing for a variable interest rate for the second 5-year term. The Allonge to Note extended the date for full payment of the indebtedness to March 1, 1993. EA 83-XII also executed a mortgage on the date of closing for each of the condominium units with EA 83-XII as the mortgagor and EMI as the mortgagee. The mortgages were modified on March 1, 1983, to reflect that the maturity date of the notes had changed from January 1, 1993, to March 1, 1993.

Set out below is a list of the 39 condominium units in the Paseos Castellanos complex that EA 83-XII purchased from Babcock, together with the purchase price, the builder fee, the rental deficit contribution, the rent advance, and the amount borrowed with respect to each condominium unit:

| The Babcock Co. Paseos Castellanos | Contract Price | Builder Fee | Rental Deficit Contribution | Rent Advance | Loan |
|---|---|---|---|---|---|
| H 101 | $82,000 | $5,576.00 | $15,953 | $1,800 | $77,900 |
| H 102 | 80,000 | 5,440.00 | 15,564 | 1,800 | 76,000 |
| H 103 | 74,500 | 5,066.00 | 14,494 | 1,800 | 70,775 |
| H 105 | 80,000 | 5,440.00 | 15,564 | 1,800 | 76,000 |
| H 106 | 74,500 | 5,066.00 | 14,494 | 1,800 | 70,775 |
| H 107 | 82,000 | 5,576.00 | 15,953 | 1,800 | 77,900 |
| H 108 | 68,450 | 4,654.60 | 13,317 | 1,575 | 65,025 |
| B 105 | 79,450 | 5,402.60 | 15,457 | 1,800 | 75,475 |
| B 107 | 81,450 | 5,538.60 | 15,846 | 1,800 | 77,375 |
| D 101 | 81,450 | 5,538.60 | 15,846 | 1,800 | 77,375 |
| D 105 | 79,450 | 5,402.60 | 15,457 | 1,800 | 75,475 |
| D 107 | 81,450 | 5,538.60 | 15,846 | 1,800 | 77,375 |
| C 101 | 81,450 | 5,538.60 | 15,846 | 1,800 | 77,375 |
| C 102 | 79,450 | 5,402.60 | 15,457 | 1,800 | 75,475 |
| C 105 | 79,450 | 5,402.60 | 15,457 | 1,800 | 75,475 |
| C 107 | 81,450 | 5,538.60 | 15,846 | 1,800 | 77,375 |
| C 108 | 67,450 | 4,586.60 | 13,122 | 1,575 | 64,075 |
| E 101 | 82,000 | 5,576.00 | 15,953 | 1,800 | 77,900 |
| E 102 | 80,000 | 5,440.00 | 15,564 | 1,800 | 76,000 |
| E 103 | 74,500 | 5,066.00 | 14,494 | 1,800 | 70,775 |
| E 104 | 68,450 | 4,654.60 | 13,317 | 1,575 | 65,025 |
| E 105 | 80,000 | 5,440.00 | 15,564 | 1,800 | 76,000 |
| E 106 | 74,500 | 5,066.00 | 14,494 | 1,800 | 70,775 |
| E 107 | 82,000 | 5,576.00 | 15,953 | 1,800 | 77,900 |
| G 101 | 82,000 | 5,576.00 | 15,953 | 1,800 | 77,900 |
| G 102 | 80,000 | 5,440.00 | 15,564 | 1,800 | 76,000 |
| G 103 | 74,500 | 5,066.00 | 14,494 | 1,800 | 70,775 |
| G 104 | 68,450 | 4,654.60 | 13,317 | 1,575 | 65,025 |
| G 105 | 80,000 | 5,440.00 | 15,564 | 1,800 | 76,000 |
| G 106 | 74,500 | 5,066.00 | 14,494 | 1,800 | 70,775 |
| G 107 | 82,000 | 5,576.00 | 15,953 | 1,800 | 77,900 |
| G 108 | 68,450 | 4,654.60 | 13,317 | 1,575 | 65,025 |
| F 101 | 82,000 | 5,576.00 | 15,953 | 1,800 | 77,900 |
| F 102 | 80,000 | 5,440.00 | 15,564 | 1,800 | 76,000 |
| F 104 | 68,450 | 4,654.60 | 13,317 | 1,575 | 65,025 |
| F 105 | 80,000 | 5,440.00 | 15,564 | 1,800 | 76,000 |
| F 106 | 74,500 | 5,066.00 | 14,494 | 1,800 | 70,775 |
| F 107 | 82,000 | 5,576.00 | 15,953 | 1,800 | 77,900 |
| F 108 | 68,450 | 4,654.60 | 13,317 | 1,575 | 65,025 |
| Subtotal | 3,020,700 | 205,407.60 | 587,676 | 68,625 | 2,869,625 |

A settlement statement was prepared for the sale of each condominium unit.  Each statement shows the above purchase price as the contract sales price.  The statements treat the builder fees, the rent advances, and the rental deficit contributions as charges to Babcock and, thus, as reductions of the amount due to Babcock as seller.  In the case of each of the subject condominium units, the "amounts paid by/for" EA 83-XII as shown on each settlement

statement is the amount of the loan proceeds.  Set out

below is a summary of the settlement sheets for the

purchase of the 39 condominium units in Paseos Castellanos:

| Paseos Castellanos | Buyer | Seller |
|---|---|---|
| Contract sales price | $3,020,700.00 | $3,020,700.00 |
| Price adjustment | 476.97 | 476.97 |
| Other charges | 30,934.87 | -0- |
| Gross amount due | 3,052,111.84 | 3,021,176.97 |
| Principal amount of loans | 2,869,625.00 | -0- |
| Builder fee | | 205,407.60 |
| Rent advance | -0- | 68,625.00 |
| Rental deficit contribution | -0- | 587,676.00 |
| Other credits | -0- | 141,575.39 |
| Amount due from buyer | 182,486.84 | |
| Amount due to seller | | 2,017,892.98 |

According to the settlement sheets, the aggregate principal

amount of the loans, $2,869,625, was credited as follows:

| | Buyer | Seller | Others | Total |
|---|---|---|---|---|
| Settlement charges | -0- | -0- | $30,934.87 | $30,934.87 |
| Builder fee | $205,407.60 | -0- | -0- | 205,407.60 |
| Rent advance | 68,625.00 | -0- | -0- | 68,625.00 |
| Rental deficit contribution | 587,676.00 | -0- | -0- | 587,676.00 |
| Other credits | -0- | -0- | 141,575.39 | 141,575.39 |
| Amount due from buyer | -182,486.84 | -0- | -0- | -182,486.84 |
| Amount due to seller | -0- | $2,017,892.98 | -0- | 2,017,892.98 |
| | 679,221.76 | 2,017,892.98 | 172,510.26 | 2,869,625.00 |

TMI issued a Commitment and Certificate of Insurance

dated January 11, 1983, under which it committed to issue

mortgage insurance for 25 percent of the first loss amount

with respect to the mortgage on each condominium unit.

Subsequently, EMI and CSL executed an Assignment of

Mortgage dated March 31, 1983, for each condominium unit

transferring their interest in each note to the National

Bank of Washington.  Thus, shortly after EA 83-XII purchased the subject properties from Babcock, National Bank of Washington purchased the promissory notes that EA 83-XII had issued to EMI.  Ultimately, Westinghouse Credit acquired the notes.

In summary, the aggregate contract prices of the properties purchased by EA 83-XII, the aggregate rental deficit contributions attributable to those properties, and the aggregate amounts borrowed are as follows:

|  | Contract Price | Rent Deficit Contribution | Loan Amount |
|---|---|---|---|
| Raldon | $485,995 | -0- | $461,675 |
| Fox & Jacobs | 394,600 | $67,643 | 374,850 |
| Babcock | 3,020,700 | 587,676 | 2,869,625 |
| Total | 3,901,295 | 655,319 | 3,706,150 |

The 83 offering memorandum states that investors would break even if the real properties acquired by EA 83-XII appreciated at the annual rate of 7.99 percent over the 4-year period that the partnership planned to hold the properties.

Financial Statements for EA 83-XII

The general partner prepared and circulated to the limited partners quarterly statements for EA 83-XII entitled "Results of Operations and Taxable Income (Loss)." The record contains the statements for the nine quarters

beginning April 16, 1983, and ending June 30, 1985.  If
the entries designated "current period" on the quarterly
statements for a particular year are added, the totals for
each year or part of a year during the period beginning
April 16, 1983, and ending June 30, 1985, are as follows:

|  | 4/16/83 to 12/31/83 | 1/1/84 to 12/31/84 | 1/1/85 to 6/30/85 |
|---|---|---|---|
| Revenue: |  |  |  |
| Rental income | $265,635.60 | $306,577 | $158,108 |
| Interest income--general partner | 2,219.83 | 90 | -0- |
| Other income | 274.10 | -0- | -0- |
| Total revenue | 268,129.53 | 306,667 | 158,108 |
| Expenses: |  |  |  |
| Interest on first mortgage | 386,821.70 | 546,197 | 273,062 |
| Additional mortgage interest | -0- | -0- | -0- |
| Other interest expense | -0- | -0- | 2,106 |
| Real estate taxes, insurance, HOA | 54,204.89 | 72,927 | 39,391 |
| Audit fee | 3,545.83 | 4,900 | 2,450 |
| Repairs and maintenance | 1,940.72 | 32,412 | 7,260 |
| Property administration fee | 21,675.00 | 30,778 | 15,300 |
| Interest expense--general partner | -0- | 7,147 | 10,459 |
| Rental commission | 24,110.00 | 21,950 | 7,461 |
| Legal fees | 725.75 | 7,915 | 730 |
| Other expenses | 77.40 | -0- | 24 |
| Total expenses | 493,101.29 | 724,226 | 358,243 |
| Net results of operations | -224,971.76 | -417,559 | -200,135 |
| Taxable income (loss): |  |  |  |
| Net results of operations | -224,971.76 | -417,559 | -200,135 |
| Plus: mortgage amortization | -0- | -0- | -0- |
| Less: depreciation | 122,625.76 | 173,120 | 86,560 |
| Amortization of loan fees | 11,808.84 | 16,672 | 8,336 |
| Amortization of refinancing costs | -0- | -0- | -0- |
| Accrued mortgage interest | -0- | -0- | -0- |
| Taxable income (loss) | -359,406.36 | -607,351 | -295,031 |

The above amounts can be compared with the cash-flow
projection that was set out in the 83 offering memorandum
and is reproduced as appendix A.

   As shown above, one of the expenses recorded as having
been paid on behalf of EA 83-XII during the quarters begin-
ning April 16, 1983, and ending June 30, 1985, is "interest

expense--general partner" in the amount of zero during 1983, $7,147 during 1984, and $10,459 during 1985. Three of the quarterly statements contain the following note or words of similar import:

Interest Expense--GP:

Cash advances by the General Partner necessary to sustain operations of the partnership continued to be greater than budget resulting in additional interest expense.

The quarterly statements also record "interest income-- general partner" during this period of $2,219.83, $90, and zero, respectively.

The record also contains audited financial statements of EX 83-XII for the years ended December 31, 1983 and 1984, that were prepared by a firm of certified public accountants. Included in those financial statements is the following statement of operations and changes in partners' capital:

|                                | Year Ended December 31, | |
|--------------------------------|------------|------------|
|                                | 1984       | 1983       |
| Revenues:                      |            |            |
| Rental income                  | $306,577   | $287,640   |
| Interest income                | 90         | 9,344      |
| Other income                   | -0-        | 548        |
|                                | 306,667    | 297,532    |
|                                |            |            |
| Expenses:                      |            |            |
| Interest                       | 539,893    | 532,724    |
| Depreciation                   | 86,559     | 86,559     |
| Real estate taxes              | 49,213     | 49,224     |
| Amortization                   | 48,096     | 31,096     |
| Repairs and maintenance        | 30,866     | 20,620     |
| Property management fee        | 30,600     | 30,600     |
| Rental commissions             | 21,950     | 25,460     |
| Homeowner's association dues    | 20,620     | 5,624      |
| Insurance                      | 16,438     | 27,744     |
| Professional fees              | 12,993     | 1,347      |
| Other expenses                 | 2,722      | 1,952      |
|                                |            |            |
|                                | 859,950    | 812,950    |
|                                |            |            |
| Net loss                       | (553,283)  | (515,418)  |
|                                |            |            |
| Partners' capital (deficit) at beginning of year | 516,606 | (10,974) |
| Partners' contributions        | -0-        | 1,042,998  |
| Partners' distributions        | (263)      | -0-        |
|                                |            |            |
| Partners' capital (deficit) at end of year | (36,940) | 516,606 |

One of the notes accompanying the financial statements deals with related-party transactions and states as follows:

4.  Related party transactions

    Equity Programs Investment Corporation (EPIC) is the sole general partner for EPIC Associates 83-XII. The general part-ner manages, controls and administers the business of the Partnership. The general partner is compensated for these services in accordance with the fee structure set forth in the Private Placement Offering Memorandum of the Partnership. The Partnership incurred $30,600 of cost per

year to EPIC for these services during
1984 and 1983.

Interest is charged or paid to the
Partnership on the due to/from general
partner balance in accordance with the rates
prescribed in the Private Placement Offering
Memorandum.  The Partnership incurred $7,057
and earned $9,344 of interest to/from EPIC
and affiliates during 1984 and 1983,
respectively.  While not obligated to do so
under the Partnership agreement, the general
partner is anticipated to advance funds to
cover cash flow deficits.

Federal Income Tax Returns Filed on Behalf of EA 83-XII

For Federal income tax purposes, EA 83-XII reported the

following income and expenses for the years in issue:

| EA 83-XII | 1983 | 1984 | 1985 |
|---|---|---|---|
| Rent income | $287,640 | $306,577 | $331,743 |
| Late charges | 548 | -0- | -0- |
| Interest income | 9,344 | 90 | 1,262 |
| Miscellaneous | -0- | -0- | 883 |
| Total gross income | 297,532 | 306,667 | 333,888 |
| Interest (noninvestment) | 466,358 | 539,893 | 560,177 |
| Commissions | 25,460 | 21,950 | 24,846 |
| Insurance | 27,744 | 16,438 | 18,992 |
| Legal and professional fee | 726 | 8,093 | 574 |
| Repairs | 1,348 | 30,866 | 15,075 |
| Taxes | 49,224 | 49,213 | 45,962 |
| Utilities | 464 | 1,547 | 951 |
| Homeowners dues | 20,620 | 20,620 | 25,350 |
| Audit fee | 4,900 | 4,900 | 3,267 |
| Points amortization | 16,671 | 16,671 | 16,671 |
| Property management | 30,600 | 30,600 | 29,837 |
| Real estate tax service | 1,278 | -0- | -0- |
| Miscellaneous | 107 | -0- | 856 |
| Depreciation | 173,119 | 173,119 | 173,119 |
| Bad debts | -0- | 1,174 | -0- |
| Amortization org. expense | -0- | 3,150 | -0- |
| Recording fees | -0- | -0- | 24 |
| Service fee-EMI | -0- | -0- | 3,413 |
| Total expenses | 818,619 | 918,234 | -919,114 |
| Net rental income | -521,087 | -611,567 | -585,226 |

On its Schedule K, Partner's Share of Income Credits,
Deductions, etc., for 1983, EA 83-XII reported an ordinary
loss of $521,087, investment interest expense of $66,366,
net investment income of $29,306, and excess expenses from
"net lease property" of $10,859; and for purposes of
allocating tax preference items to its partners, EA 83-XII
reported a net investment loss of $341,010.

On its Schedules K for 1984 and 1985, EA 83-XII
reported ordinary losses of $611,567 and $585,226,
respectively, and investment income of $90 and $1,262,

respectively; and for purposes of allocating tax preference items to its partners, EA 83-XII reported qualified investment income of $303,571 and $330,529, respectively, and qualified investment expenses of $908,960 and $909,831, respectively.

For depreciation purposes, EA 83-XII treated the aggregate contract price of its 51 properties, $3,901,295, less the aggregate rental deficit contribution, $655,319, as its aggregate basis in the real estate; viz $3,245,976. EA 83-XII allocated 20 percent of that amount to land; viz $649,195, and 80 percent to buildings; viz $2,596,781. EA 83-XII depreciated the latter amount on a straight-line basis over 15 years and claimed depreciation of $173,119 in each of the years in issue.

For each of the years in issue, EA 83-XII was obligated under the promissory notes that it had issued to EMI to pay interest on the aggregate principal amount of the notes, $3,706,150, at the annual rate of 14.375 percent. Thus, EA 83-XII was obligated to pay interest to EMI in the aggregate amount of $532,759 during each of the years in issue (i.e., $3,706,150 x 14.375 percent).

EA 83-XII was also obligated under the 83 partnership agreement to pay interest at the annual rate of 15 percent to compensate the general partner for unsecured advances of

funds to the partnership.  The returns filed on behalf of

EA 83-XII for the years in issue report the following

liabilities to the general partner on Schedule L, Balance

Sheets:

| Year Ended | Amount of Advances | Accrued Interest |
|---|---|---|
| 12/31/83 | $2,991 | -0- |
| 12/31/84 | 104,754 | $7,147 |
| 12/31/85 | 57,567 | 12,929 |

EA 83-XII reported the following interest expense on

its returns for the years in issue:

|  | 1983 | 1984 | 1985 |
|---|---|---|---|
| Interest (noninvestment) | $466,358 | $539,893 | $560,177 |
| Investment interest income | 66,366 | -0- | -0- |
| Total | 532,724 | 539,893 | 560,177 |

The difference between the above amounts and the interest

paid or incurred with respect to the partnership's first

mortgage notes is as follows:

|  | 1983 | 1984 | 1985 |
|---|---|---|---|
| Total interest expense reported | $532,724 | $539,893 | $560,177 |
| Interest on first mortgage notes | 532,759 | 532,759 | 532,759 |
| Difference | (35) | 7,134 | 27,418 |

The record of this case does not explain the above

differences.

EA 83-XII paid loan origination fees to EMI in the aggregate amount of $148,246 equal to 4 percent of the principal amount of the first mortgage loans (i.e., $3,706,150 x 4 percent). This amount was amortized over the life of the loans. For each of the years in issue, EA 83-XII reported "points amortization" expense of $16,671 on each of the subject returns.

EA 84-III

EPIC formed EA 84-III on September 14, 1983, pursuant to the Uniform Limited Partnership Act of the Commonwealth of Virginia for a 10-year term ending on September 14, 1993. EPIC was the sole general partner. The Certificate and Agreement of Limited Partnership was amended by the execution and filing of an Amended and Restated Certificate and Agreement of Limited Partnership dated October 1, 1983, which was recorded on December 20, 1983, among the limited partnership records maintained by the clerk of the court of Fairfax County, Virginia. The Certificate and Agreement of Limited Partnership of EA 84-III was amended for a second time on April 1, 1985. The Second Amended and Restated Certificate and Agreement of Limited Partnership (84 partnership agreement) describes the business of EA 84-III in the following terms:

Business of the Partnership

> The business of the Partnership has been and
> shall be to acquire, directly or indirectly, own
> and finance fee interests in certain improved
> residential real properties and to hold such
> properties for investment with the objective of
> attaining maximum capital appreciation therein
> and to engage in and perform all necessary and
> proper acts and activities in connection there-
> with including, but not limited to, operating,
> managing, maintaining, leasing, mortgaging,
> selling, exchanging or otherwise dealing with
> such properties with the objective of distribut-
> ing income generated thereby among the Partners
> as provided for herein.

The 84 partnership agreement provides that EPIC's "interest shall be deemed to be a one-percent (1%) share in the partnership's capital contributions for which it shall contribute" $12,267. In addition, the 84 partnership agreement authorizes five enumerated classes of limited partnership interest, classes A through E, and such additional classes as are authorized by the general partner.

The 84 partnership agreement states that one class A unit, representing an aggregate capital contribution of $132,918.89, was sold to four investors, one class B unit, representing a capital contribution of $56,900, was sold to one investor, and one class C unit, representing an aggregate capital contribution of $208,750, was sold to three investors. It also appears that thereafter two

investors made an aggregate capital contribution of $51,381.

According to the partnership agreement, if the need for additional equity arose, the general partner could authorize any number of additional classes of limited partnership interest.  Purchasers of the additional classes would be admitted to the limited partnership starting on July 1, 1986.  The agreement also states that the general partner, in its sole discretion, may authorize future class units from January 1, 1988, through and until the termination of the partnership.

Before offering class D and class E units of limited partnership interest in EA 84-III for sale, EPIC circulated a confidential private placement offering memorandum (84 offering memorandum) dated April 1, 1985.  The 84 offering memorandum states that the class A, B, C, D, and E limited partners' contributions would be used primarily to fund operating deficits of EA 84-III.  The 84 offering memo-randum contains a chart summarizing EA 84-III's anticipated sources and uses of the proceeds of the offering as follows:

| Sources | Amount | Percent |
|---|---|---|
| Proceeds from sale of class A unit | $132,918 | 2.32 |
| Proceeds from sale of class B unit | 56,900 | 1.00 |
| Proceeds from sale of class C unit | 208,750 | 3.64 |
| Proceeds from sale of class D unit | 75,000 | 1.31 |
| Proceeds from sale of class E unit | 290,850 | 5.07 |
| Proceeds from sale of additional class(es) | 450,000 | 7.85 |
| Capital contributions of general partner | 12,266 | 0.21 |
| First mortgage loans | 3,453,450 | 60.24 |
| Builder rebates | 755,287 | 13.17 |
| General partner advances | 297,400 | 5.19 |
| Total | 5,732,821 | 100.00 |

| Uses | | |
|---|---|---|
| Purchase price of homes | 3,956,700 | 69.02 |
| Sales commissions to broker/dealers | 97,153 | 1.70 |
| Escrows and prepaid insurance | 18,070 | .32 |
| First mortgage loan origination fees | 138,138 | 2.40 |
| Organizational fee to general partner | 85,009 | 1.48 |
| Estimated cash-flow deficits through September 30, 1984 | 473,417 | 8.26 |
| Available for cash-flow deficits | 964,334 | 16.82 |
| Total | 5,732,821 | 100.00 |

As set forth above, it was anticipated that $473,417 of the proceeds of the offering would be offset by cash-flow deficits through September 30, 1984, and $964,334 of the offering proceeds would be available for cash-flow deficits after that date.

The projected annual income and operating costs of EA 84-III as set forth in the 84 offering memorandum shows an annual operating deficit of $431,115 calculated as follows:

| Projected Annual Income | Amount | Percentage of Total Income |
|---|---|---|
| Rental income (less 20% vacancy & expense factor) | $231,293 | 100.00 |
| Total projected income | 231,293 | 100.00 |
| Annual Operating Expenditures | | |
| Aggregate first mortgage principal & interest | 502,217 | 217.14 |
| Real estate taxes | 72,617 | 31.40 |
| Insurance & homeowner's association dues | 12,511 | 5.41 |
| Audit expenses | 4,945 | 2.14 |
| Property administration fee | 33,000 | 14.27 |
| Allowance for maintenance & repairs | 19,783 | 8.55 |
| Additional interest | 17,335 | 7.49 |
| Total projected cash expenditures | 662,408 | 286.40 |
| Projected operating deficits | 431,115 | 186.40 |

The 84 offering memorandum also includes a cash-flow analysis for EA 84-III from October 1, 1983, through December 31, 1987, as set forth in appendix B to this opinion.

In the 84 offering memorandum, it was contemplated that EPIC would finance the partnership's operating deficits by advancing funds to the partnership. The 84 partnership agreement provides that EA 84-III would pay interest on all unsecured advances of funds by the general partner at the rate of 15 percent per annum. The 84 partnership agreement permits the partnership to advance to the general partner any funds that were not distributed

to the limited partners, and the agreement provides that the general partner would pay interest to EA 84-III on such advances at the rate of 12 percent per annum.

The 84 partnership agreement provides that cash from operations is to be distributed generally in the following order of priority: (i) To EPIC to repay any unsecured advances made by EPIC to the partnership together with interest; (ii) to the partners in the ratio that the cumulative cash capital contributions of each partner bear to the cumulative cash capital contributions of the partners until such amounts equal the partners' cumulative cash capital contributions; (iii) 25 percent to EPIC and 75 percent to the limited partners holding the class A, B, C, D, E, and additional class units.

The partnership agreement further provides that cash from sales not associated with a liquidation and/or financings is to be distributed generally in the following order of priority: (i) To repay the partnership debt secured by the property sold or refinanced; (ii) to repay general creditors of the partnership, including EPIC, any advances with interest; (iii) to establish such reserves as the general partner deems necessary; (iv) to the partners in the ratio that the cumulative cash capital contributions of each partner bear to the cumulative cash capital

contributions of the partners up to the amounts which equal the partners' cumulative cash capital contributions; and (v) 25 percent to EPIC and 75 percent to the limited partners.

The 84 partnership agreement states that EA 84-III shall compensate EPIC as follows:

Compensation of the General Partner and Affiliates

\* \* \* \* \* \* \*

(a)  At the time of subscription, the General Partner shall receive seven percent (7%) of each Class A, Class B, Class C, Class D, Class E and any Additional Class or Classes Limited Partner's full contribution to the Partnership as a Partnership organization fee, as defined in the Confidential Private Offering Memorandum for the Partnership, or a maximum total payment of eighty-five thousand nine and 32/100 dollars ($85,009.32) for nonrecurring services which may be incurred before or after formation of the Partnership, including the furnishing of legal, financial, accounting and operational assistance, reviewing rental schedules and expense forecasts and providing other services which do not give rise to the acquisition or leasing of specific properties or the obtaining of financing therefor.

(b)  At the time of subscription to Future Class Units authorized pursuant to section 8(k), the General Partner, in its sole discretion, shall receive up to seven percent (7%) of the proceeds of the full contribution of each holder of a Future Class Unit for nonrecurring services which may be performed before or after authorization and sale of such Future Class Units, which may include furnishing legal, financial, accounting and operational assistance, reviewing and analyz- ing the Partnership's condition and determining

the need for an amount of such additional capital to be raised by the sale of such Future Class Units.

(c)  During each full or partial month of the Partnership, the General Partner shall be paid a Property Administration Fee equal to fifty dollars ($50) per month for each Partnership property.

          *    *    *    *    *    *    *

(d)  Such loan origination fees or service fees as may derive from originating or servicing any security interests, including mortgages and deeds of trust, placed upon Partnership property.

(e)  Reimbursement of all carrying costs of the Partnership properties, including, but not limited to, interest on mortgage indebtedness encumbering the properties incurred prior to the admission to the Partnership of the Limited Partners.

(f)  On all Advances of funds to the Partnership made by the General Partner pursuant to section 8(a)(xiv), the General Partner shall be entitled to interest at the rate of fifteen percent (15%) per annum.

          *    *    *    *    *    *    *

(i)  Any item of Partnership expense or cost may be paid to an entity or person affiliated directly or indirectly with the General Partner, subject only to the requirement that such affiliated or related person or entity perform such service as is contracted for or requested in consideration for such cost or expense.

Purchase of Production Houses in Texas and Arizona

EPIC entered into a Residential Rental Purchase Agreement (rental purchase agreement), dated September 16, 1983, under which it agreed to purchase 142 residential properties from U.S. Home Corp. (U.S. Home) for an aggregate purchase price of $8,767,850.  The location and purchase price of each property is set forth in exhibit A to the rental purchase agreement.

As a condition to the purchaser's obligation under the rental purchase agreement, U.S. Home agreed to pay to EPIC 6.8 percent of the purchase price of each property on the closing date.  The rental purchase agreement provides for this payment in the following language:

> On the Closing Date, Seller shall pay to Equity Programs Investment Corporation a sum equal to six and eight-tenths (6.8%) of the Purchase Price of the Properties, and the execution of this Agreement by Seller shall constitute an irrevocable assignment to Equity Programs Investment Corporation from the sale proceeds of a sum sufficient to make the payment due under this Subparagraph 4.6.

We refer to this amount as the builder fee.

The rental purchase agreement also requires U.S. Home to pay to the purchaser 3 months' rent for each property under certain conditions.  That provision states as follows:

> On the Closing Date, Seller shall pay to Purchaser a sum equal to the total estimated rent for three (3) months, as shown on Exhibit A for each of the Properties (the "Reserve"). At such time as all of the Properties have been rented at least once, or upon the expiration of seven (7) months from the Closing Date, whichever shall first occur, Purchaser shall refund the Reserve to Seller, less the product of the rent, as shown in Exhibit A, times the period of vacancy for each Property since the Closing Date.  For seven (7) full months after the Closing Date, Purchaser shall furnish Seller written monthly reports detailing occupancy and rents.

In this opinion, we refer to the payment required under the above provision as the rent advance.

The agreement further obligated U.S. Home to pay to the purchaser "a sum equal to the amount as set forth on Exhibit 'A' hereof of the purchase price of each Property as a contribution towards rental deficits (rental deficit contribution)."  We refer to this amount as the rental deficit contribution.  Finally, the rental purchase agreement conditioned the purchaser's obligation under the agreement on the acquisition of "an appraisal of each of the Properties by a FNMA/FHLMC qualified appraiser on a standard FNMA/FHLMC form which shall reflect the value of each Property equal to or greater than the purchase price applicable to that Property".

EPIC assigned its right, title, and interest as purchaser under the rental purchase agreement with U.S. Home to various limited partnerships of which it was general partner. EPIC assigned its right to purchase 15 of the 142 properties to EA 84-III. On September 19, 1982, EA 84-III purchased the 15 properties it had been assigned for an aggregate purchase price of $908,700.

To finance its purchase of the 15 properties, EA 84-III borrowed $863,250, approximately 95 percent of the purchase price, from EMI. On the closing date, EA 84-III executed 15 nonrecourse promissory notes in the aggregate principal amount of $863,250, payable to EMI with monthly installments of interest only for 5 years at the annual rate of 14.625 percent. Thereafter, the notes required EA 84-III to pay monthly installments of principal and interest for 5 years. The full indebtedness was due and payable on October 1, 1993.

Each nonrecourse promissory note was secured by a deed of trust dated on the closing date. Most of the deeds of trust were recorded either in the land records of Harris County or Bexar County, Texas, or Pima County, Arizona. A mortgage insurance company, Republic Mortgage Insurance Co. (RMIC), issued a commitment and certificate of insurance providing mortgage insurance for 25 percent of the first

loss amount with respect to the mortgage on each of the properties.

Set out below is a list of the 15 properties, together with the purchase price, the builder fee, the rental deficit contribution, the rent advance, and the amount borrowed with respect to each property:

| Houses and Condominiums | Purchase Price | Builder Fee | Rental Deficit Contrib. | Rent Advance | Loan |
|---|---|---|---|---|---|
| 5419 Heronwood Dr. | $54,000 | $3,672.00 | $6,189 | $1,395 | $51,300 |
| 5411 Heronwood Dr. | 65,000 | 4,420.00 | 9,610 | 1,395 | 61,750 |
| 3518 Tower Hill Lane | 63,750 | 4,335.00 | 8,959 | 1,425 | 60,550 |
| 12347 Northcliff Manor Dr. | 58,500 | 3,978.00 | 7,326 | 1,425 | 55,575 |
| 13066 Clarewood Dr. | 57,000 | 3,876.00 | 8,169 | 1,275 | 54,150 |
| 6351 S. Briar Bayou Dr. | 61,500 | 4,182.00 | 8,914 | 1,350 | 58,425 |
| 12103 Kingslake Forest Dr. | 60,500 | 4,012.00 | 8,341 | 1,380 | 57,475 |
| 12107 Kingslake Forest Dr. | 50,500 | 3,434.00 | 5,231 | 1,380 | 47,975 |
| 12111 Kingslake Forest Dr. | 56,000 | 3,808.00 | 6,549 | 1,425 | 53,200 |
| 12115 Kingslake Forest Dr. | 64,000 | 4,352.00 | 9,037 | 1,425 | 60,800 |
| 12231 Carola Forest Dr. | 59,000 | 4,114.00 | 7,482 | 1,425 | 56,050 |
| 4850 West Ferret Dr. | 71,000 | 4,828.00 | 9,905 | 1,575 | 67,450 |
| 4107 Medical Dr. (Condo.) | 59,950 | 4,076.60 | 7,777 | 1,425 | 56,950 |
| 13739 Earlywood Dr. | 64,000 | 4,352.00 | 9,692 | 1,350 | 60,800 |
| 6402 Ridgecreek Dr. | 64,000 | 4,352.00 | 9,692 | 1,350 | 60,800 |
| Total | 908,700 | 61,791.60 | 122,873 | 21,000 | 863,250 |

The sale of each property to EA 84-III is reflected on a settlement statement executed on the date of closing that shows the purchase price listed above as the contract sales price. For each of the properties, the total of the "amounts paid by/for" EA 84-III, consisting principally of the loan proceeds and the sum of the builder fee, rent advance, and rental deficit contribution, exceeded the gross amount due from EA 84-III. Set out below is a summary of the settlement statements showing that a total

of approximately $142,658.49 had been overpaid by or behalf

of the buyer, EA 84-III:

| U.S. Home Corp. | Buyer | Seller |
|---|---|---|
| Contract sales price | $908,700.00 | $908,700.00 |
| Settlement charges to buyer | 18,600.95 | -0- |
| Price adjustment | 830.16 | 830.16 |
| | 928,131.11 | 909,530.16 |
| Principal amount of loans | 863,250.00 | -0- |
| Builder fee | 61,791.60 | 61,791.60 |
| Rent advance | 21,000.00 | 21,000.00 |
| Rental deficit contribution | 122,873.00 | 122,873.00 |
| Other credits | 1,875.00 | 1,875.00 |
| Settlement charges to seller | -0- | 11,320.94 |
| | 1,070,789.60 | 218,860.54 |
| Amount due to buyer | [1] 142,658.49 | |
| Amount due to seller | | 690,669.62 |

[1] The record does not contain 4 of the 15 settlement statements and some amounts composing this total were estimated.

According to the settlement statements, the aggregate

principal amount of the loans, $863,250, was credited as

follows:

| U.S. Home Corp. | Buyer | Seller | Others | Total |
|---|---|---|---|---|
| Settlement charges to buyer | -0- | -0- | $18,600.95 | $18,600.95 |
| Amount due less loan | $-64,881.11 | -0- | -0- | -64,881.11 |
| Builder fee | 61,791.60 | -0- | -0- | 61,791.60 |
| Rent advance | 21,000.00 | -0- | -0- | 21,000.00 |
| Rental deficit contribution | 122,873.00 | -0- | -0- | 122,873.00 |
| Other credits | 1,875.00 | -0- | -0- | 1,875.00 |
| Settlement charges to seller | -0- | -0- | 11,320.94 | 11,320.94 |
| Amount due seller | -0- | $690,669.62 | -0- | 690,669.62 |
| | 142,658.49 | 690,669.62 | 29,921.89 | 863,250.00 |

In passing, we note that the parties stipulated that

U.S. Home sold to EA 84-III the two houses at 5411 and 5419

Heronwood Drive, and the four houses at 12103, 12107,

12111, and 12115 Kingslake Forest Drive.  These six

properties are listed among the properties covered by the

Residential Rental Purchase Agreement dated September 16, 1983, between EPIC and U.S. Home. Furthermore, the settlement statement for the sale of five of those properties lists the seller as U.S. Homes. The record does not contain the settlement statement for the sale of 12103 Kingslake Forest Drive.

At trial, respondent introduced warranty deeds that show that on or about June 1, 1982, the two properties on Heronwood Drive were transferred by U.S. Home to Tanmis Models, Inc., and on or about August 26, 1983, were transferred by Tanmis Models, Inc., to EA 84-III. Respondent also introduced warranty deeds that show that on or about September 1, 1981, the four properties on Kingslake Forest Drive were transferred by U.S. Home to Dyblof Models, Inc., and on or about August 26, 1983, were transferred by Dyblof Models, Inc., to EA 84-III.

Apparently, these six properties were models that EPIC acquired from U.S. Home through companies affiliated with EPIC, Tanmis Models, Inc., and Dyblof Models, Inc., and leased back to U.S. Home. Under its agreement with EPIC, U.S. Home had the right to buy each property back at the original purchase price at the end of the lease term.

EMI assigned to CSL its interest in each of the promissory notes and related deeds of trust that had been

issued by EA 84-III in connection with its purchase of the 15 properties from U.S. Home. EMI made the assignment in documents entitled Assignment of Deed of Trust that are dated November 29, 1983. In the same instruments, CSL further assigned to the National Bank of Washington its interest as holder of each promissory note under the related deed of trust. This documents the fact that shortly after EA 84-III purchased the subject properties from U.S. Home, National Bank of Washington purchased the promissory notes that EA 84-III had issued to EMI. Salomon Brothers, Inc., ultimately acquired the deeds of trust for all of the 15 properties.

As general partner of EA 84-III, EPIC executed 16 promissory notes dated February 1, 1985. Each of the notes was payable to CSL in the principal amount of $5,000, a total of $80,000. Under each of the promissory notes, EA 84-III promised to pay monthly installments of interest only on the unpaid principal balance at the annual rate of 15 percent with the principal due and payable on February 1, 1987. Fifteen of the promissory notes were secured by deeds of trust on the 15 properties described above. Each of the deeds of trust states that it is "subordinate to the lien of the institutional first deed of trust which was recorded prior to this Deed of Trust".

The 16th promissory note and the related deed of trust are similar to the others, except they refer to unit 101 of The Reflections condominium complex, described below.

Purchase of 40 Condominiums Units in the Reflections

EPIC executed a Residential Rental Purchase Agreement (rental purchase agreement), dated August 3, 1983, under which it agreed to purchase a condominium complex located in San Antonio, Texas, known as the Reflections from Pitman Properties, Inc., and Japhet Properties, Inc. (herein Pitman & Japhet), for $3,048,000.  For each condominium unit, there is attached to the agreement an exhibit B that identifies the unit, lists the appliances and furnishings included in the purchase price, and states the estimated monthly rent for the unit.

The Reflections is a 40-unit condominium complex which was new at the time of this transaction in 1983. The complex is composed of seven buildings with a total of 40,356.85 square feet of net rentable living area located on 2.233 acres.  The units have fireplaces, parking spaces, 1,135 square feet of storage space, and patios, porches and balconies.  There is a pool and exterior landscaping, and one side of the complex faces a man-made lake.

Under the rental purchase agreement, Pitman & Japhet agreed as a condition to closing to pay to EPIC 6.8 percent of the purchase price of each unit.  We refer to this amount as the builder fee.  As a further condition to closing, Pitman & Japhet agreed to pay to the purchaser a sum equal to the percentage of the purchase price of each unit that is set forth on exhibit A to the agreement as a contribution towards rental deficits (rental deficit contribution).  The percentages set forth on exhibit A range from 20.30 percent to 21.39 percent.   We refer to this amount as the rental deficit contribution.

As a further condition to EPIC's obligation, the agreement provides:

> Rental of the Properties to individual tenants
> shall have been arranged, or shall be arranged,
> upon execution by Purchaser of the Agreement
> in accordance with the procedures set forth in
> Exhibit "C", attached hereto and by this
> reference made a part hereof.

Pursuant to exhibit C, in the event that any of the properties were not leased as of 7 days before closing, Pitman & Japhet agreed to pay to the purchaser, in addition to the rental deficit contribution, an amount equal to three times the monthly rent set forth for each unit that

was not rented as of the closing date.  We refer to this payment as the rent advance.

The purchaser's obligations under the rental purchase agreement were also subject to the condition that the purchaser shall have obtained "an appraisal of each of the Properties prepared by a FNMA/FHLMC qualified appraiser on a standard FHMA/FHLMC form which shall reflect the value of each Property equal to or greater than the purchase price".

It appears that EPIC assigned to EA 84-III its rights as purchaser under the rental purchase agreement dated August 3, 1983, with Pitman & Japhet.  The record does not contain an instrument of assignment.  In any event, on September 30, 1983, EA 84-III purchased the 40 condominium units at the Reflections.

To finance its purchase of the condominiums, EA 84-III borrowed $2,590,200, approximately 85 percent of the aggregate purchase price, from EMI.  EA 84-III executed 40 nonrecourse promissory notes in the aggregate principal amount of $2,590,200, that were each payable to EMI with monthly installments of interest at the annual rate of 14.125 percent.  The record does not contain any of the 40 promissory notes, but their terms are summarized in the 84 offering memorandum as follows:

> Thirty-five month interest only, thirteen months
> amortizing on the leases [sic] of a thirty year
> amortization schedule, six year level pay fully
> amortizing, with no adjustments in the interest
> rate during the life of the loan.

Each promissory note was secured by a deed of trust and was covered by a private mortgage insurance policy. The record does not contain the deeds of trust or documents relating to the private mortgage insurance. At some time, Philadelphia Savings Fund of Philadelphia acquired the promissory notes that EA 84-III had issued to EMI and EMI assigned each of the 40 deeds of trust to Philadelphia Savings Fund of Philadelphia.

Set out below is a list of the 40 condominiums that EA 84-III purchased together with the purchase price, rental deficit contribution, rent advance, and loan amount:

| Unit | Purchase Price | Builder Fee | Rental Deficit Contrib. | Rent Advance | Loan |
|------|------|------|------|------|------|
| A 101 | $91,900 | $6,249.20 | $19,661 | $1,800 | $78,100 |
| A 102 | 97,900 | 6,657.20 | 20,596 | 1,950 | 83,200 |
| A 103 | 97,900 | 6,657.20 | 20,596 | 1,950 | 83,200 |
| A 104 | 91,900 | 6,249.20 | 19,661 | 1,800 | 78,100 |
| B 201 | 91,900 | 6,249.20 | 19,661 | 1,800 | 78,100 |
| B 202 | 97,900 | 6,657.20 | 20,597 | 1,950 | 83,200 |
| B 203 | 97,900 | 6,657.20 | 20,597 | 1,950 | 83,200 |
| B 204 | 91,900 | 6,249.20 | 19,661 | 1,800 | 78,100 |
| C 301 | 91,900 | 6,249.20 | 19,661 | 1,800 | 78,100 |
| C 302 | 97,900 | 6,657.20 | 20,597 | 1,950 | 83,200 |
| C 303 | 97,900 | 6,657.20 | 20,597 | 1,950 | 83,200 |
| C 304 | 91,900 | 6,249.20 | 19,661 | 1,800 | 78,100 |
| D 401 | 75,900 | 5,161.20 | 15,616 | 1,575 | 64,500 |
| D 402 | 75,900 | 5,161.20 | 15,616 | 1,575 | 64,500 |
| D 403 | 75,900 | 5,161.20 | 15,616 | 1,575 | 64,500 |
| D 404 | 75,900 | 5,161.20 | 15,616 | 1,575 | 64,500 |
| E 501 | 75,900 | 5,161.20 | 15,616 | 1,575 | 64,500 |
| E 502 | 57,900 | 3,937.20 | 11,751 | 1,245 | 49,200 |
| E 503 | 75,900 | 5,161.20 | 15,616 | 1,575 | 64,500 |
| E 504 | 57,900 | 3,937.20 | 11,751 | 1,245 | 49,200 |
| E 505 | 57,900 | 3,937.20 | 11,751 | 1,245 | 49,200 |
| E 506 | 75,900 | 5,161.20 | 15,616 | 1,575 | 64,500 |
| E 507 | 57,900 | 3,937.20 | 11,751 | 1,245 | 49,200 |
| E 508 | 75,900 | 5,161.20 | 15,616 | 1,575 | 64,500 |
| F 601 | 75,900 | 5,161.20 | 15,616 | 1,575 | 64,500 |
| F 602 | 57,900 | 3,937.20 | 11,751 | 1,245 | 49,200 |
| F 603 | 75,900 | 5,161.20 | 15,616 | 1,575 | 64,500 |
| F 604 | 57,900 | 3,937.20 | 11,751 | 1,245 | 49,200 |
| F 605 | 57,900 | 3,937.20 | 11,751 | 1,245 | 49,200 |
| F 606 | 57,900 | 3,937.20 | 11,751 | 1,245 | 49,200 |
| F 607 | 57,900 | 3,937.20 | 11,751 | 1,245 | 49,200 |
| F 608 | 57,900 | 3,937.20 | 11,751 | 1,245 | 49,200 |
| F 609 | 57,900 | 3,937.20 | 11,751 | 1,245 | 49,200 |
| F 610 | 75,900 | 5,161.20 | 15,616 | 1,575 | 64,500 |
| F 611 | 57,900 | 3,937.20 | 11,751 | 1,245 | 49,200 |
| F 612 | 75,900 | 5,161.20 | 15,616 | 1,575 | 64,500 |
| G 701 | 75,900 | 5,161.20 | 15,616 | 1,575 | 64,500 |
| G 702 | 75,900 | 5,161.20 | 15,616 | 1,575 | 64,500 |
| G 703 | 75,900 | 5,161.20 | 15,616 | 1,575 | 64,500 |
| G 704 | 75,900 | 5,161.20 | 15,616 | 1,575 | 64,500 |
| Total | 3,048,000 | 207,264.00 | 632,414 | 62,640 | 2,590,200 |

The sale of each condominium to EA 84-III is reflected on a settlement statement executed on the date of closing that shows the purchase price listed above as the "contract sales price". On each settlement statement, the builder fee, rent advance, and rental deficit contribution are treated as charges to Pitman & Japhet, reducing the amount due Pitman & Japhet. These amounts are also treated as credits to EA 84-III. Set out below is a summary of the

settlement statements showing that the aggregate amounts paid by or on behalf of the buyer, EA 84-III, exceeded the aggregate amount due from the buyer by $441,356.12:

| Pitman & Japhet Properties | Buyer | Seller |
|---|---|---|
| Contract sales price | $3,048,000.00 | $3,048,000.00 |
| Settlement charges to buyer | 16,018.38 | -0- |
| | 3,064,018.38 | 3,048,000.00 |
| Principal amount of loans | 2,590,200.00 | -0- |
| Builder fee | 207,264.00 | 207,264.00 |
| Rent advance | 62,640.00 | 62,640.00 |
| Rental deficit contribution | 632,414.00 | 632,414.00 |
| Adjustments | 1,756.50 | 1,756.00 |
| Other credits | 11,100.00 | 11,100.00 |
| Payoff loans | -0- | 1,548,548.53 |
| Settlement charges to seller | -0- | 132,833.00 |
| | 3,505,374.50 | 2,596,556.03 |
| Amount due buyer | 441,356.12 | |
| Amount due seller | | 451,443.97 |

According to the settlement statements, the aggregate principal amount of the loans, $2,590,200, was credited as follows:

| Pitman & Japhet Properties | Buyer | Seller | Others | Total |
|---|---|---|---|---|
| Settlement charges to buyer | -0- | -0- | $16,018.38 | $16,018.38 |
| Amount due less loans | $-473,818.38 | -0- | -0- | -473,818.38 |
| Builder fee | 207,264.00 | -0- | -0- | 207,264.00 |
| Rent advance | 62,640.00 | -0- | -0- | 62,640.00 |
| Rental deficit contribution | 632,414.00 | -0- | -0- | 632,414.00 |
| Adjustments | 1,756.50 | -0- | -0- | 1,756.50 |
| Other credits | 11,100.00 | -0- | -0- | 11,100.00 |
| Payoff loans | -0- | -0- | 1,548,548.53 | 1,548,548.53 |
| Settlement charges to seller | -0- | -0- | 132,833.00 | 132,833.00 |
| Amount due seller | -0- | $451,443.97 | -0- | 451,443.97 |
| | 441,356.12 | 451,443.97 | 1,697,399.91 | 2,590,200.00 |

In summary, the aggregate contract prices of the properties purchased by EA 84-III, the aggregate rental deficit contributions attributable to those properties, and the aggregate amounts borrowed are as follows:

|  | Contract Price | Rental Deficit Contribution | Loan Amount |
|---|---|---|---|
| U.S. Home | $908,700 | $122,873 | $863,250 |
| Pitman & Japhet | 3,048,000 | 632,414 | 2,590,200 |
| Total | 3,956,700 | 755,287 | 3,453,450 |

The 84 offering memorandum states that investors would break even if the real properties acquired by EA 84-III appreciated at the annual rate of 9.15 percent over the 4-year period that the partnership planned to hold the properties.

Financial Statements for EA 84-III

The general partner prepared and circulated to the limited partners quarterly statements for EA 84-III entitled "Results of Operations and Tax Income (Loss)". The record contains the statements for the eight quarters beginning September 19, 1983, and ending June 30, 1985. If the entries designated "current period" on the quarterly statements for a particular year are added, the totals for each entry for each year or part of a year during the

period beginning September 16, 1983, and ending June 30, 1985, are as follows:

| EA 84-III | 9/19/83 to 12/31/83 | 1/1/84 to 12/31/84 | 1/1/85 to 6/30/85 |
|---|---|---|---|
| Revenue: | | | |
| Rental income | $76,790.36 | $228,516 | $107,858 |
| Interest income--general partner | 6,097.26 | -0- | -0- |
| Other income | -0- | -0- | 2,866 |
| Total revenue | 82,887.62 | 228,516 | 110,724 |
| Expenses: | | | |
| Interest on first mortgage | 118,081.87 | 504,391 | 250,902 |
| Additional mortgage interest | -0- | -0- | -0- |
| Other interest expense | -0- | -0- | 5,000 |
| Real estate taxes, insurance, HOA | 26,480.69 | 83,110 | 45,240 |
| Audit fee | 5,000.00 | 5,000 | 2,500 |
| Repairs and maintenance | 10,225.44 | 120,032 | 30,811 |
| Property administration fee | 8,250.00 | 33,000 | 16,500 |
| Interest expense--general partner | -0- | 28,175 | 18,680 |
| Rental commission | 5,305.42 | 23,198 | 10,118 |
| Legal fees | 15.00 | 687 | 167 |
| Other expenses | 140.81 | -0- | 90 |
| Total expenses | 173,499.23 | 797,593 | 380,008 |
| Net results of operations | -90,611.61 | -569,077 | -269,284 |
| Taxable income (loss): | | | |
| Net results of operations | -90,611.61 | -569,077 | -269,284 |
| Plus: mortgage amortization | -0- | -0- | -0- |
| Less: depreciation | 42,685.50 | 170,742 | 85,372 |
| Amortization of loan fees | 3,454.45 | 13,812 | 6,906 |
| Amortization of refinancing costs | -0- | -0- | -0- |
| Accrued mortgage interest | -0- | -0- | -0- |
| Misc. expenses | -0- | 28 | -5 |
| Taxable income (loss) | -136,750.56 | -753,659 | -361,557 |

The above amounts can be compared with the cash-flow projection that was set out in the 84 offering memorandum and is reproduced as appendix B.

As shown above, one of the expenses recorded as having been paid on behalf of EA 84-III during the period beginning September 19, 1983, and ending June 30, 1985, is interest expense--general partner of zero during 1983, $28,175 during 1984, and $18,680 during 1985. Three of

the statements contain the following note or words of similar import:

Interest Expense--GP:

Cash advances by the General Partner necessary to sustain operations of the partnership continued to be greater than budget resulting in additional interest expense.

The quarterly statements also record that EA 84-III received interest income--general partner of $6,097.26 during 1983.

The record contains audited financial statements of EA 84-III for the period beginning September 14 (inception) to December 31, 1983, that were prepared by a firm of certified public accountants.  Included therein  is the following statement of operations and changes in partners' capital:

Revenues:
  Rental income                                    $76,790
  Interest income                                    2,756

                                                    79,546
Expenses:
  Interest                                         118,082
  Depreciation                                      21,343
  Real estate taxes                                 18,123
  Amortization                                       3,804
  Property management fee                            8,250
  Rental commission                                 5,305
  Insurance                                          5,480
  Repairs and maintenance                            8,500
  Other                                              9,759

                                                   198,646

Loss from operations                              (119,100)
Partners' capital contributions                    134,334

Partners' capital at end of year                    15,234


One of the accompanying notes deals with related-party transactions and states as follows:

4.   Related party transactions

Equity Programs Investment Corporation (EPIC) is the sole general partner for EPIC Associates 84-III. The general partner manages, controls and administers the business of the Partnership. The general partner is compensated for these services in accordance with the fee structure set forth in the Private Placement Offering Memorandum of the Partnership. The Partnership incurred $8,250 of cost to EPIC for these services during 1983. In addition the partnership paid organization fees to EPIC of $83,755.

Interest is charged or paid to the Partnership on the due to/from general partners balance in accordance with the rates prescribed in the Private Placement Offering Memorandum. The Partnership earned

$2,756 of interest net from EPIC during 1983.  While not obligated to do so under the Partnership agreement, the general partner is anticipated to advance funds for any cash flow deficits.

The Partnership paid loan origination fees of $138,138 to EPIC Mortgage, Inc., an affiliate of the general partner.

On the basis of the above, it appears that EA 84-III realized interest income from EPIC in 1983 and paid or incurred interest expense on unsecured advances from EPIC in 1984 and 1985 in the following amounts:

|  | 1983 | 1984 | 1985 |
|---|---|---|---|
| Interest income--general partner | $6,097.26 | -0- | -0- |
| Interest expense--general partner | -0- | $28,175 | $18,680 |
|  | 6,097.26 | (28,175) | (18,680) |

## Federal Income Tax Returns Filed on Behalf of EA 84-III

For Federal income tax purposes, EA 84-III reported the following income and expenses for the years in issue:

| EA 84-III | 1983 | 1984 | 1985 |
|---|---|---|---|
| Rent income | $80,124 | $228,516 | $230,130 |
| Interest | -0- | -0- | 494 |
| Total gross income | 80,124 | 228,516 | 230,624 |
| Interest (noninvestment) | 118,082 | 522,466 | 545,848 |
| Commissions | 5,305 | 23,198 | 19,403 |
| Insurance | 5,480 | 16,663 | 19,894 |
| Legal and professional fee | 6,895 | 687 | 1,008 |
| Repairs | 8,500 | 19,782 | 108,459 |
| Taxes | 18,123 | 72,554 | 72,617 |
| Utilities | 1,726 | 33,555 | 1,830 |
| Homeowners dues | 998 | 3,993 | 12,353 |
| Property management fee | 8,250 | 33,000 | 32,175 |
| Points amortization | 3,453 | 13,814 | 13,814 |
| Miscellaneous | 141 | 606 | 574 |
| Audit fee | -0- | 5,000 | 3,333 |
| Service fee | -0- | -0- | 3,197 |
| Depreciation | 56,910 | 170,742 | 170,742 |
| Total expenses | 233,863 | 916,060 | 1,005,247 |
| Net rental income | -153,739 | -687,544 | -774,623 |

On its Schedule K, Partner's Share of Income, Credits, Deductions, etc., for 1983, EA 84-III reported an ordinary loss of $153,739, a net investment loss of $141,142 for purposes of allocating tax preference items to its partners, and net investment income of $6,097 for purposes of computing investment interest. On its Schedules K for 1984 and 1985, EA 84-III reported ordinary losses of $687,544 and $774,623, respectively, and investment income of zero and $494, respectively; and for purposes of allocating tax preference items to its partners, EA 84-III reported qualified investment income

of $217,619 and $229,131, respectively, and qualified investment expenses of $872,376 and $997,436, respectively.

For depreciation purposes, EA 84-III treated the aggregate contract price of its 55 properties, $3,956,700, less the aggregate rental deficit contributions, $755,287, as its aggregate basis in the real estate; viz $3,201,413. EA 84-III allocated 20 percent of that amount to land; viz $640,283, and 80 percent to buildings; viz $2,561,130. EA 84-III depreciated the later amount on a straight-line basis over 15 years and claimed deprecation at the annual rate of $170,742 in each of the years in issue. EA 84-III claimed a depreciation allowance for 4 months on its 1983 return, $56,910, and a depreciation allowance for 12 months on its 1984 and 1985 returns.

For each of the years in issue, EA 84-III was obligated under the promissory notes that it had issued to EMI to pay interest on the aggregate principal amount of the notes, $3,453,450. EA 84-III was obligated to pay interest at the annual rate of 14.625 percent on the notes issued to purchase the 15 properties from U.S. Home and was obligated to pay interest at the annual rate of 14.125 percent on the notes issued to purchase the 40 condominium units from Pitman & Japhet. Thus, EA 84-III was obligated

to pay interest to EMI in the total amount of $492,116.06

during each of the years 1984 and 1985 computed as follows:

|  | Loan | Rate | Annual Interest |
|---|---|---|---|
| U.S. Home properties | $863,250 | 14.625 | $126,250.31 |
| Pitman & Japhet properties | 2,590,200 | 14.125 | 365,865.75 |
| Total | 3,453,450 |  | 492,116.06 |

EA 84-III was also obligated under the 84 partnership

agreement to pay interest at the annual rate of 15 percent

to compensate the general partner for unsecured advances of

funds to the partnership.  The returns filed on behalf of

EA 84-III for the years in issue report the following

liabilities to the general partner on Schedule L:

| Taxable Year Ended | Due to General Partner | Accrued Interest--G/P |
|---|---|---|
| 12/31/83 | -0- | -0- |
| 12/31/84 | $165,481 | $28,174 |
| 12/31/85 | 373,705 | 42,750 |

EA 84-III reported noninvestment interest expense on

its returns for the years in issue of $118,082, $552,466,

and $545,848, respectively.  The difference between these

amounts and the interest paid or incurred with respect to

the partnership's first mortgage notes is as follows:

|  | 1983 | 1984 | 1985 |
|---|---|---|---|
| Total interest expense reported | $118,082 | $522,466 | $545,848 |
| Interest on first mortgage notes | [1]123,029 | 492,116 | 492,116 |
| Difference | (4,947) | 30,350 | 53,732 |

[1] Four months of interest.

The record of this case does not fully explain the above differences.

EA 84-III paid loan origination fees to EMI in the aggregate amount of $138,138 equal to 4 percent of the principal amount of the first mortgage loans (i.e., $3,453,450 x 4 percent).  On the subject returns, EA 84-III claimed a deduction for "amount of points" of $3,453, $13,814, and $13,814, respectively.

EPIC

As mentioned above, EPIC, the general partner of EA 83-XII and EA 84-III, was incorporated in 1974 for the purpose of acquiring residential real properties and providing various services in connection with the acquisition, syndication, management, and disposition of the properties.  Between 1975 and 1985, EPIC formed approximately 357 limited partnerships with more than 6,000 limited partners.  EPIC was the general partner of each limited partnership.  These partnerships owned approximately 17,600 residential dwelling units located

throughout the United States and issued approximately 20,500 mortgages totaling approximately $1,435,000,000.

When EPIC began its real estate syndication business, it contracted to purchase properties from developers of residential real estate and to lease the properties back to the developers for use as models.  Typically, the developers were willing to pay to EPIC a commission, referred to as the builder's fee, of approximately 6 percent of the purchase price of each property and were willing to pay rent on each property for some period in advance.

EPIC would form a limited partnership for the purpose of buying the models.  EPIC would assign its rights to purchase the properties to the limited partnership, and the limited partnership would purchase the properties with equity capital contributed by the limited partners.  The early limited partnerships financed 75 or 80 percent of the purchase of the properties.  These loans were recourse. The limited partnership would lease the models back to the developer on a triple net lease basis during completion of the project, a period ranging from 18 to 24 months.

Typically, the rental income from the properties exceeded the amount needed to service the debt, and the partnership realized a positive cash-flow during the lease

term.  The plan called for the limited partnership to sell the properties for a profit at the end of the developers' lease term.  These early limited partnerships were referred to by EPIC's management as income partnerships.

EPIC's success and the success of its partnerships depended upon the appreciation of the real properties that were purchased by the partnerships.  The sales of real estate by EPIC partnerships before 1980, as shown in exhibits to the 83 and 84 offering memoranda, reveal high annual appreciation.

During 1980, mortgage interest rates increased to historic levels, and the real estate market began to deteriorate as a result.  The higher interest rates significantly increased the costs of selling properties and reduced profits realized by the partnerships on the sale of properties.  Accordingly, in 1980, EPIC's management made the decision to stop selling properties until interest rates fell.  EPIC's management believed that, as an interim measure, the company could carry the limited partnerships until interest rates decreased and profit margins returned to normal.

Notwithstanding the cessation of sales, EPIC continued to syndicate real estate partnerships.  This was EPIC's core business.  EPIC's management did not consider shutting

down that business when interest rates increased in 1980 because EPIC's management believed that the company could purchase properties that would appreciate and could be sold for a profit when interest rates declined.

At this time, EPIC's management undertook to revise certain characteristics of the limited partnerships that were syndicated. EPIC's management had realized that if an income partnership held properties after the developer's lease expired, the partnership would realize cash deficits, and it had no mechanism to fund such deficits. EPIC's management wanted greater flexibility in the period of time that a partnership could hold its properties. In order to permit a longer holding period, the partnerships would have to lease properties to individual tenants, and, as a result, the rental stream would decrease substantially because lease rates paid by individual tenants are much lower than the commercial rates paid by developers. However, EPIC found that developers would discount the price of the properties by an amount roughly equivalent to the present value of the difference in rental rates. EPIC referred to this discount as the rental deficit contribution.

Because of the longer holding period, EPIC's management also wanted to increase the loan-to-value ratio

of its mortgages to 95 percent in order to help carry the properties.  For the same reason, EPIC's management wanted the loans to be nonrecourse.

EPIC found that lenders in the secondary mortgage market would purchase such loans if the lender's risk, taking private mortgage insurance into account, was no greater than 72 percent of the loan.  Thus, in the case of a 95-percent loan, for example, a secondary lender would require mortgage insurance of at least 25 percent.  In the case of a 90-percent loan, a secondary lender would require mortgage insurance of at least 20 percent, and so on.  Through negotiation, EPIC found that private mortgage insurance companies were willing to insure nonrecourse mortgages on residential properties.  As a result of negotiations with secondary lenders and private mortgage insurers, EPIC's management found that it could obtain 95-percent nonrecourse financing on single-family houses and condominiums owned by its investment partnerships.  Finally, EPIC's management found that investors were willing to purchase interests in the new partnerships for roughly one-half of the anticipated tax losses; i.e., a 2-to-1 ratio.  The new partnerships were known internally to EPIC's management as "tax partnerships" to distinguish them from the earlier "income partnerships".

During the period after 1980, EPIC's management also experimented with resyndicating properties from older partnerships and with expandable partnerships. EPIC's management also formed EPIC Residential Network, Inc. (ERNI), to act as a real estate broker to be in position to sell properties when interest rates declined and the real estate market recovered.

Thus, beginning in 1981 or 1982, EPIC expanded its business by entering into agreements to purchase properties that it intended to rent to the public, rather than to the developer. After this change, EPIC did not limit itself to models in a particular project but contracted to buy production houses. This meant that, in some cases, EPIC acquired a substantial inventory of unsold houses in a single project and facilitated the developer's completion of the project.

Under this business plan, EPIC intended to syndicate the properties to limited partnerships which would rent the properties for 4 years before selling them. EPIC calculated the capital contributions of the limited partners to equal one-half of the anticipated tax losses, resulting in a "two-to-one tax write-off."

For cash management purposes, EPIC "swept" all funds from all of the partnerships' accounts daily and deposited

the funds into a master account maintained by EPIC. EPIC then advanced funds to pay the debts of any of its partnerships that needed funds. The amounts borrowed from each partnership and the amounts advanced to each partnership were accounted for in the books and records of the appropriate partnerships. Interest was credited to partnerships to which EPIC owed money and was charged to partnerships which owed money to EPIC (net borrowers and net lenders). Among the funds swept from the accounts of individual partnerships were the funds received by partnerships upon the acquisition of real properties. EPIC management believed that a default by any of its partnerships would have an adverse impact on the entire EPIC enterprise, and EPIC never permitted any limited partnership to default on a payment until August 1985 when all of the limited partnerships sought protection under the bankruptcy laws.

During the time it was in existence, EPIC formed or acquired a number of subsidiaries and affiliated companies to engage in different aspects of the real estate business. For example, as mentioned above, EMI originated mortgage loans on behalf of EPIC limited partnerships and received fees for doing so. EMI obtained the funds to originate loans through "warehouse" or interim lines of credit from CSL, an affiliated savings and loan association, and other financial institutions. EPIC sold interests in pass-through certificates or whole loans in the secondary market to other financial institutions. All of the purchase money promissory notes at issue in these cases were sold in the secondary market in one form or another.

Another affiliate, ERSI, managed the properties that were owned by EPIC limited partnerships, other than properties leased back to the developers on net leases. ERSI leased the properties, reviewed tenant applications, collected and accounted for rental income, secured insurance and arranged maintenance and repairs. EPIC paid ERSI a monthly fee of $35 of the $50 it received for managing each property.

Another affiliate, ERNI, acted as a real estate broker to sell properties. Generally, ERNI received a real estate

commission of 6 percent of the sale price of each unit sold.

Another affiliate, Continental Appraisal Group, Inc. (CAG), appraised the residential properties purchased by EPIC partnerships. The appraisals were made either by a member of the CAG staff or by an outside appraiser and reviewed by a staff appraiser. CAG also appraised properties for unrelated lenders. Another company, EPIC Securities, Inc., wholesaled the limited partnership interests in EPIC partnerships and received a percentage of the capital contributions as a commission. Finally, in October 1983, EPIC or one of its affiliates acquired Community Savings & Loan, a Maryland-chartered savings and loan association.

Private Mortgage Insurance

While EMI originated the loans at issue, each of the loans was insured by a private mortgage insurance company for 25 percent of the first loss amount. Tricor Mortgage Insurance Co. and Republic Mortgage Insurance Co. (RMIC) issued mortgage insurance covering the first mortgage loans at issue in the instant cases. In addition, EPIC dealt with other mortgage insurance companies, including Mortgage

Guarantee Insurance Corp. (MGIC) and Commonwealth Mortgage Assurance Corp. (CMAC).

The private mortgage insurance companies thoroughly investigated the risks presented by EPIC's business. For example, in June 1982, after EPIC had changed the nature of its limited partnerships, representatives of MGIC's appraisal department and underwriting evaluation department made a risk management study of EPIC. The study sets forth a detailed description of EPIC's business and the under-writing risks presented to MGIC from that business. As part of the study, MGIC had conducted spot checks of EPIC's appraisals and had found "inflated property values". The report states as follows:

> Based on our spot checks Epic's appraisals had inflated property values. The value estimates made 2 or 3 years ago by Epic's appraisers are higher than the value estimates as of the date of contract and the current value estimates of the properties. It is not known if Epic Mortgage is aware of this over-valuing in as much [sic] as they do not have an appraisal department to review the appraisals.

>     \*    \*    \*    \*    \*    \*    \*

> Based on MGIC's 25 spot checks there is over-valuing by Epic that has resulted in inflated property values and 14 properties with loan to value ratios in excess of 95%, up to 112%.

> a.    We can only speculate at the reason for the overvaluing because Epic Mortgage utilizes independent fee appraisers. The appraisers

                  might be influenced by the builder's indicated cost and are finding higher priced comparable sales to justify this cost rather than carefully studying the marketplace.

b.    The higher value estimates by Epic's appraisers are a result of using higher priced comparable sales, higher land value estimates which do not accurately indicate the subject property's true market value and model upgrade.  The model "upgrades" increase the sales price of the home and typically make it the highest priced home in the subdivision with the cost not typically recognized by the end purchaser.

c.    Epic should have the same concerns with overvaluing as MGIC because of losses to the partnership.  Epic's expertise may be in syndication and marketing not property valuation.  This would explain why they are only now setting up an appraisal review department.

Representatives of MGIC met with EPIC's management on two occasions to discuss possible overvaluation of properties.  Circa 1983, MGIC ceased insuring EPIC mortgages.  The principal reason given for this action was the concentration of risk represented by EPIC's business and the fact that EPIC had switched from syndicating model properties to production properties.  Nevertheless, MGIC wished to retain the renewal business for existing EPIC insurance policies.

Similarly, beginning in December 1983, before agreeing to insure any mortgage loans to an EPIC partnership,

Mr. James C. Miller, president of Commonwealth Mortgage
Assurance Co. (CMAC), and his staff met on several
occasions with representatives of EPIC's management to
discuss EPIC's business and the risks that CMAC would face
in writing mortgage insurance on mortgage loans issued by
EPIC partnerships.  A memorandum dated February 24, 1984,
written by Mr. Miller before any mortgage insurance was
written describes EPIC's business and the risks presented
by that business.  The memorandum describes the risks as
follows:

Risks

They described their program as unique, and it
is certainly entirely different from the normal
owner-occupied situation.  To hear them tell it,
there is virtually no chance of borrower default.
Their track record of selling to high-income
investors and obtaining the note payments from
them has been very good to date.

The next major risk is that the real estate
projects themselves do not work out.  Deprived
of rental income, the pool's cash flow would be
negatively impacted.  EPIC minimizes this risk
by wide diversification of the properties--
geographically, price and style.  They showed
us one sample pool in which the diversification
seemed to be excellent.

There's always the possibility that the general
partner, EPIC, will fail; the most likely form
of failure would be a series of projects that
did not rent out adequately.  We can review their
project plans to verify that they have adequate
margins built in to minimize this risk.  We can

also constantly monitor the financial position of the general partner.

Another risk is that the EPIC property management company will fail.  If the manager is collecting the rents and does not promptly forward all of the rent to the general partner, the entire enterprise is in jeopardy.  Of course, this is virtually the entire business of EPIC. Therefore, it is highly improbable that the property management company would fail alone.

Ultimately, we have the property to look to. Of course, the critical question is whether or not the property investors are acquiring the property at a bargain price, or whether EPIC is overcharging the investors.  Presumably, this is what our underwriting is intended to guard against.  We'll have to look at it carefully to satisfy ourselves that the value is probably there if we need it.  However, I believe that we should be concerned only with the entire pool because there is no way that an individual property will go into default--unless the general partner can decide to stop making payments on one individual mortgage.

The rates may be standard, owner-occupied rates on the primary insurance.  Frank Bossle agreed to send me copies of the current rates of the other PMI companies.  He says he is not looking for a bargain rate, because the cost of the mortgage insurance is passed on to the customer anyway.

He also says that they do not believe in requir- ing an insurer to take property that the insurer doesn't want.  They like all their business relationships to be based upon cooperation and mutual trust and profitability.

As noted above, one of the risks that Mr. Miller identified

related to the value of the property; i.e., "whether or not

the property investors are acquiring the property at a

bargain price, or whether EPIC is overcharging the investors."

In a later memorandum dated August 24, 1984, after CMAC had written mortgage insurance on a small amount of EPIC's business, Mr. Miller focused on the risk "that the overall market for investment property could become saturated, and/or the EPIC Management might overextend themselves by paying too much for their properties." Mr. Miller instructed his staff to order spot-check appraisals of the EPIC property.  The spot-check appraisals did not support the values suggested by EPIC's appraisals, and CMAC was not able to reconcile the differences. Shortly thereafter, in a letter dated August 5, 1985, CMAC ended its business relationship with EPIC.

## EPIC's Financial Statements

The record contains EPIC's financial statements for 1981, 1982, and 1983.  These statements show the following revenue and expenses:

| | Year Ended | | |
|---|---|---|---|
| | 12/31/81 | 12/31/82 | 12/31/83 |
| **Revenues:** | | | |
| Builder Fees | $8,960,780 | $15,895,234 | $18,905,034 |
| Interest income and | | | |
| loan service fees | 3,910,907 | 8,871,358 | 8,233,739 |
| Rental income | 1,613,598 | 1,219,852 | -0- |
| Property management fees | 972,077 | 1,357,220 | 941,616 |
| Partnership organization fees | 474,220 | 4,882,669 | 9,403,021 |
| Loan origination fees | 177,031 | 2,790,098 | 7,580,544 |
| Other income | 298,442 | 698,480 | 443,087 |
| Total revenue | 16,407,055 | 35,714,911 | 45,507,041 |
| **Costs and Expenses:** | | | |
| Interest expense | 4,149,063 | 7,629,826 | 3,270,713 |
| Payroll & fringe benefits | 3,969,457 | 8,696,684 | 8,430,324 |
| Commissions | 339,277 | 3,319,496 | 8,483,881 |
| Partnership rental expenses | 2,799,960 | 1,916,887 | -0- |
| Other operating expenses | 2,411,917 | 3,991,804 | 10,000,887 |
| Total expenses | 13,669,674 | 25,554,697 | 30,185,805 |
| Income from operations | 2,737,381 | 10,160,214 | 15,321,236 |

## EA 83-XII and EA 84-III's Bankruptcy

In 1985, the Governor of Maryland shut down the
State's savings and loan system, and the State required
all savings and loan associations subject to Maryland
regulation to liquidate their assets or to obtain Federal
deposit insurance from the Federal Home Loan Bank Board
(FHLBB).  CSL, a nonfederally insured Maryland savings and
loan, applied for deposit insurance issued by the Federal
Savings & Loan Insurance Corp. (FSLIC).

In July 1985, the FHLBB informed CSL that it would
not approve CSL's application for FSLIC insurance.  As a
result, EPIC and its real estate partnerships, including

EA 84-III and EA 83-XII, could no longer use CSL as a source of funds necessary for their operations. By August 15, 1985, EA 83-XII and EA 84-III defaulted on their respective obligations under the mortgages and deeds of trust on the properties. Shortly thereafter, EA 83-XII and EA 84-III filed petitions in the U.S. Bankruptcy Court for the Eastern District of Virginia.

## Notices of FPAA Issued to EA 83-XII

In the notices of FPAA issued to EA 83-XII for 1983, 1984, and 1985, respondent adjusted the ordinary income reported by the partnership as shown below in the second column for each year:

| EA 83-XII | 1983 | | 1984 | | 1985 | |
|---|---|---|---|---|---|---|
| Rent income | $287,640 | $287,640 | $306,577 | $306,577 | $331,743 | $331,743 |
| Late charges | 548 | 548 | -0- | -0- | -0- | -0- |
| Interest income | 9,344 | 9,344 | 90 | 90 | 1,262 | 1,162 |
| Miscellaneous | -0- | -0- | -0- | -0- | 883 | 883 |
| Total gross income | 297,532 | 297,532 | 306,667 | 306,667 | 333,888 | 333,888 |
| Interest (noninvestment) | 466,358 | -0- | 539,893 | -0- | 560,177 | -0- |
| Commissions | 25,460 | 25,460 | 21,950 | 21,950 | 24,846 | 24,846 |
| Insurance | 27,744 | 27,744 | 16,438 | 16,438 | 18,992 | 18,992 |
| Legal and professional fee | 726 | 726 | 8,093 | 8,093 | 574 | 574 |
| Repairs | 1,348 | 1,348 | 30,866 | 30,866 | 15,075 | 15,075 |
| Taxes | 49,224 | 49,224 | 49,213 | 49,213 | 45,962 | 45,962 |
| Utilities | 464 | 464 | 1,547 | 1,547 | 951 | 951 |
| Homeowner dues | 20,620 | 20,620 | 20,620 | 20,620 | 25,350 | 25,350 |
| Audit fee | 4,900 | 4,900 | 4,900 | 4,900 | 3,267 | 3,267 |
| Points amortization | 16,671 | -0- | 16,671 | -0- | 16,671 | -0- |
| Property management | 30,600 | 30,600 | 30,600 | 30,600 | 29,837 | 29,837 |
| Real estate tax service | 1,278 | 1,278 | -0- | -0- | -0- | -0- |
| Miscellaneous | 107 | 107 | -0- | -0- | 856 | 856 |
| Depreciation | 173,119 | -0- | 173,119 | -0- | 173,119 | -0- |
| Bad debts | -0- | -0- | 1,174 | 1,174 | -0- | -0- |
| Amortization organization expense | -0- | -0- | 3,150 | 3,150 | -0- | -0- |
| Recording fees | -0- | -0- | -0- | -0- | 24 | 24 |
| Service fee-EMI | -0- | -0- | -0- | -0- | 3,413 | 3,413 |
| Total expenses | 818,619 | 162,471 | 918,234 | 188,551 | 919,114 | 169,147 |
| Total rent income | -521,087 | 135,061 | -611,567 | 118,116 | -585,226 | 164,741 |

Respondent also disallowed the investment interest expense of $66,366 claimed on the 1983 return.

The "explanation of items" attached to the notice of FPAA for 1983 gives the following explanation of these adjustments:

INTEREST EXPENSE AND POINT AMORTIZATION

    *    *    *    *    *    *    *

The deductions shown on your return as interest
are not deductible because it has not been
established that the amounts were for interest on
a bona fide debt. Consequently, the partnership's
taxable income is increased.

    *    *    *    *    *    *    *

In the event that it is determined that there
was an actual investment associated with the
acquisition of the property or that there was
genuine indebtedness on the property, then with
respect to EPIC Associates 83-XII partnership
for the taxable year 1983, this activity was not
engaged in for profit and the allowability of
interest expenses incurred is limited to the
investment income of the taxpayer for the tax-
able year.  Consequently, all interest expenses
relative to this activity are not allowable as
deductions against ordinary income, but are
separately stated items subject to the invest-
ment interest limitations.

DEPRECIATION

The deductions shown on your return as
depreciation are not deductible because it has
not been established that a bona fide investment
in depreciable property was made.  Consequently,
the partnership's taxable income is increased.

In the event that it is determined that there was an actual investment associated with the acquisition of the property or that there was genuine indebtedness on the property, then with respect to the EPIC Associates 83-XII partnership for the taxable year 1983 [1984 and 1985], this activity was not engaged in for profit and only the following deductions are allowable:

(1) The deductions which would be allowable for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable for the taxable year year [sic] only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity of the taxable year exceeds the deductions allowable by reason of paragraph (1) above.

The notices of FPAA for 1984 and 1985 are virtually identical.

Respondent made other adjustments to EA 83-XII's returns for 1983, 1984, and 1985. For taxable year 1983, respondent disallowed the net investment loss of $341,010 reported for purposes of allocating tax preference items to its partners, and respondent disallowed the excess expenses from net lease property of $10,859 and the investment interest income of $29,306. For taxable years 1984 and 1985, respondent disallowed the qualified investment income of $303,571 and $330,529, respectively, the qualified

investment expenses of $908,960 and $909,831, respectively, and the investment interest income of $90 and $1,262, respectively.  In support of these other adjustments, the notices of FPAA issued to EA 83-XII state that "it has not been established that there was an actual investment associated with the acquisition of the property or that there was genuine indebtedness on the property."  In further support of these other adjustments, the notices state that the activity of EA 83-XII for 1983, 1984, 1985, and 1986 "was not engaged in for profit."

Notices of FPAA Issued to EA 84-III

In the notices of FPAA issued to EA 84-III for 1983, 1984, and 1985, respondent adjusted the ordinary income reported by the partnership as shown below in the second column for each year:

| EA 84-III | 1983 | | 1984 | | 1985 | |
|---|---|---|---|---|---|---|
| Rent income | $80,124 | $80,124 | $228,516 | $228,516 | $230,130 | $230,130 |
| Interest | -0- | -0- | -0- | -0- | 494 | 494 |
| Total gross income | 80,124 | 80,124 | 228,516 | 228,516 | 230,624 | 230,624 |
| Interest (noninvestment) | 118,082 | -0- | 522,466 | -0- | 545,848 | -0- |
| Commissions | 5,305 | 5,305 | 23,198 | 23,198 | 19,403 | 19,403 |
| Insurance | 5,480 | 5,480 | 16,663 | 16,663 | 19,894 | 19,894 |
| Legal & professional fee | 6,895 | 6,895 | 687 | 687 | 1,008 | 1,008 |
| Repairs | 8,500 | 8,500 | 19,782 | 19,782 | 108,459 | 108,459 |
| Taxes | 18,123 | 18,123 | 72,554 | 72,554 | 72,617 | 72,617 |
| Utilities | 1,726 | 1,726 | 33,555 | 33,555 | 1,830 | 1,830 |
| Homeowner dues | 998 | 998 | 3,993 | 3,993 | 12,353 | 12,353 |
| Property management fee | 8,250 | 8,250 | 33,000 | 33,000 | 32,175 | 32,175 |
| Points amortization | 3,453 | -0- | 13,814 | -0- | 13,814 | -0- |
| Miscellaneous | 141 | 141 | 606 | 606 | 574 | 574 |
| Audit fee | -0- | -0- | 5,000 | 5,000 | 3,333 | 3,333 |
| Service fee | -0- | -0- | -0- | -0- | 3,197 | 3,197 |
| Depreciation | 56,910 | -0- | 170,742 | -0- | 170,742 | -0- |
| Total expenses | 233,863 | 55,418 | 916,060 | 209,038 | 1,005,247 | 274,843 |
| Net rental income | -153,739 | 24,706 | -687,544 | 19,478 | -774,623 | -44,219 |

The explanation of the above adjustments is virtually identical to the explanation in the notices of FPAA issued to EA 83-III, quoted above.

Respondent made a number of other adjustments to EA 84-III's returns for 1983, 1984, and 1985. Respondent disallowed the net investment loss of $141,142 and investment interest income of $6,097 claimed in 1983. Respondent disallowed qualified investment income of $217,619 and qualified investment expenses of $872,376 claimed in 1984. Respondent disallowed qualified investment income of $229,131, qualified investment expenses of $997,436, and investment interest income of $494 claimed in 1985. In support of these other adjustments, the notices of FPAA state that "it has not

been established that there was an actual investment associated with the acquisition of the property or that there was genuine indebtedness in the property."  In further support of the other adjustments, the notices state that the activity of EA 84-III for 1983, 1984, 1985, and 1986 "was not engaged in for profit."

## OPINION

In the subject notices of FPAA, respondent disallowed the interest and depreciation deductions that each partnership claimed on its tax returns for 1983, 1984, and 1985.  According to the notices of FPAA, the interest deductions are disallowed because "it has not been established that the amounts were for interest on a bonafide [sic] debt."  Similarly, according to the notices of FPAA, the depreciation deductions are disallowed because "it has  not been established that a bona fide investment in depreciable property was made."

The interest deductions at issue consist principally, but not entirely, of amounts paid or accrued with respect to the nonrecourse promissory notes issued by each partnership for the purchase of the residential properties described above.  We sometimes refer to the subject promissory notices as first mortgage notes.  The

depreciation deductions are based entirely on the portion of the subject promissory notes that each partnership claims as a basis in the residential properties purchased with the notes.

If none of the promissory notes constitutes a bona fide debt, as determined by the notices of FPAA, it follows, as discussed below, that no amount paid or accrued with respect to any of the notes is deductible as interest under section 163(a).  Furthermore, if none of the promissory notes constitutes a bona fide debt, it also follows that neither partnership incurred a cost in issuing the notes and neither partnership obtained a basis in any of the properties for depreciation purposes.  Thus, the first issue for decision in these cases is whether any of the nonrecourse promissory notes issued by either partnership constitutes a bona fide debt.

A portion of the interest deducted by both partnerships was for "points amortization".  These deductions are based upon the loan origination fees paid by both partnerships to EMI.  The partnerships treated these fees as additional interest on the first mortgage notes and amortized them over the life of the loans.  The second issue for decision in these cases is whether the

partnerships are entitled to these deductions for points amortization.

The notices of FPAA also take the position that the activity of each partnership for each of the tax years in issue, 1983, 1984, and 1985, is an "activity not engaged in for profit" within the meaning of section 183(c). The notices of FPAA state: "the allowability of interest expenses incurred is limited to the investment income of the taxpayer for the taxable year." Thus, according to the notices of FPAA, if section 183 applies, then the interest expenses of each partnership must be treated as investment interest subject to limitation under section 163(d). On that basis, the adjustments to the subject returns would be similar in amount to the adjustments determined under the theory, described above, that neither partnership had entered into a bona fide indebtedness during any of the years in issue.

The application of section 183 is not just an alternative theory. The notice of FPAA issued to EA 84-III for 1985 relies on section 183 to disallow net operating expenses of $44,219. This is the amount by which the deductions claimed by EA 84-III exceed the partnership's gross income, after the deductions for interest and depreciation are disallowed under the non-bona

fide indebtedness theory, described above.  Thus, we must consider the application of section 183 no matter how we decide the other issues.  This is the third issue for decision in these cases.

It appears that each partnership also deducted, as interest, amounts paid or accrued during the years in issue with respect to certain funds advanced to it by EPIC, as general partner.  By implication, the notices of FPAA take the position that any such unsecured advance made by EPIC to either partnership did not create a bona fide indebtedness of the partnership to EPIC and any amount paid or accrued with respect to any such advance is not deductible under section 163(a).  This is the fourth issue for decision in these cases.

It also appears that EA 84-III deducted, as interest, amounts paid or accrued during 1985 with respect to 16 promissory notes issued to CSL.  Each of those promissory notes was secured by a deed of trust on one of the properties that had been purchased by EA 84-III in 1983.  As mentioned above, the notices of FPAA disallow all of the interest deductions claimed by the partnerships on the ground that the amounts deducted were not shown to have been paid as interest on a bona fide debt.  Thus, the fifth issue for decision in these cases is whether any of the 16

promissory notes issued by EA 84-III to CSL constitutes a bona fide debt.

## Nonrecourse Promissory Notes

Generally, a taxpayer is allowed to deduct an amount as interest under section 163(a) if the amount was paid or incurred during the taxable year with respect to genuine indebtedness.  See, e.g., Knetsch v. United States, 364 U.S. 361 (1960); Lukens v. Commissioner, 945 F.2d 92, 97 (5th Cir. 1991), affg. T.C. Memo. 1990-87; Fox v. Commissioner, 80 T.C. 972, 1019 (1983), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984); Hager v. Commissioner, 76 T.C. 759, 773 (1981).  Similarly, a taxpayer is allowed to include purchase money indebtedness in the basis of an asset for purposes of computing the allowance for depreciation under section 167 if the indebtedness is genuine indebtedness and represents an actual investment in property.  See, e.g., Brannen v. Commissioner, 722 F.2d 695, 701 (11th Cir. 1984), affg. 78 T.C. 471 (1982); Siegel v. Commissioner, 78 T.C. 659, 684 (1982).

Indebtedness is not considered genuine, that is, a true loan, if the facts show that the parties to the loan did not intend the principal amount of the indebtedness to

be repaid in full. See, e.g., <u>Siegel v. Commissioner</u>, <u>supra</u> at 688. In the case of nonrecourse indebtedness, such as that involved in the instant cases, the indebtedness is a lien that the debtor must satisfy according to its terms in order to retain possession and use of the encumbered property, but there is no fixed, unconditional obligation of the debtor to pay. See, e.g., <u>Waddell v. Commissioner</u>, 86 T.C. 848, 898 (1986), affd. 841 F.2d 264 (9th Cir. 1988). However, the lack of personal liability of the debtor, by itself, does not mean that nonrecourse indebtedness will not be repaid, nor does it disqualify the nonrecourse indebtedness from being considered genuine. See, e.g., <u>Hager v. Commissioner</u>, <u>supra</u> at 773; <u>Mayerson v. Commissioner</u>, 47 T.C. 340, 351-352 (1966). A nonrecourse mortgage can be found to be genuine indebtedness for tax purposes "on the assumption that the mortgage will be repaid in full." <u>Commissioner v. Tufts</u>, 461 U.S. 300, 308 (1983).

We have previously summarized the approaches taken by the courts in determining whether a purported nonrecourse liability is to be treated as true debt for Federal tax purposes. See, e.g., <u>Waddell v. Commissioner</u>, <u>supra</u> at 900-902; <u>Fox v. Commissioner</u>, <u>supra</u> at 1019-1021. In <u>Fox</u>

v. Commissioner, supra at 1019-1021, we described these approaches as follows:

> There are various approaches which may be taken in establishing whether a purchaser may treat a nonrecourse liability as a bona fide debt.  One, originating in Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), indicates that when the amount of the aggregate purchase price unreasonably exceeds the value of the property securing the note (or when the principal amount of the note unreasonably exceeds the value of the property securing the note), the debt will not be recognized.  In such instance, the purchaser acquires no equity in the property by making payments and, therefore, would have no economic incentive to pay off the note. Estate of Franklin v. Commissioner, supra at 1048-1049.  The Estate of Franklin analysis, comparing the purchase price and size of the note to the fair market value of the property at the time of purchase, originated in real estate transactions (see Estate of Franklin v. Commissioner, supra; Narver v. Commissioner, 75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); Beck v. Commissioner, 74 T.C. 1534 (1980), affd. 678 F.2d 818 (9th Cir. 1982)), but has also been applied to the purchase of cattle (see Hager v. Commissioner, supra), and, more recently, to movies (see Wildman v. Commissioner, supra; Siegel v. Commissioner, supra; Brannen v. Commissioner, supra).

> Another line of cases, in many ways complimentary to the above, more closely addresses the problem of bona fide loans where the sole security for such loans is a speculative asset with an undeterminable value at the time of purchase.  This line of decisions holds that highly contingent or speculative obligations are not recognized for tax purposes until the uncertainty surrounding them is resolved. CRC Corp. v. Commissioner, 693 F.2d 281 (3d Cir.

1982), revg. and remanding on other grounds Brountas v. Commissioner, 73 T.C. 491 (1979); Brountas v. Commissioner, 692 F.2d 152, 157 (1st Cir. 1982), vacating and remanding on other grounds 73 T.C. 491 (1979); Gibson Products Co. v. United States, 637 F.2d 1041 (5th Cir. 1981); Denver & Rio Grande Western R.R. Co. v. United States, 205 Ct. Cl. 597, 505 F.2d 1266 (1974); Lemery v. Commissioner, 52 T.C. 367, 377-378 (1969), affd. on another issue 451 F.2d 173 (9th Cir. 1971); Inter-City Television Film Corp. v. Commissioner, 43 T.C. 270, 287 (1964); Albany Car Wheel Co. v. Commissioner, 40 T.C. 831 (1963), affd. per curiam 333 F.2d 653 (2d Cir. 1964). For example, in Lemery v. Commissioner, supra, we held that an obligation to pay $444,335.17 of the $1,131,000 stated purchase price of a business only out of future "net profits" was too contingent to be included in the purchaser's amortizable basis. [Fn. refs. omitted.]

Respondent takes the position in the instant cases that none of the first mortgage notes issued by EA 83-XII or EA 84-III is a bona fide debt because the aggregate principal amount of the notes issued by each partnership exceeds the aggregate fair market value of the property securing the notes and, for that reason, neither partnership had an incentive to repay the notes. See, e.g., Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975). Respondent does not rely on a disparity between the purchase price of the properties and their value, and neither respondent nor petitioners address the question whether the value comparison required under the Estate of Franklin line

of cases should be based upon the purchase prices of the properties as opposed to the principal amounts of the notes. See Brannen v. Commissioner, 722 F.2d at 513 (Chabot, J., concurring). Therefore, as framed by the parties, the first issue in these cases is whether the principal amount of the first mortgage notes issued by each partnership unreasonably exceeds the value of the properties securing the notes.

Petitioners argue that "the fair market value of the properties [purchased by each partnership] was at least equal to the amount of the debt at the time it was incurred." They argue that the fair market value of each of the subject properties is its contract price, as established by a contemporaneous appraisal that was made by an independent, unrelated appraiser. The appraisals reflect the sale of each property to an individual buyer, rather than the bulk sale of all of the properties to a single buyer. Petitioners argue that the promissory note issued to purchase each of the properties, based upon 85 to 95 percent of the contract price, is bona fide indebtedness.

Petitioners emphasize that "each of the nonrecourse mortgages in the partnerships was insured by an unrelated

mortgage insurance company" and "was purchased by an
unrelated lender shortly after the loan was funded".
According to petitioners, the unrelated mortgage insurers
and the lenders who acquired the loans in the secondary
market each "had the incentive to ascertain that the value
of the properties was at least equal to the debt" and the
fact that they undertook to participate in the transactions
is "evidence that the fair market value of the properties
was at least equal to the amount of the debt at the time
it was incurred."  Petitioners argue that "the unrelated
lenders and insurers did due diligence" and, in fact "would
have exercised special caution with respect to such loans"
because of the unusual nature of the loans.  They further
argue that the facts show "that there was no attempt by
EPIC to conceal the facts."

Petitioners acknowledge that the partnerships
purchased the properties with substantial discounts and
that the partnerships did not pay the contract price for
any of the properties purchased.  As stated in their
posttrial brief:  "common sense suggests that a large
and astute investor [such as EPIC] would demand price
concessions."  Thus, petitioners acknowledge that the
prices paid by each partnership reflected the discounts

or price concessions that a large buyer would expect when buying "in bulk". In fact, as discussed above, EPIC negotiated with the sellers of the properties various "discounts" in the aggregate amount of approximately 20 percent of the contract price of the properties. Furthermore, the tax returns filed on behalf of each partnership compute the partnership's cost basis for each property under section 1012 as the contract price of the property less the rental deficit contribution for that property and claim depreciation on the portion of the cost that was allocated to the improvements. Petitioners argue that the value of each of the subject properties is equal to the contract price notwithstanding the fact that each partnership paid a price that reflected discounts from the contract price. Petitioners argue that such discounts "do not reduce the underlying value of any one item purchased".

Finally, petitioners argue that respondent's evidence relating to the fair market value of the properties is "rife with errors in assumptions and/or judgement and/or application of concepts". Petitioners ask the Court to conclude that respondent's evidence is biased and not worthy of consideration.

Respondent argues that the 106 promissory notes issued by EA 83-XII and EA 84-III should be disregarded for tax purposes "because the debt substantially exceeded the fair market value of the underlying property and lacked economic substance."  According to respondent's posttrial brief:

> Respondent's appraisals reflect that the nonrecourse debt by EMI exceeds the actual values of EA83-XII's properties by 39.40% and the actual values of EA84-III's properties by 19.53% and that EA83-XII and EA84-III "overmortgaged" the 106 properties to support nominal purchase prices that permitted Epic to receive substantial builder fees, rental deficit contributions, and rental advances.

Respondent explains the computation of the above percentages as follows:

> Respondent's appraisals reflecting values totalling $2,658,600.00 for the properties acquired by EA83-XII demonstrate that the nonrecourse debt totalling $3,706,150.00 originated by EMI exceeds the actual values by $1,047,550.00, or 39.40%.  Respondent's appraisals reflecting values totalling $2,889,150.00 for the properties acquired by EA84-III demonstrate that the nonrecourse debt totalling $3,453,450.00 originated by EMI exceeds the actual values by $564,300.00, or 19.53%.

According to respondent, EA 83-XII and EA 84-III "overmortgaged" the 106 properties in order "to generate substantial builder fees, rental deficit contributions, and rental advances necessary to feed EPIC's ravenous appetite

for fees to enlarge and maintain EPIC's real estate empire."  As an essential element of the "scheme", respondent alleges that "EPIC secured inflated, faulty appraisals to support the nonrecourse debt originated by EMI to acquire the 106 properties."  In this connection, respondent asserts that EPIC, through CAG "encouraged outside appraisers to inflate values on properties acquired by the partnerships", such as "by requesting appraisers to value multiple properties purchased in bulk sales as if purchased separately by different individuals."  As a result, respondent argues, the nonrecourse debt issued by EA 83-XII and EA 84-III to acquire the properties exceeded the value of the properties.  Thus, respondent asserts: "there was no incentive to repay the debt and the debt lacked economic substance."

Respondent also argues that the instant transactions did not "involve unrelated parties and independent appraisers establishing purchase prices."  Respondent argues that the transactions "involved related parties" and notes that EPIC, acting through its subsidiary, EMI, "originated, serviced each nonrecourse loan, and was primarily responsible for any due diligence related to the loans."  Respondent claims that for at least six properties acquired by EA 84-XII, EPIC, through two

subsidiaries "was both the seller and purchaser".
Respondent argues that the outside appraisers were not
independent because EPIC "influenced their appraisals with
guidelines and requests that precluded the use of bulk sale
methods in purchases of multiple units." According to
respondent, "EPIC, through CAG, influenced the inflated
appraisals related to the properties and determined the
stated purchase price."

Respondent also argues that the participation of
secondary lenders and mortgage insurers does not establish
that the value of the properties approximated the debt
because there is no evidence that they engaged in due
diligence. According to respondent: "the lack of due
diligence by secondary lenders and mortgage insurers
demonstrates that [the] lenders ignored or did not
understand the realities of the EPIC transactions." At
the same time, respondent notes the fact that some mortgage
insurers refused to insure "newly-created debt on EPIC
properties."

The following is a list of the 51 properties purchased
by EA 83-XII (viz 12 single-family residences and 39
condominium units) together with the amount of each loan,
the value of each property as determined by respondent's

appraisers, and the loan to value ratio for each property, computed using respondent's value:

EA 83-XII

| Address | Loan Amount | Respondent's Value | Loan ÷ Value |
|---|---|---|---|
| 1612 Hemphill Ave. | $54,525 | $57,400 | 94.99 |
| 1921 West 17th St. | 51,300 | 54,000 | 95.00 |
| 1728 Coronado Ave. | 51,300 | 54,000 | 95.00 |
| 1700 Linda Ave. | 54,050 | 56,900 | 94.99 |
| 1716 Coronado Ave. | 54,050 | [1] 53,900 | 100.28 |
| 1916 Hollywood Dr. | 53,200 | 56,000 | 95.00 |
| 1720 Coronado Ave. | 56,425 | 59,400 | 94.99 |
| 2109 Avignon Dr. | 84,525 | 84,000 | 100.63 |
| 2111 Avignon Dr. | 85,025 | 85,000 | 100.03 |
| 2113 Avignon Dr. | 95,475 | 91,000 | 104.92 |
| 2115 Avignon Dr. | 95,475 | 100,500 | 95.00 |
| 2117 Avignon Dr. | 101,175 | 106,500 | 95.00 |
| Paseos Castellanos (39 units) | [2] 2,869,625 | [2] 1,800,000 | 159.42 |
| Total | 3,706,150 | 2,658,600 | 139.40 |

[1] At trial, respondent's appraiser conceded that this value should equal the contract price of the property, $56,900.

[2] This is the aggregate amount for all 39 condominium units.

Respondent's position is that the promissory notes issued by EA 83-XII, comprising 51 of the 106 notes mentioned above, should be disregarded for tax purposes because the aggregate nonrecourse debt represented by those notes exceeds the value of the properties by 39.40 percent.

Similarly, the following is a list of the 55 properties purchased by EA 84-III (viz 14 single-family residences and 41 condominium units) together with the amount of each loan, the value of each property as determined by respondent's appraisers, and the loan to value ratio for each property, computed using respondent's value:

EA 84-III

| Address | Loan Amount | Respondent's Value | Loan ÷ Value |
|---|---|---|---|
| 5419 Heronwood Dr. | $51,300 | $58,000 | 88.45 |
| 5411 Heronwood Dr. | 61,750 | 65,000 | 95.00 |
| 3518 Tower Hill La. | 60,550 | 55,000 | 110.09 |
| 12347 Northcliffe Manor Dr. | 55,575 | 45,000 | 123.50 |
| 13066 Clarewood Dr. | 54,150 | 48,000 | 112.81 |
| 6351 S. Briar Bayou Dr. | 58,425 | 47,000 | 124.31 |
| 12103 Kingslake Forest Dr. | 57,475 | 46,000 | 124.95 |
| 12107 Kingslake Forest Dr. | 47,975 | 38,000 | 126.25 |
| 12111 Kingslake Forest Dr. | 53,200 | 40,000 | 133.00 |
| 12115 Kingslake Forest Dr. | 60,800 | 52,000 | 116.92 |
| 12231 Carola Forest Dr. | 56,050 | 54,000 | 103.80 |
| 4850 W. Ferret | 67,450 | 71,200 | 94.73 |
| 4107 Medical Dr. (Condo.) | 56,950 | 56,400 | 100.98 |
| 13739 Earlywood Dr. | 60,800 | 57,600 | 105.56 |
| 6402 Ridgecreek Dr. | 60,800 | 55,950 | 108.67 |
| Reflections Condos (40 Units) | [1] 2,590,200 | [1] 2,100,000 | 123.34 |
| Total | 3,453,450 | 2,889,150 | 119.530 |

[1] This is the aggregate amount for all 40 condominium units in the Reflections.

Respondent's position is that the promissory notes issued by EA 84-III, comprising 55 of the 106 notes mentioned above, should be disregarded for tax purposes because the aggregate nonrecourse debt represented by those notes exceeds the value of the properties by 19.53 percent.

The above schedules show that respondent tests whether the principal amount of the indebtedness exceeds the value of the property securing it in the aggregate, rather than loan by loan. If the value comparison were made loan by loan, most of the loans issued with respect to the single-family residences would approximate the value of the property securing the loan, even using respondent's values. For example, in the case of the 12 single-family residences acquired by EA 83-XII, as shown

in the schedule above, none of the loans issued by the partnership materially exceeds the value of the related property, as determined by respondent's appraisers. Similarly, in the case of the properties acquired by EA 84-III, other than the Reflections condominium units, 7 of the 15 loans issued by the partnership are 110 percent or less of the value of the related property, as determined by respondent's appraisers. Nevertheless, respondent determined that all of the loans issued by both partnerships are not bona fide because the aggregate principal amount of the loans issued by each partnership exceeds the aggregate value of the properties by 39.4 percent in the case of EA 83-XII and 19.53 percent in the case of EA 84-III. Petitioners do not take issue with this aspect of respondent's approach and the parties do not address the issue whether the value comparison should be made in the aggregate or loan by loan.

In these cases, we must determine whether the fair market value of the properties acquired by each partnership is more or less than the principal amount of the debt that was incurred by the partnership in purchasing the properties. For purposes of making this comparison, we must determine the fair market value of the properties as of the time they were acquired by each partnership. See,

e.g., Bailey v. Commissioner, 993 F.2d 288, 293 (2d Cir. 1993), affg. T.C. Memo. 1992-72; Lebowitz v. Commissioner, 917 F.2d 1314, 1318 (2d Cir. 1990), revg. and remanding T.C. Memo. 1989-178.  In the case of EA 83-XII, we must determine the fair market values of the properties as of December 1982; and, in the case of EA 84-III, we must determined the fair market values of the properties as of September 1983.

The fair market value of an item of property is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reason-able knowledge of relevant facts."  E.g., United States v. Cartwright, 411 U.S. 546, 551 (1973); Narver v. Commissioner, 75 T.C. 53, 96 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); McShain v. Commissioner, 71 T.C. 998, 1004 (1979); see sec. 1.170A-1(c)(2), Income Tax Regs.; sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs.  This is a question of fact to be determined from an examination of the entire record.  See, e.g., Lio v. Commissioner, 85 T.C. 56, 66 (1985), affd. sub nom. Orth v. Commissioner, 813 F.2d 837 (7th Cir. 1987); McShain v. Commissioner, supra at 1004.

The fair market value of real property is based on the highest and best use to which the property could be put on the date of valuation.  See, e.g., Frazee v. Commissioner, 98 T.C. 554, 563 (1992); Symington v. Commissioner, 87 T.C. 892, 896 (1986); Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986).  Generally, the highest and best use of a parcel of property is the reasonable and probable use of the property that supports the highest present value.  See Frazee v. Commissioner, supra at 563; Symington v. Commissioner, supra at 896-897. In determining the highest and best use of the property, it is necessary to consider the realistic, objective potential uses for which the property is adaptable and needed or likely to be needed in the foreseeable future. See Stanley Works v. Commissioner, supra at 400.  See generally Olson v. United States, 292 U.S. 246, 255-256 (1934).

In the process of establishing the fair market value of an item of property on the basis of its highest and best use, it is sometimes necessary to consider the most appropriate market through which the property would change hands from a willing seller to a willing buyer.  See, e.g., Akers v. Commissioner, 799 F.2d 243 (6th Cir. 1986), affg. T.C. Memo. 1984-490; Anselmo v. Commissioner, 757

F.2d 1208 (11th Cir. 1985), affg. 80 T.C. 872 (1983); cf. United States v. Cartwright, supra at 551-552. In identifying what market to use in estimating the value of an item of property, we have looked to the regulations promulgated under the estate and gift taxes, see sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs., which provide that the fair market value of an item of property is the sales price of the item in the market in which such item is "most commonly sold to the public." See, e.g., Goldstein v. Commissioner, 89 T.C. 535, 544 (1987); Lio v. Commissioner, supra at 66; Orth v. Commissioner, 813 F.2d 837 (7th Cir. 1987); Skripak v. Commissioner, 84 T.C. 285, 321-322 (1985); Anselmo v. Commissioner, 80 T.C. at 881-882.

In applying the estate and gift tax regulations to ascertain the fair market value of an item of property for purposes of computing the amount of a charitable contribution deduction, the Court of Appeals in Anselmo v. Commissioner, 757 F.2d at 1214, noted the following:

> Rules governing valuations for charitable contributions of property are distinguishable from valuations in the estate and gift context because the taxpayer has the opposite incentives in the two situations: the taxpayer wants to reduce the value of property for estate and gift tax purposes but, as here, the taxpayer wishes to inflate the value of property for charitable

> donation purposes. The estate and gift tax
> regulations are aimed at preventing abusive
> undervaluation of property; the regulations
> governing charitable contributions are not.
> In the usual case, however, there should be no
> distinction between the measure of fair market
> value for estate and gift tax and charitable
> contribution purposes. Cf. Champion v.
> Commissioner, 303 F.2d 887, 892-93 (5th Cir.
> 1962). * * *

Thus, the Court of Appeals noted that the estate and gift tax regulations were not a perfect fit in considering the charitable deduction in that case because the taxpayers had an incentive to inflate the value of the property, whereas "the estate and gift tax regulations are aimed at preventing abusive undervaluation of property". Id. The same is true in the instant cases. Nevertheless, we also agree with the Court of Appeals that "there should be no distinction between the measure of fair market value". Id.; see also United States v. Parker, 376 F.2d 402, 408 (5th Cir. 1967); Skripak v. Commissioner, supra at 322 n. 30. Finally, we agree with the Court of Appeals that selection of the proper market for valuation purposes is a question of fact. See Anselmo v. Commissioner, 757 F.2d at 1213.

A sale to the public is a sale to the ultimate consumer of the property, that is, a sale to one of a group of persons who do not purchase the item for resale.

See, e.g., Goldstein v. Commissioner, supra at 545-546; Lio v. Commissioner, supra at 70. In the normal situation, a sale to the ultimate consumer is a sale to a retail customer. See Lio v. Commissioner, 85 T.C. at 66; Anselmo v. Commissioner, 80 T.C. at 882. This is not invariably the case, however, because the term "public" refers to the "customary purchasers" of an item of property and not necessarily to individual consumers. Anselmo v. Commissioner, 757 F.2d at 1214. In Anselmo the Court of Appeals noted, for example, that the buying public for live cattle comprises primarily slaughterhouses, rather than individual consumers. See id. Therefore, in Anselmo, the Court of Appeals agreed with the finding of this Court that the market for low quality, unmounted gems was the market in which jewelry manufacturers and jewelry stores purchase stones to create jewelry items, rather than the retail market in which individual purchasers buy finished jewelry. Similarly, in Akers v. Commissioner, supra at 246, the court found that the market for a tract of land containing approximately 1,250 acres was the market for large tracts of over 1,000 acres and not the market for properties averaging less than a tenth that size. The court noted that the "ultimate consumer" of a 50-acre lot "does not normally

have the time, inclination, expertise or capital to buy a tract of land 10 or 20 times as big as the one he wants, with a view to subdivision and sale of the excess."  Id.

The above cases may be contrasted with Goldman v. Commissioner, 388 F.2d 476 (6th Cir. 1967), affg. 46 T.C. 136 (1966), in which the fair market value of 151 bound volumes of medical journals that had been contributed to a hospital was at issue.  The court held that the fair market value should be computed "on the price an ultimate consumer would pay", i.e., valued at retail, and further held that "what might be paid by a dealer buying to resell is not a proper consideration."  Id. at 478.  In Akers v. Commissioner, 799 F.2d at 247, the court reconciled that case with the others by noting that, unlike the unmounted gems in Anselmo and unlike the undivided land in Akers, the medical journals in Goldman "had already been 'subdivided,' in effect" and "were ready for immediate sale in the retail market and were not so expensive as to suggest that no retail buyer for them could have been found."

The appropriate market for estimating the value of an item of property may sometimes be the market in which the taxpayer purchased the property.  For example, in Lio v. Commissioner, 85 T.C. 56 (1985), the taxpayers purchased large quantities of lithographs and donated them to a

charitable organization 9 months later, claiming a charitable deduction of approximately three times the amount paid, and in Goldstein v. Commissioner, 89 T.C. 535 (1987), the taxpayers purchased posters and other art and donated them to a charitable organization 4 days later, claiming a charitable deduction of approximately twice the present value of the consideration paid. The taxpayers in each case asked us to value the property by looking to the prices charged by galleries and dealers to their retail customers. In defining the appropriate market and the ultimate consumer for the property in those cases, we gave particular attention to three factors: (1) Whether the buyers purchased the item of property for resale; (2) whether the buyers received special discounts in the purchase price; and (3) whether the sellers made substantial sales of the same type of property. See id. at 545-546. We found that the taxpayers had not purchased the property for resale, they had received no special discounts, and they had purchased from dealers who were responsible for a substantial portion of the total retail sales of the property. Thus, contrary to the taxpayers' position, we found that the appropriate market for valuing the property at issue in both cases was the market in which the taxpayers had purchased the property, and that the

taxpayers were the ultimate consumers of the property. Accordingly, we looked to the price paid by the taxpayers as the fair market value of the property.  See also Klaven v. Commissioner, T.C. Memo. 1993-299; Weiss v. Commissioner, T.C. Memo. 1993-228; Rhode v. Commissioner, T.C. Memo. 1990-656; Weintrob v. Commissioner, T.C. Memo. 1990-513, opinion modified T.C. Memo. 1991-67, affd. and remanded without published opinion sub nom. Wagner v. Commissioner, 31 F.3d 1175 (3d Cir. 1994); Broad v. Commissioner, T.C. Memo. 1986-340.

At the outset of our consideration of the instant cases, it is helpful to note several points about the positions of the parties.  First, respondent's appraisers valued the single-family houses and one condominium unit on a different basis than they used to value the other 79 condominium units.  According to respondent's brief, respondent's appraisers valued the single-family houses acquired by each partnership and one of the condominium units purchased by EA 83-III on a "retail" basis; that is:  "As if the properties were purchased separately by individuals."  Respondent's brief describes the appraisals of 14 of the single-family houses and the condominium unit at 4107 Medical Drive as follows:

Respondent's appraisals, which were performed 11 to 13 years after EA83-XII and EA84-III acquired the properties, reflect retail values of the houses at 2109, 2111, 2115, and 2117 Avignon Drive in Carrollton, the seven houses in Odessa [viz, 1612 Hemphill Avenue, 1921 West 17th Street, 1728 Coronado Avenue, 1700 Linda Avenue, 1716 Coronado Avenue, 1916 Hollywood Drive, and 1720 Coronado Avenue], the two houses at 5411 and 5419 Heronwood Drive in Humble, the condominium at 4107 Medical Drive in San Antonio, the house at 4850 W. Ferret Drive in Tucson as if the properties were purchased separately by individuals. [Emphasis supplied.]

Similarly, respondent's brief describes the appraisals of the other 12 single-family houses as follows:

Respondent's appraisals, which were performed 11 to 13 years after EA83-XII and EA84-III acquired the properties, reflect retail values for the residences at 2113 Avignon in Carrollton, 13739 Earlywood Drive and 6402 Ridgecreek Drive in San Antonio, and 3518 Tower Hill Lane, 12347 Northcliffe Manor Drive, 13066 Clarewood Drive, 6351 S. Briar Bayou, 12231 Carola Forest Drive, and 12103, 12107, 12111, and 12115 Kingslake Forest Drive in Houston as if purchased separately by individuals. [Emphasis supplied.]

On the other hand, respondent's appraisers valued the condominium units acquired by each partnership (other than the condominium unit at 4107 Medical Drive) on a "wholesale" basis; that is, as if the purchase consisted "of multiple properties purchased in bulk sales from the same builder." Respondent's brief states as follows:

Respondent's appraisals of the 39 units in Miami and 40-unit complex in San Antonio, which were performed 11 to 13 years after EA83-XII and EA84-III acquired the properties, reflect the wholesale value of multiple properties purchased in bulk sales from the same builder. [Emphasis supplied.]

Second, according to respondent's brief, the difference between the retail value of each single-family property, as determined by respondent's appraisers, and the wholesale value of that property is the amount of the rental deficit contribution. Respondent's brief states as follows:

because each of the [single family] properties was purchased by Epic in purchases involving multiple houses from the same builder, a discount in the amount of the rental deficit contribution of approximately 20% to the retail value is appropriate to arrive at the wholesale value of each property. * * *

The above statement echoes the opinion of respondent's appraisers, Messrs. Dalton and Ramos, who valued the Reflections condominium complex that was purchased by EA 84-III. In a memorandum that accompanied their appraisal, Messrs. Dalton and Ramos describe the difference between the wholesale and retail values of the properties as the amount of the rental deficit contribution. The memorandum states as follows:

4.  Another way to view the RDC [i.e., rental deficit contribution] is as the difference between the properties [sic] retail price over its wholesale price. As discussed above, the sum of the parts is much greater than the whole. By selling the properties individually, the owner receives the greater retail price, while he would get only a wholesale price if he sold all of the properties to a single investor in one transaction. That is, multiple purchases from the same builder demand a wholesale price. The discount would be in the range of the RDC, or a 20%-25% reduction of the retail price of each unit if sold separately. The percentage reduction is supported in the 40-Unit Condominium Complex appraisal (TAB C). The indicated wholesale value was estimated at $2,100,000. EPIC financed the property based on a projected retail sale of the property of $3,000,000. The wholesale value is 30% lower than EPIC's projected retail value.

5.  The 40-Unit Condominium Complex (TAB C) was valued at wholesale as this was the market for these types of properties. The values obtained for the single-family houses in TAB's A and B of this report reflect the retail fair market value of the properties. Multiple sales of single-family houses were not plentiful at the date of value and at the present date they are very obscure. A discount, in the approximate amount of the RDC, for each single-family property is required if these house were sold wholesale, i.e., grouped with a multitude of other houses, in one transaction to a single investor. The RDC was chosen as a discount from retail to wholesale based on the discussion presented in (4) above.

Significantly, respondent does not appear to take the position that the builder fees and rent advances are

additional discounts that must be applied to the retail value of the property in computing its wholesale value. In this connection, we note the fact that the builder fees were treated as having been paid by the seller to EPIC, as opposed to the partnership, and were reported as income by EPIC, and the fact that the rent advances were treated as rents and were included in the gross income of each partnership.

In summary, respondent's position is that valuing the subject properties as if sold to separate individuals yields the retail value of the properties, whereas valuing them as if purchased in a bulk sale yields the wholesale value of the properties. Furthermore, according to respondent, the difference between the retail value and the wholesale value of a particular property is the discount that EPIC negotiated with each of the sellers, referred to as the rental deficit contribution. Both of these positions are set forth in the memorandum written by Messrs. Dalton and Ramos, the relevant portion of which is quoted above.

Third, the appraisals that were obtained pursuant to EPIC's contracts with the sellers at the time EA 83-XII and EA 84-III purchased the subject properties (referred to herein as the contemporaneous appraisals) valued all of the

properties without discount as if each property were sold separately to an individual purchaser. To use respondent's terminology, all of the contemporaneous appraisals valued the properties, both single-family houses and condominiums, on a retail basis. They did not value the subject properties on a wholesale basis; that is, as if purchased in bulk by a single person.

Thus, in valuing the single-family homes and the condominium unit at 4107 Medical Drive, all of the appraisers used the retail market. In valuing the other 79 condominiums, on the other hand, respondent's appraisers used the wholesale market and the contemporaneous appraisals used the retail market.

Fourth, in valuing the subject properties, none of the parties relies upon the values that were established in the contracts between EPIC and the sellers of the properties. Petitioners argue that the transactions were arm's-length transactions between unrelated parties, but they take the position that the value of each property is its contract price, rather than the discounted price that the partnership actually paid for the property. On the other hand, respondent argues that the value of each property is a discounted price, as determined in respondent's

appraisals, but not the discounted price that the partnership actually paid for the property.

EPIC negotiated the purchase of the subject properties on behalf of EA 83-XII and EA 84-III from five developers, Fox & Jacobs, Raldon, Babcock, U.S. Home, and Pitman & Japhet. The contracts between EPIC and each of the sellers followed a similar pattern. Each contract set forth a purchase price for each property, referred to herein as the contract price, that was based on the prices that the seller had received from sales of similar properties to individual retail purchasers. The contract provided that the seller would "pay" an amount negotiated between EPIC and the seller called the rental deficit contribution. The seller agreed to "pay" this amount to the purchaser, the limited partnership. The contract further provided that the seller would pay to EPIC a commission of 6.8 percent of the contract price and, under certain conditions, would prepay rent to the purchaser.

In negotiating these contracts with EPIC, each seller was principally interested in the amount that it would net after the above discounts and fees. A representative of one seller, Babcock, testified that his concern was the "bottom line" or "minimum number" and that he permitted EPIC to structure the discounts and fees.

There is nothing in the record of either of the subject cases to suggest that the business interests of EPIC and both limited partnerships were not adverse to the business interests of each of the five developers, nor is there anything to suggest that EPIC and the partnerships did not deal with those companies at arm's length. Respondent does not suggest otherwise. In asserting that "the transactions * * * involved related parties", respondent focuses on EMI, the company affiliated with EPIC that originated the loans, and on CAG, the affiliated appraisal company that obtained contemporaneous appraisals in many cases. The activities of those companies, however, did not establish the prices of the properties. That was done through negotiation between EPIC, the willing buyer, and each of the five developers, the willing seller.

Generally, where there is evidence that parties having adverse economic interests have dealt at arm's length and have assigned a value to certain property, that evidence is viewed as the most reliable basis for a determination of fair market value of the property. See, e.g., Siegel v. Commissioner, 78 T.C. at 687; Narver v. Commissioner, 75 T.C. at 97; McShain v. Commissioner, 71 T.C. at 1004; Ambassador Apts., Inc. v. Commissioner, 50 T.C. 236, 243-244 (1968), affd. 406 F.2d 288 (2d Cir. 1969). In the

instant cases, the values assigned to the properties at issue under EPIC's contracts with the sellers are the discounted purchase prices paid for the properties. To use respondent's terminology, these values are the wholesale values of the properties. The following schedule shows the aggregate contract prices of the properties purchased by each partnership, less the aggregate rental deficit contributions, the aggregate builder fees, and the aggregate rent advances and compares the net amount to respondent's valuation:

| EA 83-XII Properties | Single Family | Condos | Total |
|---|---|---|---|
| Aggregate contract prices | $880,595 | $3,020,700 | $3,901,295 |
| Less: Aggregate rental deficit contributions | 67,643 | 587,676 | 655,319 |
| Less: Aggregate builder fees | 55,993 | 205,408 | 261,401 |
| Less: Aggregate rent advances | 17,557 | 68,625 | 86,182 |
| Contract prices less discounts, fees, & advances | 739,402 | 2,158,991 | 2,898,393 |
| Respondent's valuation | 858,600 | 1,800,000 | 2,658,600 |

| EA 84-XII Properties | Single Family[1] | Condos | Total |
|---|---|---|---|
| Aggregate contract prices | 908,700 | 3,048,000 | 3,956,700 |
| Less: Aggregate rental deficit contributions | 122,873 | 632,414 | 755,287 |
| Less: Aggregate builder fees | 61,792 | 207,264 | 269,056 |
| Less: Aggregate rent advances | 22,425 | 62,640 | 85,065 |
| Contract prices less discounts, fees, & advances | 701,610 | 2,145,682 | 2,847,292 |
| Respondent's valuation | 789,150 | 2,100,000 | 2,889,150 |

[1] Includes the condominium at 4107 Medical Drive in San Antonia, Texas.

Single-Family Houses and the Condominium at 4107 Medical Drive

As discussed above, all of the appraisals, including respondent's, valued the single-family houses and the

condominium unit at 4107 Medical Drive on a retail basis.
The reason for this in the case of the single-family houses
was suggested in the memorandum of respondent's appraisers,
Messrs. Dalton and Ramos, quoted above, when they stated:
"Multiple sales of single-family houses were not plentiful
at the date of value and at the present date they are very
obscure."  In effect, it appears that there was not a
market for multiple sales of single-family houses in 1982
and 1983 when the properties were purchased.

Furthermore, respondent used the retail value of the
single-family houses and the condominium unit at 4107
Medical Drive in computing the percentages and arguing that
the aggregate nonrecourse debt exceeded the value of the
properties by 39.40 percent in the case of EA 83-XII and
19.53 percent in the case of EA 84-III.  Respondent does
not argue that the single-family houses and the condominium
unit at 4107 Medical Drive should be valued on a wholesale
basis.  Thus, it appears that respondent agrees with
petitioners that these properties should be valued on a
retail basis.  Accordingly, we shall review the evidence
in the record to determine the retail value of the single-
family houses and the condominium at 4107 Medical Drive.

The partnerships purchased a total of 26 single-family
houses and the condominium unit at 4107 Medical Drive.  As

to 19 of these 27 properties, the difference between the principal amount of the debt and the fair market value determined by respondent's appraisers is not material. This is certainly true in the case of the 12 single-family properties purchased by EA 83-XII.  According to respondent's appraisers, the aggregate value of the 12 properties is $858,600, or $22,075 more than the aggregate principal amount of the loans, $836,525.  Similarly, according to respondent's appraisers, the difference between the value of 6 of the 14 single-family properties and the condominium unit at 4107 Medical Drive purchased by EA 84-III and the principal amount of the loan is less than 10 percent.  As to these 19 properties, therefore, there is no appreciable difference in the result of the value comparison depending on whether we use respondent's valuation or the contract prices of the properties.

The single-family residences as to which, according to respondent's appraisers, there is a material difference between the value of the property, and the principal amount of the debt are the following:

EA 84-III

| Property | Loan | Respondent's Value | Loan ÷ Value |
|---|---|---|---|
| 3518 Tower Hill Ln. | $60,550 | $55,000 | 110.09 |
| 12347 Northcliff Manor | 55,575 | 45,000 | 123.50 |
| 13066 Clarewood Dr. | 54,150 | 48,000 | 112.81 |
| 6351 S. Briar Bayou Dr. | 58,425 | 47,000 | 124.31 |
| 12103 Kingslake Forest | 57,475 | 46,000 | 124.95 |
| 12107 Kingslake Forest | 47,975 | 38,000 | 126.25 |
| 12111 Kingslake Forest | 53,200 | 40,000 | 133.00 |
| 12115 Kingslake Forest | 60,800 | 52,000 | 116.92 |

Petitioners' evidence regarding the above eight properties includes contemporaneous appraisals of the properties and testimony of the appraiser, Mr. Paul Lang, regarding the general nature of his appraisals for EPIC. Mr. Lang is a licensed real estate appraiser in the State of Texas and a senior resident associate (SRA) of the Appraisal Institute. He appraised each of the subject eight properties at the time EA 84-III purchased it in 1983.

Mr. Lang's appraisals of the above single-family properties were made on FHLMC/FNMA forms, as required by EPIC's contract with the seller, U.S. Home. Those forms state as follows: "This appraisal is based upon the * * * market value definition * * * stated in FHLMC Form 439 (Rev. 10/78) and FNMA Form 1004B (Rev. 10/78)". That definition of market value is as follows:

> DEFINITION OF MARKET VALUE: The highest price in terms of money which a property will bring, in a competitive and open market under all conditions

requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in cash or its equivalent; (5) financing, if any, is on terms generally available in the community at the specified date and typical for the property type in its locale; (6) the price represents a normal consideration for the property sold unaffected by special financing amounts and/or terms, services, fees, costs, or credits incurred in the transaction. ("Real Estate Appraisal Terminology," published 1975.)

Mr. Lang used both the sales comparison and the cost approach in valuing the subject properties. In the case of each of the properties, Mr. Lang concluded that the market value of the property was equal to its contract price. At trial, Mr. Lang testified that his appraisals were independent and objective, and that he had inspected each of the properties at the time of the appraisal. The appraisal forms provide support for this testimony. Mr. Lang made notations on the appraisal forms describing specific work on certain of the properties that had to be completed for the valuation to be accurate. Mr. Lang testified that the copies of his appraisals which are in

evidence are incomplete in that there is no map showing the comparable sales used in his analysis. The addresses and sale prices for the properties that he used as comparables appear on the forms.

Respondent's appraiser, Mr. Charles Brown, a valuation engineer employed by the Internal Revenue Service, appraised a number of single-family properties purchased by EA 84-III, including the eight properties listed above. At the time of his testimony, Mr. Brown had applied for but had not received the Appraisal Institute's designation as SRA, and he was not licensed as a real estate appraiser in Texas.

The definition of fair market value used by Mr. Brown is the following:

> The most probable price, as of a specified date,
> in cash, in terms equivalent to cash, or in other
> precisely revealed terms, for which the specified
> property rights should sell after reasonable
> exposure in a competitive market under all
> conditions requisite to a fair sale, with the
> buyer and seller acting prudently, knowledgeably,
> and for self-interest, and assuming that neither
> is under undue duress.

Thus, Mr. Lang's appraisals are based upon a definition of market value formulated in terms of "the highest price", as contained on the FHLMC/FNMA forms, and Mr. Brown's

appraisals are based upon a definition of market value formulated in terms of "the most probable price".

We note that the definition of market value of real property formulated in terms of "the most probable price", as contained on the FHLMC/FNMA forms, was not used in FHLMC/FNMA forms until 1986.  Announcement 86-11, made by FNMA on April 24, 1986, describes the new wording of the definition, effective for appraisals completed on and after July 1, 1986, as follows:

> It also defines the market value as the "most
> probable price which a property should bring
> * * *" as opposed to the "highest price which a
> property will bring * * *" in the old version.
> This change recognizes that the market value of
> a property usually falls within a range and that
> the indicated value is <u>an estimate which should
> not necessarily be at the highest portion of
> that range</u>.  [Emphasis supplied.]

Mr. Brown's report states generally that the value of single-family residences in the Houston, Texas, area decreased significantly after 1983.  His report states as follows:

> These homes closely followed the prevalent
> Houston area real estate trends during the early
> 1980's.  Values increased dramatically until 1983
> when values declined sharply for the next 3 to 6
> years.

Mr. Brown appraised the houses in 1995, 12 years after the sales at issue, using both the comparable sales and cost methods.  Mr. Brown testified that he inspected the exterior of each house appraised, and that he reviewed the records at the Harris County Appraisal District and at Baca Landata, a company located in Houston, Texas, which assists taxpayers in dealing with the Harris County Appraisal District.

Mr. Brown's approach is illustrated by his appraisal of the property at 3518 Tower Hill Lane.  That property is located on a cul-de-sac in the Northcliffe Manor subdivision approximately 12 miles northwest of downtown Houston.  It consists of a 1,331-square-foot house and garage built in 1983 on a 5,775-square-foot lot.

Mr. Brown employed the comparable sales approach and the cost approach to value this property.  He identified four comparable sales, two sales of comparable houses in 1983 and two sales in 1987.  He then used a "comparable sales adjustment grid" to adjust the sale price of each of the comparables to account for differences in the date of sale, location, lot size, size of the improvements, and year built.  After determining the adjusted fair market value of each of the comparables, Mr. Brown divided the adjusted value of each property by the square footage of

the improvements to arrive at the fair market value per square foot of the comparable.

For example, Mr. Brown determined that the fair market values per square foot of the two comparable sales in 1983 were $56.21 and $54.40.  He found that the fair market values per square foot of the two comparable sales in 1987 were $40.98 and $38.14.  Mr. Brown then chose the relatively low value of $40 per square foot as the market value in 1983 of the subject house, referred to in the appraisal report as Tract I.  Mr. Brown's report explains his choice as follows:

> After the adjustments are made, the fair market value of Tract I falls in the range of $38 to $56 per square foot in 1983.  Since Tract I is one of the largest homes in the subdivision, it shall command a loan value per square foot, say $40.

We note that the size of the improvements was already taken into account in the comparable sales adjustment grid.

Mr. Brown multiplies this value by the square footage of the improvements on Tract I and estimates that the fair market value of the property, on the basis of the sales comparison approach, is $53,200.  After further adjusting the value  by his estimate of the cost to reproduce the house, Mr. Brown's final estimate of the fair market value of the property is $55,000.

It appears that Mr. Brown's appraisal is too low. One of the comparable sales in 1983 is a house located on the same cul-de-sac as the subject property, 3510 Tower Hill Lane. That property was 116 square feet smaller and was sold for $64,400 ($53 per square foot) to an unrelated buyer in the same month that the partnership purchased the subject property. This is $9,400 more than Mr. Brown's appraised value of its larger neighbor. Similarly, a second comparable that was 173 square feet smaller than the subject property sold in September 1983 for $62,500.

In valuing the 11 properties that are the subject of his report, Mr. Brown used a total of 15 comparable sales, 8 from 1983, 1 from 1982, and 6 from 1987. In applying the comparable sales approach, Mr. Brown followed the same approach in valuing the 11 properties. As to each of the properties, he reviewed three to five of the comparables. He adjusted the sales prices of the comparables for age, location, and size, as described above, and computed an adjusted fair market value per square foot of the comparable. He then selected a value per square foot that represented his opinion of the fair market value of the subject property.

Set out below is a summary, for each of the subject properties, of the fair market values per square foot of

the comparables that were sold in 1982 or 1983, the fair market values per square foot of the comparables that were sold in 1987, and the fair market value per square foot that was selected by Mr. Brown as the value of the subject property:

| EA 84-III Properties | Tract | Adjusted FMV Per Sq. Ft. of Comparable Sales in 1982 & 1983 | | | Adjusted FMV Per Sq. Ft. of Comparable Sales in 1987 | | Subject Property FMV Per Sq. Ft. |
|---|---|---|---|---|---|---|---|
| 3518 Tower Hill Ln. | I | $54.40 | $56.21 | -0- | $40.98 | $38.14 | $40 |
| 12347 Northcliff Manor Dr. | II | 44.73 | 48.64 | -0- | 35.89 | 31.77 | 35 |
| 13066 Clarewood Dr. | III | 50.40 | 38.35 | -0- | 32.43 | -0- | 35 |
| 6351 S. Briar Bayou Dr. | IV | 52.91 | 42.66 | -0- | 34.07 | -0- | 30 |
| 12231 Carola Forest Dr. | V | 48.97 | 56.18 | $57.12 | 30.87 | 35.31 | 40 |
| 12115 Kings Lake Forest Dr. | VI | 49.47 | 56.82 | 57.70 | 31.20 | 35.63 | 35 |
| 12111 Kings Lake Forest Dr. | VII | 44.70 | 51.60 | 52.51 | 28.29 | 32.27 | 35 |
| 12107 Kings Lake Forest Dr. | VIII | 44.70 | 51.60 | 52.51 | 28.29 | 32.27 | 35 |
| 12103 Kings Lake Forest Dr. | IX | 47.09 | 56.82 | 55.06 | 29.78 | 33.95 | 35 |
| 5419 Heronwood Dr. | X | 45.88 | 48.00 | -0- | 32.31 | -0- | 35 |
| 5411 Heronwood Dr. | XI | 45.88 | 48.00 | -0- | 33.95 | -0- | 35 |

It is readily apparent that, in every case, Mr. Brown selected a fair market value per square foot that is roughly equivalent to the value of the comparable sales in 1987 and is substantially below the value of the comparable sales in 1982 and 1983. In doing so, we believe that Mr. Brown gave undue weight to the comparable sales in 1987 that took place after the value of the subject properties had "declined sharply".

For the above reasons, in comparing the fair market value of the property and the principal amount of the debt, we will treat the amount set forth in the contemporaneous appraisal of the property made by Mr. Lang as the fair

market value of each of the eight properties as of September 1983.

Condominiums

Unlike the single-family residences, it appears that there was both a retail market and a wholesale market for condominiums at the time the partnerships purchased the condominium units at issue in these cases. Respondent's principal expert witness, Dr. Richard Hewitt III, wrote an article in 1980, in which he described a "double-tiered market" for condominiums. Hewitt, "Condominium/Developed Lot Discounting Concepts...Again", 46 Real Estate Appraiser and Analyst (Jan.--Feb. 1980). Dr. Hewitt noted that in valuing condominiums some persons advocated using the gross sellout amount, the sum of the retail sale prices of the condominiums, as the market value, while others advocated using a discounted or wholesale value. See id. According to Dr. Hewitt: "both are correct under certain circumstances". Id. Dr. Hewitt wrote the following:

> Numerous questions continue to arise relative to
> what exactly is market value for condominium/
> developed lots. Certain advocates promote the
> idea that gross sellout (summation of retail
> sales prices) constitutes market value, whereas
> others have advocated the use of discounted
> value (or wholesale value). Actually, both are
> correct under certain circumstances due to what
> can best be described as a double-tiered market

phenomenon.  The two-tier participants consist of end-product users (final condominium unit owners or final single family dwelling purchasers) and "interim" purchasers.  It is the basic purchase motivation and investment goal differentials between these two tiers that result in dramatically different actual price; hence, value levels.  The general misunderstanding of these differentials also serves as a major stumbling block to the proper appraisal of, and underwriting of loans for, such projects.  In view of this, the estimate of market value first requires a clear recognition of value to whom. [Id.]

Petitioners take the position that the fair market value of the condominium units purchased by each partnership is equal to the sum of the contract prices of the units, as determined by the contemporaneous appraisals. As discussed above, the contemporaneous appraisals valued each condominium unit individually, principally using the comparable sales approach.  Thus, using the terminology suggested by respondent and Messrs. Dalton and Ramos, as discussed above, the contemporaneous appraisals valued the condominium units purchased by EA 83-XII and EA 84-III in the retail market.  Adding together the contract prices of the individual units to derive the value of the condominium complex is the "gross sellout" approach referred to in the portion of Dr. Hewitt's article quoted above.  On that basis, the fair market value of the 39 units in Paseos Castellanos that were purchased by EA 83-XII in December

1982 is $3,020,700, or $151,075 more than the aggregate principal amount of the promissory notes issued by EA 83-XII to purchase those properties. Similarly, on that basis, the fair market value of the 40 units composing the Reflections condominium complex that were purchased by EA 84-III in September 1983 is $3,048,000 or $457,800 more than the aggregate principal amount of the promissory notes issued by EA 84-III to purchase those units.

Respondent contends that the condominium units purchased by each partnership should be valued on a discounted or wholesale basis. On that basis, respondent contends, the aggregate fair market value of the 39 units in Paseos Castellanos purchased by EA 83-XII is $1,800,000, or $1,069,625 less than the aggregate principal amount of the promissory notes issued by EA 83-XII. In support thereof, respondent relies on the appraisal report prepared by Mr. Harold Mogul.

Mr. Mogul's report states that the highest and best use of the 39 condominium units is "the use for which the complex was originally designed and constructed: Residential Condominium Development." The report begins by determining "the total retail sales potential" of the units. Mr. Mogul did this by looking to the prices received for 23 units in the same condominium complex that

were sold to buyers other than EPIC.  Treating these "retail" sales as comparables, Mr. Mogul determined the retail sales potential of the subject 39 condominium units to be $2,962,000.

From the total retail sales potential, Mr. Mogul deducted anticipated expenses over a 30-month absorption period in the aggregate amount of $797,971, and he discounted the annual net income to arrive at a wholesale value of the subject condominium units of $1,800,000. Respondent acknowledges on brief that Mr. Mogul doubled real estate taxes and association fees in his computations and that using the correct amounts would increase the present worth of the 39 condominium units under Mr. Mogul's discounted cash-flow analysis to $1,856,576.

In passing, we note that a representative of Babcock Co. testified at trial that the contract prices of the subject 39 units in Paseos Castellanos were based upon the prices of actual sales of similar units to members of the public.  Mr. Mogul's appraisal tends to support that testimony.  The total retail sales potential of the units, as determined by Mr. Mogul, $2,962,000, differs from the aggregate contract prices of the units, $3,020,700, by $58,700 or less than 2 percent.

Respondent contends that on a discounted or wholesale basis the aggregate fair market value of the 40 units of the Reflections condominium complex that were purchased by EA 84-III is $2,100,000 or $490,200 less than the aggregate principal amount of the promissory notes issued by EA 84-III. In support thereof, respondent relies on the appraisal report prepared by Mr. David B. Dalton, an appraiser employed by the Internal Revenue Service, and by Mr. Mark D. Ramos, an Internal Revenue Service engineer.

Messrs. Dalton and Ramos considered the highest and best use of the 40 condominium units in the long term to be "the possible sale of the units individually or as a whole". They considered the short-term highest and best use of the condominium units to be "as apartment units to exploit a possible cash-flow from the residential rental income of the forty units." In their appraisal, Messrs. Dalton and Ramos used the comparable sales approach to arrive at the "wholesale value" of the units, $2,100,000, based upon the sale of one apartment building with 36 units. This is an entirely different method than the discounted retail sales method used by Mr. Mogul.

In applying the sales comparison approach to the subject property, Messrs. Dalton and Ramos reviewed four buildings in the same general area that were sold in 1983.

Three of the buildings were substantially larger than the Reflections both in the number of units and in square footage, and the appraisers chose not to use those sales because the size differences "would require a large upward adjustment to bring them comparable to the subject." The fourth comparable, the one on which they based their appraisal, involved the sale of an apartment with 36 units that "was purchased for conversion to condominiums" and as of "December 1994, 12 of the 36 units [had] been converted."

The sale price of the apartment building, $1,650,000, divided by the number of apartments, 36, works out to a price per unit of approximately $45,800. Respondent's appraisers note that the Reflections has a more desirable setting, with a view of a lake, than the comparable and has approximately three-fourths of an acre more land. Accordingly, the appraisers increased the price per unit to $52,500, an increase of $6,700 per unit, to account for these differences. Their report, however, does not explain how this adjustment was determined. Respondent's appraisers made no adjustment for the fact that the comparable was approximately 3 years old at the time of the time of the sale, whereas the Reflections had just been built.

In passing, we note that their appraisal of the 40 units of the Reflections condominium complex is accompanied by a memorandum, discussed above, in which Messrs. Dalton and Ramos point out that this "wholesale value is 30 percent lower than EPIC's projected retail value" of the condominiums, "$3,000,000", and they suggest that the two values are within the range of what would be expected. Messrs. Dalton and Ramos also state that EPIC over-leveraged the condominiums "by financing the properties at their retail price", and they note that "EPIC financed the Condo's at $3,000,000". Thus, their memorandum implies that the sum of the retail values of the condominium units is $3,000,000 or $48,000 less than the sum of the contract prices of the condominiums, $3,048,000.

It is evident from the above that the threshold question in these cases is whether the condominiums should be valued on a retail basis or on a wholesale basis. If we decide that the condominiums should be valued in the retail market, then it appears that the fair market value of the condominiums exceeds the amount of debt. This is true whether we base the retail values of the properties on the contract prices, as argued by petitioners, or the retail prices implied in the reports of respondent's appraisers. On the other hand, if we decide that the condominiums

should be valued in the wholesale market, then it appears that the fair market value of the condominiums is less than the amount of debt.  This is true whether we base the wholesale values on the amounts set forth in respondent's appraisals or the prices that each partnership actually paid for the condominiums.  As the court noted in <u>Anselmo v. Commissioner</u>, 757 F.2d at 1213:  "The selection of the relevant market at a given time for appraisal purposes is tantamount to selecting the price."  That is certainly true in this case.

None of the appraisers who testified in these cases considered this issue.  Mr. Seph Pomerantz, who prepared the contemporaneous appraisals of the 39 units in Paseos Castellanos, testified that his firm was asked to appraise the units individually and not in bulk.  He further testified that he would not have completed his appraisals in the same fashion if he had been asked for a bulk appraisal.

Similarly, Mr. Mogul's letter transmitting his appraisal report to respondent's counsel states that the report was made for the purpose of estimating the fair market value of the 39 condominium units in Paseos Castellanos as of December 30, 1982, "assuming sale of thirty-nine units to a single purchaser."  Thus, as he

further stated during his testimony, Mr. Mogul appraised the condominium units as property to be held by a single investor, or "entrepreneur".

Finally, Mr. Dalton, who appraised the 40 units of the Reflections, testified at trial that his "assignment [from respondent] was, how much should EPIC have paid for this property."  In the memorandum attached to their appraisal, Messrs. Dalton and Ramos make the following statement:

> The fair market value of the properties acquired by Epic Associates 84-III is based on the market place in which they were acquired, the wholesale market.  As such, the fair market value is the price paid by Epic Associates 84-III to the seller, without regard to any RDC (rental deficit contribution) or other supposed Builder Rebate.

They do not explain why the fair market value of the properties acquired by EA 84-III must be determined in "the market place in which they were acquired, the wholesale market" when, as they also recognize, EA 84-III purchased the properties for resale and received special discounts in the purchase price from the sellers.

The report of respondent's principal expert witness, Dr. Richard Hewitt III, does not explicitly discuss the appropriate market for determining the value of the subject properties.  Dr. Hewitt's report does suggest that the

value of the subject properties must be based upon the bulk purchase price, the wholesale price, rather than the value of each single unit because:

> The potential market risk [to each partnership] is actually related to multiple units and not a single unit as would be unrealistically reflected by the EPIC/CAG approach of solely obtaining individual unit appraisals.

In his testimony, Dr. Hewitt elaborated on that concept as follows:

> What I was illustrating in the report is that if you look at the way Epic appraised the properties, they specifically, by the directive of their captive appraisal group, dictated that the appraisals be done on an individual basis, despite the reality that their purchases were done in bulk.
>
> And what I am saying is is [sic] that discount was represented because of the fact that they, in fact, had a risk exposure relating to a bulk purchase, so they paid a fair price for buying 50, 60, 150 or 200.
>
> They may have-and I am trying to illustrate, which is really the difficult concept in this whole Epic matter--is there is a significant difference between the one-house-at-a-time appraisal versus the risk, the portfolio risk of having 50, having 100, having 250.

On the basis of that statement, respondent asks the Court to make the following finding of fact:

> Because market risk for EA83-XII and EA84-III
> related to multiple units acquired in bulk sales
> and not single units acquired in separate
> transactions and the appraisals obtained by Epic
> for the properties were only on an individual
> basis using market and cost approaches, the
> separate appraisals for each property did not
> realistically reflect the market risk or value
> to EA83-XII and 84-III.  [Emphasis supplied.]

We agree with Dr. Hewitt that each partnership made bulk purchases of the properties and received special discounts from the sellers and that each partnership undoubtedly paid a fair price for the properties that it purchased.  We agree with Dr. Hewitt that each partnership purchased the properties for resale.  As Dr. Hewitt stated:

> Someone buying, in the case of Epic, 40, 100, 200
> homes at a pop, obviously, is not going to live
> in those homes.  The intent from a typical market
> purchaser's standpoint, if you were to buy a
> hundred homes, would be to resell those.

We further agree with Dr. Hewitt that the contemporaneous appraisals valuing each property individually do not reflect the bulk purchases made by each partnership.

The question that we must decide, however, is whether, for purposes of determining the bona fides of the subject indebtedness, the fair market value of the properties must be determined in the wholesale market, the market in which the partnerships purchased the properties, or the retail

market, the market in which the partnerships planned to resell the properties. The thrust of respondent's position is that the fair market value of the properties, as stated by Messrs. Dalton and Ramos: "is based on the marketplace in which they were acquired, the wholesale market." Neither respondent nor respondent's witnesses provide a reason why this must be the case.

During his testimony, Dr. Hewitt touched on the appropriate market for valuing property and, contrary to respondent's position, his testimony suggests that the subject properties should be valued in the retail market. On cross-examination, Dr. Hewitt answered a number of questions from petitioners' representative about the value of a bag of peanuts as purchased by an individual, on the one hand, or the value of the same bag of peanuts as purchased by a bulk purchaser, such as an airline, on the other hand. On redirect, the following exchange took place between Dr. Hewitt and respondent's attorney:

> Q.     Mr. Hewitt, you and Mr. Griffith talked about buying peanuts, where he could go buy one bag of peanuts and Delta could go buy another bag of peanuts. Let's do this example: You could go to the grocery store where a bottle of Coca-cola sells for 50 cents a bottle, and you can buy a six-pack for $2.

        You bought a six-pack.  Do you value
        your acquisition at $2 or $3?

A.          Of course not.  You would value it
        based on what you paid for it, because it
        takes into account the discount.  The only
        way you could achieve the higher number
        would be to go into the soda-dispensing
        business and sell out individual Cokes to
        individual users of one Coke after another.

Dr. Hewitt's response suggests that the purchaser must

value the property on the basis of the amount paid,

unless the purchaser is a person who is in the business

of reselling the property, like each of the subject

partnerships, and receives a discount from the seller.

In such a case, the purchaser is entitled to value the

property at the resale value; i.e., $3 in the hypothetical

example posited by respondent's counsel, or $1 more than

the buyer paid for the property.

     Dr. Hewitt's testimony on this point is consistent

with the cases, discussed above, involving the

determination of the appropriate market to use in

estimating the value of an item of property.  See, e.g.,

Goldstein v. Commissioner, 89 T.C. at 544-546; Lio v.

Commissioner, 85 T.C. at 66; Anselmo v. Commissioner, 80

T.C. at 882-883.  Under those cases, the fair market value

of an item of property is its sale price in the market in

which it is "most commonly sold to the public" in the sense of the "customary purchasers" of the property. Anselmo v. Commissioner, 757 F.2d at 1212-1214.

It is evident that the subject condominium units were ready for immediate sale to individual purchasers and that individual purchasers were among the "customary purchasers" of condominiums. It is also evident that neither partnership was the ultimate consumer of the condominiums. The partnerships purchased the condominiums in bulk purchases and received substantial discounts from the sellers, the developers of the properties. The partnerships purchased the condominiums for the purpose of reselling them to owner occupants after leasing them for a period of time. See Goldstein v. Commissioner, supra at 545-546. Therefore, on the basis of the facts of the instant cases, we find that the retail market was the appropriate market to use in estimating the fair market value of the condominiums.

Furthermore, in the instant cases, retail valuation of the condominium units appears to have been approved by the marketplace. As discussed in the findings of fact, the specific loans at issue were initially made by EMI, which originated the loans and continued to service them; but the loans were insured by private mortgage insurance companies

and were sold to unrelated lenders in the secondary mortgage market. Tricor and RMIC are the private mortgage insurance companies that issued mortgage insurance covering the loans at issue in the instant cases.

The information submitted as part of Dr. Hewitt's report confirms, as one would suspect, that the private mortgage insurers thoroughly investigated EPIC's business and were particularly careful to investigate the risks relating to the values of the properties that EPIC syndicated. That information also shows that the private mortgage insurers had occasion to review appraisals submitted by EPIC in connection with its application for mortgage insurance and, in some cases, the private mortgage insurers ordered spot appraisals to compare with EPIC's appraisals. It would be readily evident from reviewing the contemporaneous appraisals that EPIC had valued each of the condominiums and other residential properties purchased by its limited partnerships on an individual or retail basis and not on a discounted or wholesale basis. Therefore, the record suggests that the private mortgage insurers knew or had reason to know that EPIC valued the properties that it purchased on a retail, rather than on a wholesale, basis. We do not mean to suggest that the private mortgage

insurers gave advance approval to the specific loans at issue in these cases or to any other loans but only that the private mortgage insurers knew that EPIC valued the properties on a retail basis.

Respondent argues that we should disregard the actions of the private mortgage insurers and secondary lenders on the ground that there is no evidence that the mortgage insurers and secondary lenders performed due diligence. Respondent argues that they "ignored or did not understand the realities of the EPIC transactions." We disagree. While the record does not show what due diligence was conducted by or on behalf of the secondary lenders, Dr. Hewitt's testimony and the material submitted with Dr. Hewitt's report confirm that the private mortgage insurers conducted due diligence with respect to the EPIC loans, including risk assessments, spot appraisals, and other forms of due diligence and, in fact, two companies, MGIC and CMAC, ceased insuring EPIC loans after spot appraisals disclosed values that were lower than the values shown on the EPIC's appraisals.

Retail Valuation of the Subject Properties

Respondent's appraisers valued the 26 single-family houses and the condominium unit at 4107 Medical Drive in the retail market. As discussed above, in the case of 19 of these properties the difference between respondent's value and the contract price of the property is not material. As to those properties, we have used respondent's values in comparing the aggregate fair market value of the properties to the aggregate principal amount of the debt. As to 8 of these 27 properties, as discussed above, we do not agree with respondent's appraisals and, for purpose of making the value comparison required in these cases, we accept the values established by the contemporaneous appraisals.

As to the 39 units of Paseos Castellanos purchased by EA 83-XII and the 40 units of the Reflections purchased by EA 84-III, respondent's appraisers used the wholesale market, rather than the retail market, to value the units. However, the aggregate retail value of the 39 units of Paseos Castellanos is implied in Mr. Mogul's appraisal report when he finds that the total retail sales potential of the units is $2,962,000. Similarly, the aggregate retail value of the 40 units of the Reflections is implied by Messrs. Dalton and Ramos in the memorandum that

accompanied their appraisal report when they referred to $3,000,000 as the "retail price" of the units. In comparing the aggregate fair market value of the properties to the aggregate principal amount of the debt, we shall use the retail values of the condominiums implied in the reports of respondent's appraisers.

The following schedules show the aggregate retail value of the properties purchased by each partnership as compared to the aggregate debt:

| EA 83-XII Properties | Loan | Value | Loan ÷ Value |
|---|---|---|---|
| 1612 Hemphill Ave. | $54,525 | $57,400 | 94.99 |
| 1921 W. 17th St. | 51,300 | 54,000 | 95.00 |
| 1728 Coronado Ave. | 51,300 | 54,000 | 95.00 |
| 1700 Linda Ave. | 54,050 | 56,900 | 94.99 |
| 1716 Coronado Ave. | 54,050 | 56,900 | 94.99 |
| 1916 Hollywood Dr. | 53,200 | 56,000 | 95.00 |
| 1720 Coronado Ave. | 56,425 | 59,400 | 94.99 |
| 2109 Avignon Dr. | 84,525 | 84,000 | 100.63 |
| 2111 Avignon Dr. | 85,025 | 85,000 | 100.03 |
| 2113 Avignon Dr. | 95,475 | 91,000 | 104.92 |
| 2115 Avignon Dr. | 95,475 | 100,500 | 95.00 |
| 2117 Avignon Dr. | 101,175 | 106,500 | 95.00 |
| Paseos Castellanos | 2,869,625 | 2,962,000 | 96.88 |
| Total | 3,706,150 | 3,823,600 | 96.93 |

| EA 84-XII Properties | Loan | Value | Loan ÷ Value |
|---|---|---|---|
| 5419 Heronwood Dr. | $51,300 | $58,000 | 88.45 |
| 5411 Heronwood Dr. | 61,750 | 65,000 | 95.00 |
| 3518 Tower Hill Lane | 60,550 | 63,750 | 94.98 |
| 12347 Northcliff Manor Dr. | 55,575 | 58,500 | 95.00 |
| 13066 Clarewood Dr. | 54,150 | 57,000 | 95.00 |
| 6351 S. Briar Bayou Dr. | 58,425 | 61,500 | 95.00 |
| 12103 Kings Lake Forest Dr. | 57,475 | 60,500 | 95.00 |
| 12107 Kings Lake Forest Dr. | 47,975 | 50,500 | 95.00 |
| 12111 Kings Lake Forest Dr. | 53,200 | 56,000 | 95.00 |
| 12115 Kings Lake Forest Dr. | 60,800 | 64,000 | 95.00 |
| 12231 Carola Forest Dr. | 56,050 | 54,000 | 103.80 |
| 4850 West Ferret Dr. | 67,450 | 71,200 | 94.73 |
| 4107 Medical Dr. | 56,950 | 56,400 | 100.98 |
| 13739 Earlywood Dr. | 60,800 | 57,600 | 105.56 |
| 6402 Ridgecreek Dr. | 60,800 | 55,950 | 108.67 |
| The Reflections | 2,590,200 | 3,000,000 | 86.34 |
| Total | 3,453,450 | 3,889,900 | 88.78 |

As shown above, on a retail basis, the aggregate fair market value of the subject properties exceeds the aggregate amount of the debt. Accordingly, on the basis of the record of these cases, we find that the debt incurred by each partnership in purchasing the subject properties is bona fide indebtedness.

Points Amortization

Both partnerships paid loan origination fees to EMI equal to 4 percent of the principal amounts of the first mortgage loans. This amounted to $148,246 in the case of EA 83-XII and $138,138 in the case of EA 84-III. These fees were nonrefundable and were similar in amount to origination fees charged by other lenders. As discussed above, they were paid in connection with bona fide indebtedness. Accordingly, we agree with petitioners that these fees are deductible ratably over the life of the first mortgage loans. See Von Muff v. Commissioner, T.C. Memo. 1983-514.

Profit Motive

Respondent determined in the subject notices of FPAA that the activity conducted by each partnership, EA 83-XII and EA 84-III, during each of the years in issue, was an "activity not engaged in for profit" within the

meaning of section 183.  Thus, in effect, respondent determined that the activity of each partnership was an "activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."  Sec. 183(c).

Petitioners do not contend that the partnerships are entitled to deductions under section 212.  Accordingly, we must redetermine whether EA 83-XII and EA 84-III are entitled to deductions under section 162 during the taxable years in issue.  See Brannen v. Commissioner, 722 F.2d at 704.

Section 162(a) provides for the deduction of all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.  See sec. 162(a).  It is settled that in order to constitute the carrying on of a trade or business under section 162(a), the activity must be entered into in good faith with the dominant hope and interest of realizing a profit.  See, e.g., Brannen v. Commissioner, supra at 704; Siegel v. Commissioner, 78 T.C. at 698.  As we have noted in many cases, the taxpayer must show that he or she had an "actual and honest objective of making a profit."  E.g., Marine v. Commissioner, 92 T.C. 958, 988 (1989); Hulter v. Commissioner, 91 T.C. 371, 392-393 (1988); Dreicer v.

Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). For this purpose, the term "profit" means economic profit independent of tax consequences. E.g., Ronnen v. Commissioner, 90 T.C. 74, 88 (1988); Herrick v. Commissioner, 85 T.C. 237, 255 (1985).

Generally, in the case of an activity to which section 183 applies, the deductions attributable to the activity are grouped into two categories: Those that would be allowable "without regard to whether or not such activity is engaged in for profit" and those that would be allowable "only if such activity were engaged in for profit." Sec. 183(b). Paragraph (1) of section 183(b) allows a taxpayer to take the deductions in the first category without limit, but paragraph (2) of section 183(b) limits the aggregate amount of the deductions in the second category, i.e., deductions which are allowable only if the activity is engaged in for profit, "to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Sec. 183(b)(2).

The depreciation deductions claimed by each partnership under section 167 are allowed only if the expenses were incurred in connection with an activity that constitutes a trade or business of the taxpayer.

See sec. 167(a)(1).  Thus, if section 183 applies to the activities of EA 83-XII and EA 84-III, the depreciation deductions would be subject to limitation under section 183(b)(2).

On the other hand, the interest deductions claimed by each partnership under section 163(a) are not subject to the trade or business requirement.  However, the notices of FPAA determined that the activity of neither partnership was engaged in for profit, with the result that "all interest expenses relative to this activity are not allowable as deductions against ordinary income, but are separately stated items subject to the investment interest limitations."  The notices of deficiency thus take the position that, if section 183 applies to the activities of each partnership, then the interest expense incurred with respect to the partnership's activities will be treated as interest on investment indebtedness and will be subject to the rules prescribed by section 163(d) limiting the allowable deduction before the limitation under section 183 is computed.  See sec. 1.183-1(b)(1)(i), Income Tax Regs.

In the case of a limited partnership, the profit motive determination under section 183 is made at the partnership level.  See, e.g., Brannen v. Commissioner, 722 F.2d 695 (11th Cir. 1984); Fox v. Commissioner, 80 T.C. 972

(1983); Feldman v. Commissioner, T.C. Memo. 1993-17, affd. 20 F.3d 1128 (11th Cir. 1994). Therefore, in the instant cases, we look to the actions of the general partner, EPIC, to determine whether both of the partnerships are subject to section 183.

The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. See sec. 1.183-2(a), Income Tax Regs. No one factor is determinative in making this determination. See sec. 1.183-2(b), Income Tax Regs. Greater weight is to be given to objective facts than to the taxpayer's statement of his or her interest. See sec. 1.183-2(a), Income Tax Regs.

As a preliminary matter, we note that none of the parties to these cases contends that either partnership conducted more than one activity. See generally sec. 1.183-1(d)(3), Income Tax Regs. For example, no party contends that the holding of the residential properties for appreciation and the renting of those properties by either partnership were separate activities for purposes of section 183.

The regulations list the following nine factors that should be taken into account in determining whether an

activity was engaged in for profit:  (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectations that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) any elements of personal pleasure or recreation.  See sec. 1.183-2(b), Income Tax Regs.

The properties purchased by EA 83-XII and EA 84-III were highly leveraged and produced operating losses.  The offering memorandum issued by each partnership disclosed the fact that the partnership would incur such operating losses and that the properties had to appreciate in value in order for an investor to realize a profit.  The offering memorandum issued for EA 83-XII projected a break-even appreciation rate of 7.99 percent, and the offering memo- randum for EA 84-III projected a break-even appreciation rate of 9.15 percent.  The appreciation rates required for a profit were high, but there is nothing in the record of

these cases to show that, as of the initiation of either partnership, such appreciation rates could not be achieved. For example, respondent's appraiser, Mr. Charles D. Brown, testified that in Houston, Texas, property values increased during 1981, 1982, and 1983, even though interest rates were increasing.  He testified that if interest rates had dropped, then the real estate market in Houston "would have gone even more ballistic."

Moreover, in an internal memorandum, prepared in late 1983 or early 1984, a member of EPIC's management noted that "since 1964, mortgage rates have averaged 2.75% above the inflation rate" and "appreciation rates have also averaged 2.09% above the inflation rate."  On the basis of these relationships, the memorandum concludes that EPIC's "partnerships could be expected to generate positive economic benefits".  The memorandum also notes that there have been periods, notably 1980, 1981, and 1982, when home price appreciation performed below average, relative to inflation and interest rates.

Respondent takes the position that neither EPIC nor any of its limited partnerships, including EA 83-XII and EA 84-III, ever intended to realize a profit.  Respondent's position is that EPIC formed EA 83-XII and EA 84-III and other limited partnerships in order to "satisfy its

ravenous appetite for funds necessary to support its real estate empire."  According to respondent, the centerpiece of EPIC's "scheme" involved overmortgaging the properties purchased by each partnership "by obtaining inflated, defective appraisals to support nominal purchase prices that permitted EPIC to generate substantial builder fees, rental deficit contributions, and rental advances".  Respondent also contends that EPIC's projected break-even appreciation rates of 7.99 percent and 9.15 percent "were approximately twice as high as the actual appreciation rates from 1980 to 1985" and that EPIC failed to disclose its inability to sell the properties of older partnerships, the adverse market conditions in the housing industry, the re-syndications of properties from "matured" partnerships into new properties, the use of defective appraisals to arrive at inflated values, the purchase of properties for partnerships from EPIC subsidiaries, the nature and use of the "sweep" account, and the payment and appraisal fee for property not purchased by EA 83-XII.  We disagree.

Under respondent's view of the facts, EPIC was interested only in obtaining lump-sum payments from new property acquisitions and the fees attributable to those new properties.  Respondent ignores the fact that EPIC's business of syndicating real estate partnerships depended

upon the perceived success of the limited partnerships that it syndicated. As a result, EPIC advanced a high percentage of the lump-sum payments and fees that it realized from the acquisition of new properties to satisfy the obligations of older partnerships, and thus to make sure that none of the partnerships defaulted on its obligations. In choosing to make those advances and prevent any default, the management of EPIC continued to believe that it could carry the properties until interest rates decreased and the real estate market turned around. Respondent also ignores the fact that EPIC was entitled to 25 percent of the net profits from the sale of properties, so-called back-end appreciation. Mr. Clayton McQuistion, an important member of EPIC's management, referred to this as "a gigantic profit opportunity".

Based upon the record of these cases, we find that EPIC, acting as the general partner of both EA 83-XII and EA 84-III, engaged in the activities of both partnerships with an actual and honest objective of making a profit.

## EPIC's Advances to EA 83-XII and EA 84-III

As mentioned above, respondent determined in the subject notices of FPAA that the deductions for interest claimed by each partnership with respect to the unsecured

advances made by EPIC were not allowed on the ground that any such interest expenses were not paid or accrued on bona fide indebtedness. Respondent cites Hambuechen v. Commissioner, 43 T.C. 90 (1964), and invites the Court to test whether the advances in this case are valid indebtedness in accordance with the holding of that case. Hambuechen involved an advance of money to a partnership by a limited partner. In that case, we noted that the question whether a transaction created a debtor-creditor relationship for tax purposes is a question of fact. See id. at 98. We applied the same factual analysis used to resolve debt-equity issues in the context of a corporation and its stockholders, and we held that the subject advance constituted a capital contribution, rather than a loan. See Kingbay v. Commissioner, 46 T.C. 147, 154-155 (1966).

Petitioners argue that the advances in this case constitute bona fide indebtedness rather than equity. In support of that argument, petitioners review each of the 13 factors that were taken into account by the court in Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972), in determining whether the advances in that case constituted debt or equity. Those factors are the following:

(1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement.

See also Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634 (11th Cir. 1984), affg. T.C. Memo. 1982-314, applying the same 13 factors.

Some of the above factors support respondent's position that the advances are equity.  For example, there was no fixed maturity date for repayment of the advances, and the only realistic source of repayment was from gains from the sale of partnership properties.  Furthermore, it is unlikely that either partnership could have obtained credit on the same basis from outside sources.

Other factors support petitioners' position that the advances are debt.  For example, the partnership agreement governing each partnership treats the unsecured advances as indebtedness, establishes an interest rate, and gives EPIC the right to collect payment of the advances from the

partnership. Furthermore, the advances were disproportionate to EPIC's interest in the partnership.

Certain other factors do not clearly indicate that the advances were either debt or equity. For example, EPIC did not receive increased management control over either partnership by reason of the advances, but, as general partner, EPIC already exercised full management control of both partnerships. Similarly, it appears that the advances were used for all partnership needs.

We believe that the weight of the evidence tips in favor of finding that the subject unsecured advances are equity when we consider the intent of the parties. In our view, EPIC's management placed these funds at the risk of the business and had no reasonable expectation of repayment without regard to the success of all of the partnerships. As discussed above, EPIC's management anticipated that EA 83-XII and EA 84-III would have surplus cash during their early lives but that each partnership eventually would incur operating deficits and would need to receive advances from EPIC in order to avoid defaults.

Other than the sale of a partnership's properties, a partnership had only four sources of cash to fund these operating deficits: Capital contributions by the limited partners, partnership income consisting primarily of rental

income, builder rebates, and general partner advances.
EPIC's management realized that its ability to remain in
business would be hurt if any of its limited partnerships
defaulted on an obligation. EPIC's management recognized
that EPIC had to advance funds to its partnerships. EPIC's
management also recognized that the advances would not
realistically be repaid until and unless the properties
were sold at a profit. An internal memorandum prepared
sometime after September 1983 states as follows:

> To the extent anticipated operating deficits are
> greater than depreciation (5.3% of purchase
> price), one half of this deficit must be funded
> by sources other than limited partner contribu-
> tions. To the extent we initially over-estimate
> partnership income in the offerings, all of the
> increased operating deficit will come from the
> general partner.

On the basis of the testimony at trial and the above, we
find that EPIC's advances to both partnerships were in the
nature of equity rather than indebtedness. Accordingly,
any "interest" attributable to such advances claimed as a
deduction by either partnership for any of the years in
issue is not allowable under section 163(a).

Sixteen Promissory Notes Each in the Principal Amount
of $5,000

As mentioned above, EA 84-III issued 16 promissory
notes payable to CSL each in the principal amount of $5,000
and dated February 1, 1985.  Each promissory note was
secured by a deed of trust also dated February 1, 1985, in
favor of CSL.  Eleven of the deeds of trust purport to have
been filed on September 6, 1985, with the County Clerk of
Harris County, Texas.  Five of the deeds of trust do not
appear to have been filed.

In the bankruptcy filing that was made on behalf of EA
84-III, CSL is listed as a secured creditor with respect to
16 promissory notes in the aggregate amount of $80,000.
The filing also states that accrued interest in the amount
of $4,000 is payable to CSL as a secured creditor.

At trial, respondent introduced appraisals of the
subject 16 properties as of February 1, 1985, and
respondent argues on brief that the appraisals demonstrate
that the value of the underlying properties declined or did
not appreciate enough to support the new debt.  Set out
below is a list of the 16 properties that shows the sum of
the original purchase money indebtedness, plus $5,000, the
value of each such property on February 1, 1985, as

determined by respondent's appraisers, and the difference

between those amounts:

| EA 84-111 Properties | Loan + $5,000 | Value 2/1/85 | Difference |
|---|---|---|---|
| 5419 Heronwood Dr. | $56,300 | $55,000 | -$1,300 |
| 5411 Heronwood Dr. | 66,750 | 62,000 | -4,750 |
| 3518 Tower Hill Lane | 65,550 | 50,000 | -15,550 |
| 12347 Northcliff Manor Dr. | 60,575 | 42,000 | -18,575 |
| 13066 Clarewood Dr. | 59,150 | 46,000 | -13,150 |
| 6351 S. Briar Bayou Dr. | 63,425 | 45,000 | -18,425 |
| 12103 Kings Lake Forest Dr. | 62,475 | 44,000 | -18,475 |
| 12107 Kings Lake Forest Dr. | 52,975 | 36,000 | -16,975 |
| 12111 Kings Lake Forest Dr. | 58,200 | 38,000 | -20,200 |
| 12115 Kings Lake Forest Dr. | 65,800 | 48,000 | -17,800 |
| 12231 Carola Forest Dr. | 61,050 | 50,000 | -11,050 |
| 4850 West Ferret Dr. | 72,450 | 74,287 | 1,837 |
| 4107 Medical Dr. | 61,950 | 58,846 | -3,104 |
| 13739 Earlywood Dr. | 65,800 | 60,098 | -5,702 |
| 6402 Ridgecreek Dr. | 65,800 | 58,324 | -7,476 |
| The Reflections, unit 101 | 69,755 | 54,790 | -14,965 |
| Total | 1,008,005 | 822,345 | -185,660 |

In the case of the property at 4850 West Ferret Drive,
it appears, according to respondent's evidence, that the
value of the property as of February 1, 1985, $74,287,
exceeds the amount of the indebtedness, $72,450.
Accordingly, it appears that respondent's evidence shows
that the second trust note secured by that property was
valid indebtedness. Furthermore, in the case of the
properties at 5419 Heronwood Drive, 5411 Heronwood Drive,
4107 Medical Drive, and 13739 Earlywood Drive, the
difference reflected in respondent's appraisals is not
material.

Petitioners presented no evidence to substantiate the fair market value of any of the subject properties as of February 1, 1985. Petitioners argue that the 16 promissory notes are, in fact, "unsecured debt" and are bona fide indebtedness without regard to the value of the property. Initially, petitioners argued that "the promissory notes were not recorded until after the bankruptcy filing", and thus the notes had "no substance in the eyes of the bankruptcy court." On the basis of that premise, petitioners argued: "respondent should not be allowed to rely upon defective documents to assert that those notes represented secured debt". Petitioners further argued that the notes should be treated as unsecured debt "indistinguishable from the unsecured advances which they replaced."

In their reply brief, petitioners withdrew the factual assertion that the 16 promissory notes replaced unsecured advances made by EPIC. They continue to take the position that the validity of the notes should be determined without regard to the value of the 16 properties in 1985 for either of two reasons. First, petitioners argue that the notes were related to "an $80,000 line of credit from Community" that is described in respondent's brief as "a nonrecourse line of credit with Community [CSL] totalling $80,000

secured by notes of limited partners", and thus petitioners contend that the 16 promissory notes were "adequately secured" without regard to the value of the real estate. Second, they argue that "the real estate was never legal security for the promissory notes; therefore, the value of the real estate in 1985 is irrelevant." We disagree.

Each of the 16 promissory notes states that it "is the Note described in and secured by a Deed of Trust dated February 1, 1985, on property located in HARRIS COUNTY, State of TEXAS", and each note sets forth the address of the property. Each related deed of trust provides a legal description and an address of the property securing the note. Those documents are complete in and of themselves and make no reference to "an $80,000 line of credit from Community". In form, each of the 16 promissory notes purports to be secured by one of the 16 properties. Furthermore, petitioners do not take issue with the premise of respondent's argument that each of the 16 promissory notes that was issued by EPIC, the general partner of each partnership, to CSL, an affiliated savings and loan associate, is a nonrecourse obligation. Accordingly, we agree with respondent that none of the promissory notes can be treated as bona fide indebtedness unless petitioners prove that the amount of the debt does not unreasonably

exceed the value of the property securing it. See, e.g., Brannen v. Commissioner, 722 F.2d 695 (11th Cir. 1984); Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976).

As mentioned above, petitioners introduced no evidence of the value of any of the properties as of February 1, 1985. There is no evidence to show that the fair market values of the properties on February 1, 1985, exceed the aggregate indebtedness secured by the property at that time, except in the case of the property at 4850 West Ferret Drive, as to which respondent's evidence shows that the fair market value exceeds the amount of the debt, and except in the case of the properties at 5419 Heronwood Drive, 5411 Heronwood Drive, 4107 Medical Drive, and 13739 Earlywood Drive, as to which the discrepancies between the fair market value of the property and the amount of the debt are negligible. Accordingly, we hereby sustain respondent's adjustment disallowing any interest deduction claimed by EA 84-III on its 1985 return attributable to the remaining 11 promissory notes payable to CSL issued by EA 84-III on February 1, 1985.

To reflect the foregoing,

Decisions will be entered

under Rule 155.

**Appendix A**

EPIC Associates 83-XII
Schedule D--Pro Forma
Cash-Flow and Taxable Income (Loss) Analysis
Through June 30, 1987

| Application of Funds | 1983 | 1984 | 1985 | 1986 | 1987 | Total |
|---|---|---|---|---|---|---|
| Annual Cash-Flow | | | | | | |
| Rental Income[1] | | | | | | |
| Interest income | $229,517.00 | $325,246.14 | $333,247.08 | $356,488.68 | $186,475.74 | $1,430,974.63 |
| Interest income | 17,877.95 | 17,533.96 | 6,660.78 | -0- | -0- | 42,072.68 |
| Less: First mortgage payments[2] | 386,822.00 | 546,101.64 | 546,101.64 | 546,101.64 | 273,050.82 | 2,298,177.74 |
| Additional interest payments[3] | -0- | -0- | -0- | 5,111.18 | 7,487.36 | 12,598.54 |
| Taxes | 34,859.01 | 51,516.95 | 55856.44 | 59,926.95 | 30,981.10 | 233,140.45 |
| Insurance | 15,229.20 | 22,467.54 | 24,402.55 | 26,337.55 | 13,652.53 | 102,089.36 |
| Audit fees | 3,454.27 | 4,876.62 | 4,876.62 | 4,876.62 | 2,438.31 | 20,522.44 |
| Maintenance and repairs[4] | 12,095.85 | 19,059.93 | 21,811.80 | 23,348.69 | 12,058.57 | 88,374.84 |
| Property administration fee | 21,675.00 | 30,600.00 | 30,600.00 | 30,600.00 | 15,300.00 | 128,775.00 |
| | | | | | | |
| Net cash-flow from operations | -226,740.38 | -331,842.58 | -343,741.19 | -339,813.95 | -168,492.94 | -1,410,631.04 |
| | | | | | | |
| Taxable Income (loss) analysis | | | | | | |
| Net cash-flow from operations | -226,740.38 | -331,842.58 | -343,741.19 | -339,813.95 | -168,492.94 | -1,410,631.04 |
| Plus: Mortgage amortization | -0- | -0- | -0- | -0- | -0- | -0- |
| Other income recognized[5] | -0- | -0- | -0- | -0- | -0- | -0- |
| Less: Depreciation | 122,625.76 | 173.118.72 | 173,118.72 | 173,118.72 | 86,559.36 | 728,541.28 |
| Amortization of mortgage loan fee | 11,808.84 | 16,671.30 | 16,671.30 | 16,671.30 | 8,335.65 | 70,158.38 |
| Accrued mortgage interest | -0- | -0- | -0- | -0- | -0- | -0- |
| | | | | | | |
| Net taxable income | -361,174.98 | -521,632.60 | -533,531.21 | -529,603.97 | -263,387.95 | -2,209,330.71 |

[1] It is assumed that the Raldon Corp. leases will terminate June 30, 1984. It is assumed that after builder lease terminations, all properties will be rented out to individuals at 8-percent market value. In order to project the market of value the properties at the time they are rented out, it is assumed they will appreciate 9 percent per year. For all rentals to individuals, projected income is reduced by 20 percent to allow for vacancies and rental commissions.

[2] Loan payments are not expected to increase within the period of these projections.

[3] Fifteen percent per year on net advances to the partnership. The amount decreases at the beginning of each quarter by the amount of the quarterly investment minus the Organization Fee. It increases during the year by the amount of the negative cash-flow. To the extent EPIC owes the partnership money, interest will be paid at 12 percent per year.

[4] While the houses are leased to the builder, the builder is responsible for all maintenance and repairs. Thereafter, it is assumed that these payments will amount of 0.5 percent per year of the original purchase price.

[5] Not applicable to this partnership.

## Appendix B

EPIC ASSOCIATES 84-III
Schedule D--Pro Forma
Cash-Flow and Taxable Income (Loss) Analysis
October 1, 1983 Through December 31, 1987

| Application of funds<br>Annual cash-flow | 1983 | 1984 | 1985 | 1986 | 1987 | Total |
|---|---|---|---|---|---|---|
| Gross rental income from individuals | $83,640 | $294,341 | $315,619 | $338,435 | $362,901 | $1,394,936 |
| Less: Rental commissions | 5,305 | 27,885 | 25,250 | 27,075 | 29,032 | 114,547 |
| Vacancy | -0- | 69,169 | 37,874 | 40,612 | 43,548 | 191,203 |
| Net rental income from individuals[1] | 78,335 | 197,287 | 252,495 | 270,748 | 290,321 | 1,089,186 |
| Interest income on partnership funds | | | | | | |
| Lent to EPIC | 5,937 | 6,888 | -0- | -0- | -0- | 12,824 |
| Less: First mortgage payments[2] | 128,155 | 504,374 | 502,217 | 502,217 | 502,217 | 2,139,182 |
| Interest expenses on funds lent by | | | | | | |
| EPIC to the partnership[3] | -0- | 2,325 | 24,056 | 53,197 | 80,733 | 160,312 |
| Taxes | 20,003 | 73,836 | 79,274 | 85,004 | 91,149 | 349,266 |
| Insurance | 3,620 | 10,705 | 9,299 | 9,972 | 10,693 | 44,289 |
| Home owner association dues | 333 | 2,069 | 4,359 | 4,674 | 5,012 | 16,446 |
| Audit fees | 1,250 | 4,986 | 4,946 | 4,946 | 4,946 | 21,074 |
| Maintenance and repairs[4] | 10,225 | 49,170 | 21,597 | 23,158 | 24,832 | 139,359 |
| Miscellaneous | 5,444 | -0- | -0- | -0- | -0- | 5,444 |
| Property administration fee | 8,250 | 33,000 | 33,000 | 33,000 | 33,000 | 140,250 |
| Net cash-flow from operations | -103,384 | -476,291 | -426,253 | -445,421 | -462,262 | -1,913,611 |
| Taxable income (loss) analysis | | | | | | |
| Net cash-flow from operations | -103,384 | -476,291 | -426,253 | -445,421 | 462,262 | -1,913,611 |
| Less: Depreciation | 42,686 | 170,741 | 170,742 | 170,742 | 170,742 | 725,653 |
| Amortization of mortgage loan fee | 3,453 | 13,814 | 13,814 | 13,814 | 13,814 | 58,709 |
| Net taxable income | -149,524 | -660,846 | -610,809 | -629,976 | -646,818 | -2,697,972 |

[1] The year 1983 and the first three quarters of 1984 contain actual operating history; thereafter, it is assumed that the rent will increase 7 percent per year.  During the period that the properties are assumed to be rented to individual tenants, projected income is reduced by 8 percent to allow for rental commissions and 12 percent yearly to allow for vacancies.

[2] Loan payments are not expected to increase during this period.

[3] Fifteen percent per year on net advances by EPIC to the partnership.  The amount decreases at the beginning of each quarter by the amount of the quarterly investment minus the Organization Fee.  It increases during the year by the amount of the negative cash-flow.  To the extent EPIC owes the Partnership money, interest will be paid at 12 percent per year.

[4] It is assumed that these expenses will amount to 0.5 percent per year of current property value.